# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

City of Moundridge, Kansas, *et al.,*

        Plaintiffs,

    v.

Exxon Mobil Corporation, *et al.,*

        Defendants.

Case No. 1:04CV00940
Judge Richard W. Roberts

---

## MEMORANDUM BY PLAINTIFFS IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

---

Charles F. Wheatley, Jr. #121533
John F. Woods #234310
James F. Fairman #14464
WHEATLEY & RANQUIST, P.A.
34 Defense Street
Annapolis, MD 21401
(410) 266-7524
(301) 261-8608 (Washington, DC line)
(301) 261-8699 (fax)
wheatlaw@aol.com

Robert C. Huntley
HUNTLEY PARK, L.L.P.
250 S. 5th Street, Suite 660
P.O. Box 2188
Boise, ID 83702
(208) 388-1230
(208) 388-0234 (fax)

*Attorneys for Plaintiffs*

November 19, 2004

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iii

INTRODUCTION............................................................................................................2

BACKGROUND..............................................................................................................4

I.   DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT UNDER
     RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE
     WITHOUT DISCOVERY ARE IMPROPER. ...........................................................8

     A.   The Basic Standards Set by the U.S. Supreme Court Preclude Dismissal
          Under Rule 12(b)(6) Where Disputed Issues of Fact and Law Are Involved....8

     B.   The High Standard for Dismissal Under Rule 12(b)(6) Is Even Higher
          in Antitrust Cases, Because the Statutes Rely on Private Suits to Help
          Enforce the Antitrust Laws and Because the Evidence Proving the
          Allegations Is Often in the Hands of the Defendant. ......................................11

II.  DEFENDANTS HAVE CONSPIRED TO FIX NATURAL GAS PRICES
     IN THE UNITED STATES IN VIOLATION OF SECTION I OF THE
     SHERMAN ACT. ..................................................................................................13

III. THE DEFENDANTS VIOLATED SECTION 2 OF THE SHERMAN ACT. ........17

IV.  THE DEFENDANTS VIOLATED SECTION 2 OF THE CLAYTON ACT
     (ROBINSON-PATMAN ACT). .............................................................................21

V.   THE FILED RATE DOCTRINE DOES NOT PROVIDE ANTITRUST
     IMMUNITY TO DEFENDANTS. ..........................................................................22

     A.   The *Otter Tail* Case......................................................................................22

     B.   Congress Has Confirmed in the 1992 Energy Policy Act That FERC
          Lacks Jurisdiction to Modify, Impair, or Supersede the Antitrust Laws. ........24

     C.   The FERC Has Ruled That It Has No Jurisdiction to Regulate Wellhead
          Sales of Natural Gas.......................................................................................24

VI.  THE NPC IS NOT A "FEDERAL INSTRUMENTALITY" IMMUNE FROM
     LIABILITY UNDER THE ANTITRUST LAWS. ...................................................24

VII. THE NOERR-PENNINGTON DOCTRINE IS NOT A BAR TO PLAINTIFFS'
     ANTITRUST CLAIMS. .........................................................................................27

VIII. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED ANTITRUST INJURY
AND HAVE STANDING TO BRING THIS CASE.................................................31

    A.    The Plaintiffs Have Properly Alleged Antitrust Injury....................................31

    B.    Plaintiffs' Allegations Show That They Have Antitrust Standing...................32

IX.   NEITHER THE STATUTE OF LIMITATIONS NOR CLAIM OF
NO PERSONAL JURISDICTION APPLY................................................................36

    A.    The Statute of Limitations..................................................................................36

    B.    The Claim of No Personal Jurisdiction in This Court by One Defendant
Is Defective. ......................................................................................................36

CONCLUSION ...............................................................................................................38

CERTIFICATE OF SERVICE ........................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Pan American World Airways, Inc.*, 828 F.2d 24 (D.C. Cir. 1987),
 *cert. denied*, 485 U.S. 961 (1988) ................................................................... 35

*Albrecht v. The Herald Co.*, 390 U.S. 145 (1968) ........................................... 16

*\*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) ...... 29

*\*American Tobacco Co. v. U.S.*, 328 U.S. 781(1946) ...................................... 18

*\*Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001),
 *cert. denied*, 535 U.S. 931 (2002) .................................................... 31, 32, 35

*\*Arizona v. Maricopa County Medical Society, et al.*, 457 U.S. 332 (1982) .................. 16

*\*Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981) ............................ 23

*\*Associated General Contractors v. California State Council of Carpenters*,
 459 U.S. 519 (1983) ..................................................................... 20, 35

*\*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) .................... 13

*Borough of Lansdale v. Philadelphia Electric Co.*, 692 F.2d 307 (3d Cir. 1981) ............. 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ....................... 31

*Burch v. Goodyear Tire and Rubber Co.,* 420 F. Supp. 82, *aff'd*, 554 F.2d 633
 (4th Cir. 1976) ................................................................... 11

*\*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) ..................... 31

*Caribbean Broad. Sys. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998) ......... 13

*\*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) ............................. 16

*City of Chanute v. Kansas Gas & Electric Co.*, 754 F.2d 310 (10th Cir. 1985) .............. 21

*\*City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365 (1991) ..................... 27

*\*City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921 (2nd Cir. 1981) .......... 20

*\*City of Kirkwood v. Union Electric Co.*, 671 F.2d 1173 (8th Cir. 1981),
 *cert. denied*, 459 U.S. 1170 ................................................. 20, 22, 25

*City of Mishawaka v. Indiana and Michigan Electric Co.*, 560 F.2d 1314
(7th Cir. 1977), *cert. denied*, 436 U.S. 922 (1978) .......................................................20

*Collins v. International Dairy Queen*, 59 F. Supp. 2d 1305 (M.D. Ga. 1999) ...............34

*Concord v. Boston Edison Co.*, 676 F. Supp. 396 (D. Mass. 1988 ...................................22

*Conley v. Gibson*, 355 U.S. 41 (1957) .................................................................3, 9, 12

Continental Orthopedic Appliances v. Health Ins. Plan of Greater N.Y.,
956 F. Supp. 367 (E.D.N.Y. 1997) ...............................................................................13

*Dart Drug Corp. v. Peoples Drug Store, Inc.*, Civil Action No. 76-0476,
1977 U.S. Dist. LEXIS 17439, *3 (D. D.C. Feb. 9, 1977) ..........................................12

*Dee-K Enters., Inc. v. Heveafil SDN. Bhd.*, 982 F. Supp. 1138 (E.D. Va. 1997) .............33

*Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148
(5th Cir. 1992), *cert. denied*, 506 U.S. 107 ..................................................................10

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) .......................................................................................................28

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)..................10

*Elwood City v. Pennsylvania Power Co.*, 570 F. Supp. 553 (W.D. Pa. 1983)..................22

*Ethyl Gasoline Corp. v. United States*, 309 U.S. 436 (1940)..........................................18

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir. 1980)..................34

FPC v. Sierra Pacific Power Co., 350 U.S. 348 (1956) ....................................................23

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003),
*cert. denied*, 124 S.Ct. 355 (2003) ...............................................................................32

*FTC v. Super. Ct. Trial Lawyers Assn.*, 493 U.S. 411 (1990)....................................28, 29

*Gainesville v. Florida Power & Light Co.*, 488 F. Supp. 1258 (S.D. Fla. 1980) ..............22

*General Aircraft Corp. v. Air America, Inc.*, 482 F. Supp. 3 (D. D.C. 1979)..................30

*Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) ....................................10

Greensboro Lumber Co. v. Georgia Power Co., 844 F.2d 1538 (11th Cir. 1988) ...........26

H.R.M. Inc. v. Tele-Communications, Inc., 653 F. Supp. 645 (D. Colo. 1987).................11

*Hartford-Empire Co. v. U.S.*, 323 U.S. 386 (1945), *supplemented* 324 U.S. 570 ..........19

*Hoover v. Ronwin*, 466 U.S. 558 (1984) ....................................................... 12

*Hospital Bldg. Co. v. Trustees of Rex Hospital*, 511 F.2d 678 (4th Cir. 1975),
    *rev'd on other grounds*, 425 U.S. 738 (1976) ................................................ 13

*Hughes Automotive Inc. v. Mid-Atlantic Toyota Distributors, Inc.*,
    543 F. Supp. 1056  (D. Md. 1982) ................................................................ 11

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ..................................... 32, 34

*In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355 (D. N.J. 2001) ................. 33

*Jenkins v. McKeithen*, 395 U.S. 411 (1969) ............................................... 3, 9

*Jewish Hosp. Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971 (6th Cir. 1980),
    *cert. denied*, 450 U.S. 966 (1981) ............................................................ 33

*Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir. 1980) ....................................... 12

*Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991),
    *cert. denied,* 501 U.S. 1222 (1991) .......................................................... 12

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211 (1951) ............... 16

*KWF Industries, Inc. v. American Tel. & Tel. Co.*, 592 F. Supp. 795
    (D. D.C. 1984) ........................................................................ 13, 36

*Lawrence v. The National Westminster Bank,* 98 F.3d 61 (3d Cir. 1996) ..................... 10

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*,
    507 U.S. 163 (1993) ............................................................................ 12

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998). 32

*Maty v. The Grasselli Chemical Co.*, 303 U.S. 197 (1937) .................................... 9

*McCoy v. Major League Baseball*, 911 F. Supp. 454 (W.D. Wash. 1995) ....................... 11

*Metcalf v. National Petroleum Council*, 553 F.2d 176 (D.C. Cir. 1977) ...................... 25

*Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984) ................................. 17

*Monument Builders of Greater Kansas City, Inc. v. American Cemetery Assn. of Kansas*,
    891 F.2d 1473 (10th Cir. 1989), *cert. denied*, 495 U.S. 930 (1990) .......................... 19

*National Gerimedical Hospital & Gerontology Center v. Blue Cross*,
    452 U.S. 378 (1981) ............................................................................ 27

*National Used Car Market Report, Inc. v. National Automobile Dealers Ass'n et al.*,
  200 F.2d 359 (D.C. Cir. 1952) ...................................................................12

*\*New York, et al. v. FERC, et al.*, 535 U.S. 1, 9 n.6 (2002) ........................................22, 23

*Newman v. Universal Pictures,* 813 F.2d 1519 (9th Cir. 1987)....................................10

North Carolina *ex rel. Edmisten v. P.I.A. Asheville, Inc.*, 740 F.2d 274 (4th Cir. 1984)...25

*\*Northern Securities Co. v. U.S.*, 193 U.S. 197 (1904) ....................................................18

*\*Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973)...................................19, 23

*Parker v. Brown*, 317 U.S. 341 (1943) ............................................................................26

*\*Perkins v. Standard Oil Co.*, 395 U.S. 642 (1969) .........................................................22

Permian Basin Area Rate Cases, 390 U.S. 747 (1968) ....................................................23

*Perrington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369 (10th Cir. 1979) .........10

*Poller v. Columbia Broadcasting Company System, Inc.*, 368 U.S. 464 (1962) ...............10

*Poster Exchange, Inc. v. Nat'l Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975) ........36

*Rankin County Cable Vision v. Pearl River Valley Water Supply District*,
  692 F. Supp. 691 (S.D. Miss. 1988).............................................................................22

*\*Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995),
  *cert. denied*, 516 U.S. 987 (1995) ................................................................................19

*Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289 (1973)..................................................26

*Rolite v. Wheelabrator Env. Sys., Inc.*, 958 F. Supp. 992 (E.D. Pa. 1997) .......................13

*\*Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980).............32, 33

*\*Sanner v. Chicago Bd. of Trade*, 62 F.3d 918 (7th Cir. 1995).........................................12

*\*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .............................................................3, 9, 12

*Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110 (1948),
  *petition denied*, 334 U.S. 831 (1948).........................................................................19

*Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367 (3d Cir. 1985) .........................22

*\*Sinclair v. Kleindienst*, 711 F.2d 291 (D.C. Cir. 1983) ..................................................13

*Southern Motor Carriers Rate Conference, Inc. v. United States*,
   471 U.S. 48 (1985) .................................................................................. 25, 26

*Standard Oil Company v. United States*, 221 U.S. 1 (1911) ................................. 2

*Stelwagon Mfg. Co. v. Tarmack Roofing Sys.*, 63 F.3d 1267 (3rd Cir. 1995) ................... 22

*\*Superior Court Trial Lawyers Ass'n v. F.T.C.*, 856 F.2d 226 (D.C. Cir. 1988),
   *cert. granted*, 490 U.S. 1019 (1989), *reversed in part*, 493 U.S. 411 (1990) ......... 28, 29

*\*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) ................................................ 12

*\*Swift & Co. v. United States*, 196 U.S. 375 (1905) ......................................... 18

*\*Texaco, Inc. v. Hasbrouck*, 496 U.S. 543 (1990) ........................................... 21

*\*Thomas v. Network Solutions, Inc.*, 176 F.3d 500 (D.C. Cir. 1999),
   *cert. denied* 528 U.S. 1115 (2000) ............................................................ 25

*Three Crown Ltd. P'ship v. Salomon Bros.*, No. 92 Civ. 3142,
   1995 U.S. Dist. LEXIS 9961 (S.D.N.Y. 1995) ............................................... 34

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123 (3d Cir. 1994) ..... 10

*\*U.S. v. Griffith*, 334 U.S. 100 (1948) ....................................................... 18

*U.S. v. Yellow Cab Co.*, 332 U.S. 218 (1947) ................................................ 19

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965) ................................... 27

*\*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ........................... 25

*\*United States v. Philip Morris USA, Inc.,* 337 F. Supp. 2d 15 (D. D.C. 2004) ......... 28, 30

*\*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ........................... 15

*United States v. Topco Associates*, 405 U.S. 596 (1972) ..................................... 2

*United States v. Trenton Potteries*, 273 U.S. 392 (1927) .................................... 18

*\*Whelan v. Abell* , 48 F.3d 1247 (D.C. Cir. 1995) ........................................... 30

*Yeager's Fuel, Inc., et al. v. Pennsylvania Power & Light Company, et al.*,
   953 F. Supp. 617 (E.D. Pa. 1997) ............................................................ 22

*Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100 (1969) ........................... 31

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) ..................... 36

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F. Supp. 1246 (E.D. Pa. 1980) ..35

**Statutes**

Clayton Act, 15 U.S.C. § 13 (Robinson-Patman Act) .................................................passim

Energy Policy Act of 1992, 16 U.S.C. § 824k ....................................................................24

Federal Advisory Committee Act of 1972 ("FACA"), 5 U.S.C. § 2 ...........................24, 25

Federal Power Act, 16 U.S.C. 7 § 824 *et al.* ..............................................................19, 23

National Health Planning and Resource Act of 1974, 42 U.S.C. § 300b .........................27

Natural Gas Act, 15 U.S.C. § 717 *et seq.* ...................................................................22, 23

Sherman Act, 15 U.S.C. § 1 ...................................................................................passim

Sherman Act, 15 U.S.C. § 2 .....................................................................3, 17, 19, 20

Wellhead Decontrol Act (PL101-60), 103 Stat. 157 (1989),
     15 U.S.C. § 3431(a) .....................................................................................6, 7, 22, 24

**Rules**

Fed.R.Civ.P. 12(e)...........................................................................................................13

**Treatises**

2 Phillip E. Areeda, Herbert Hovenkamp & Roger D. Blair, *Antitrust Law* ¶ 339 (2d. ed.
     2000) .........................................................................................................29, 36

**Regulatory Cases**

*National Association of Gas Consumers v. All Sellers of Natural Gas*, 106 FERC ¶ 61,072
     (2004)................................................................................................................24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

City of Moundridge, Kansas
City of Winfield, Kansas
City of Coffeyville, Kansas
City of Denison, Kansas
City of Garnett, Kansas
City of Greensburg, Kansas
City of Halstead, Kansas
City of Humboldt, Kansas
City of Iola, Kansas
City of La Cygne, Kansas
City of Macon, Missouri
City of Minneapolis, Kansas
City of Osage City, Kansas
City of Rensselaer, Indiana
City of Sabinal, Texas,                                   Case No. 1:04CV00940
City of Shelbina, Missouri,                               Judge Richard W. Roberts
City of Stonington, Illinois, and
City of Wellington, Kansas,

        Plaintiffs,

   v.

Exxon Mobil Corporation,
BP America, Inc.,
Coral Energy Resources, L.P.,
Chevron Texaco Corporation, and
ConocoPhillips Corporation,

        Defendants.

## MEMORANDUM BY PLAINTIFFS IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiffs, Cities of Moundridge, Kansas, *et al.*, consisting of 18 municipal natural gas distribution systems located in five states (Kansas, Illinois, Indiana, Missouri, and Texas), submit this memorandum in opposition to the motions to dismiss filed by defendants, consisting of five major companies owning and engaged in the production and

sale at the wellhead of over 70% of the natural gas available for use in the United States. Plaintiffs submit that defendants' motions, designed to preclude any discovery and trial as to plaintiffs' allegations of anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act and Section 2 of the Clayton Act, resulting in a tripling of prices for natural gas, should be denied.

## **INTRODUCTION**

The present case seeks enforcement of the federal antitrust laws under the Sherman Act, passed by Congress in 1890 chiefly in response to extensive anticompetitive conduct of certain large energy companies, *Standard Oil Company v. United States*, 221 U.S. 1 (1911), and by the Clayton Act of 1914. The Supreme Court has recognized that the antitrust laws are of major importance to the economic well-being of the United States:

> Antitrust laws in general and the Sherman Act in particular are the Magna Carta of free enterprise. They are as important in our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedom.

*United States v. Topco Associates*, 405 U.S. 596, 610 (1972).

The defendants in their separate motions allege a number of different and sometimes disparate grounds in support of their motion for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] Plaintiffs will seek to identify and answer all of their arguments in this memorandum.

The plaintiffs first set forth the guiding principles emanating from a long line of Supreme Court cases that the Federal Rules of Civil Procedure "do not require a claimant

---

[1] Two of the original defendants, BP, p.l.c. and Royal Dutch/Shell Group, originally objected to the jurisdiction of the Court, but have waived these claims based on the amended complaint naming BP America, Inc. and Coral Energy Resources, LP. BP, p.l.c. did not amend its original motion to dismiss filed August 13, 2004 after the Amended Complaint was accepted, but has conceded that this Court has jurisdiction over BP America, Inc., now named as a defendant. Chevron Texaco does claim no personal jurisdiction has been established, on the ground that it is a "holding company," but states it will request plaintiffs to further amend their complaint to name a subsidiary that conducts natural gas operations. Br. at 3, fn.3. Plaintiffs address this in Section IX, *infra*.

to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is a 'short and plain statement of the claim' and that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim…" *Conley v. Gibson*, 355 U.S. 41 at 45-48 (1957); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) and *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).

Second, the plaintiffs will demonstrate that the allegations of the complaint present a proper claim of violations by the defendants of Section 1 of the Sherman Act for price-fixing, which has resulted in large increases in the price of natural gas, damaging the plaintiffs.

Third, the plaintiffs will demonstrate that the complaint alleges a proper claim that defendants have conspired to monopolize the natural gas market in the United States by withholding gas at the wellhead to thereby improperly drive up the price, in violation of Section 2 of the Sherman Act.

Fourth, the plaintiffs will demonstrate that the complaint set forth a proper claim that defendants have violated Section 2 of the Clayton Act (the Robinson-Patman Act) by discriminating against plaintiffs by charging them high prices for natural gas at wholesale for their municipal systems, while selling natural gas at lower prices directly to retail customers.

Fifth, one of defendants improperly claims immunity from the federal antitrust laws under the "filed rate doctrine" based on asserted jurisdiction of the Federal Energy Regulatory Commission ("FERC") over wellhead gas.[2]

Sixth, two defendants improperly claim that they are immune from the federal antitrust laws because their anticompetitive conduct was undertaken by them in relation to

---

[2] Coral Energy Resources, L.P.

reports for the National Petroleum Council, a claimed "federal instrumentality."[3]

Seventh, three of the defendants improperly claim immunity from the federal antitrust laws on the ground that as long as they are seeking legislative goals, they are free to fix prices and monopolize with impunity from the antitrust laws under the *Noerr-Pennington* doctrine.[4]

Eighth, three defendants improperly assert antitrust immunity based on claims that the plaintiffs lack standing to sue under the federal antitrust laws.[5]

Ninth, this Court has jurisdiction of Chevron Texaco.

## BACKGROUND

The facts of the case alleged in the complaint, consistent with the Federal Rules of Civil Procedure as prescribed in *Conley*, establish violations of sections 1 and 2 of the Sherman Act and Section 2 of the Clayton Act. These are specifically set forth in the context of the applicable legal standards for compliance with those provisions of the federal antitrust laws established by the Supreme Court and other federal courts, in sections II, III, and IV of this memorandum, *infra*.

The background of events leading to the present complaint is as follows:

On December 15, 1999, the National Petroleum Council ("NPC", "the Council")[6] issued a report entitled "Meeting the Challenges of the Nation's Growing Natural Gas Demand" (the "1999 Report") to the U.S. Secretary of Energy, Hon. Bill Richardson. The Secretary had requested the Council "to reassess its 1992 report, taking into account the past five years' experience…that will affect the potential for natural gas in the United States to 2020 and beyond." The Secretary stated that: "For a secure energy future,

---

[3] Chevron Texaco Corporation, ConocoPhillips Corporation.

[4] Chevron Texaco Corporation, ConocoPhillips Corporation, BP America, Inc.

[5] Chevron Texaco Corporation, ConocoPhillips Corporation, BP America, Inc.

[6] The Council is primarily comprised of representatives of the natural gas industry, including the defendants in this case. The companies paid for their participation in the report.

Government and private sector decision-makers need to be confident that industry has the capability to meet potentially significant increases in future natural gas demand."

The 1999 Report stated that the actual price of natural gas for 1991-1998 averaged $1.97 per MMBtu (1 million British thermal units) and was $1.99 during 1999.

The 1999 Report also stated that the natural gas resource base for the United States as of 1999 was 1,466 TCF (trillion cubic feet) excluding Alaska. This represented a net increase of 171 TCF in available proved resources over the 1,295 TCF contained in the 1992 Report. Taking into account the 124 TCF that had been produced in the lower 48 states since 1992, the resource base had increased 23% since the 1992 Report. The 1999 Report projected increased natural gas usage in the United States of 7 TCF, from the 22 TCF level in 1999 to 29 TCF by 2010. It projected that "the natural gas demand will be met primarily with domestic resources," with highest growth from the Gulf of Mexico (33%) and the Rockies (14%).

Not only did the proved reserves of natural gas available in the lower 48 states substantially increase in the seven-year period from 1992 to 1999, the available proved reserves in 1999 of 1,466 TCF represented a 50-year supply of natural gas—even if demand after 1999 were at 29 TCF for the entire period, rather than the gradual rise from 22 TCF to a peak of 29 TCF in 2010 that was projected in the 1999 Report.

The 1999 Report projected that this growth from 1999 to 2010 from 22 TCF to 29 TCF could be accomplished at "an average production weighted U.S. wellhead gas price through 2010 of approximately $2.74 per million British thermal units (MMBtu)" and could be $.32 per MMBtu lower. This was the basic underlying rationale of the Report upon which the National Petroleum Council concluded that:

> The Council is pleased to report that natural gas can make an important contribution to the nation's energy portfolio well into the twenty-first century. Demand for natural gas will continue to increase as economic growth, environmental concerns, and the restructuring of the electricity markets encourage the use of natural gas. More than 14 million new customers will be connected to natural gas supply by 2015 and many more

will find their growing electricity needs met by gas-fired generators.

The estimated natural gas resource base is adequate to meet the increasing demand for many decades, and technological advances continue to make more of those resources technically and economically available.

Letter from NPC Chair Joe B. Foster (of Newfield Exploration Company) to Secretary of Energy Bill Richardson, dated December 15, 1999.

However, after December 15, 1999—indeed, commencing in 2000—natural gas prices in the United States rapidly escalated above the $2.74 price projected by the Council to be effective through 2010 and beyond.

On February 1, 2001, the National Association of Gas Consumers (NAGC), a group of municipally owned gas distribution systems located throughout the United States, filed a complaint at the Federal Energy Regulatory Commission (FERC) in Washington, D.C., requesting that it set a benchmark price for natural gas at the wellhead of $2.74 per MMBtu—the same figure declared as a reasonable average by the NPC in its 1999 Report to accomplish all growth up to 29 TCF by 2010. The NAGC complaint also asked the FERC to provide that any natural gas prices charged exceeding the benchmark would be subject to complaints filed by adversely affected parties requesting refunds, or in the alternative, that the FERC immediately set the complaint for investigation and hearing.

On November 4, 2002, the FERC issued an order dismissing the NAGC complaint, on the ground that the Wellhead Decontrol Act of 1989 (PL101-60) divests the Commission of any jurisdiction over the matter. The NAGC filed for rehearing at the FERC on December 4, 2002. On January 3, 2003, the FERC issued an order granting rehearing "for further reconsideration."

In the meantime, in 2002-2003 the defendants sought and participated in a revision of the 1999 Report. They jointly concluded that "supply and demand are projected to balance at higher prices than historical levels." A "Supply Task Group" subcommittee, chaired by one of the defendants and on which all of the defendants participated, was responsible for preparing a new report on natural gas prices for the future, which was

issued by the NPC as part of its new report of September 2003 (the "2003 Report").

The 2003 Report, which the defendants jointly prepared, completely revised the 1999 Report by asserting that there now was a shortage of natural gas in the United States, and that in order to meet the 1999 Report's goals of increased gas usage in the future, much higher gas prices would be required. The 2003 Report projected natural gas prices of over $6.00 per MMBtu by 2010 if a course it described as the "Reactive Path" were followed, but projected prices approximately $1.50 less under a "Balanced Future" path, which required certain legislative policies urged by gas producers to be met. Exhibit 1, Fig. 6, p. 11. The report was based on the recommendations of the Supply Task Group subcommittee, to which all of the defendants agreed as participants.

Since 2000 and the issuance of the 2003 Report, natural gas prices in the United States have remained at or above the "Reactive Path" level agreed to by the defendants on the subcommittee—substantially above the $2.74 price in the 1999 Report.

On January 29, 2004, the FERC issued an order denying rehearing of the NAGC complaint. The Commission concluded it had no jurisdiction to regulate the price of natural gas at the wellhead under the Wellhead Decontrol Act of 1989. That Act restricted only the jurisdiction of the FERC and provided no immunity to the defendants from complying with the federal antitrust laws.

The plaintiff municipalities filed their complaint against the defendants in this Court for violations of the federal antitrust laws on June 8, 2004.

Afterwards, in July 2004, a group of independent experts criticized the prices set by the defendants in the NPC's 2003 Report as based on faulty modeling techniques.[7]

From mid-2000 to the present, the defendants have continued to charge the new high prices for natural gas at the wellhead—prices at or above those set forth in the 2003 Report, jointly proposed and agreed to by them. As of November 11, 2004, futures prices

---

[7] *See* Exhibit 2 hereto.

for 2005 on the New York Mercantile Exchange (NYMEX) were over $8.00 per MMBtu for the January-March winter season, and over $6.70 for all other months.

At the same time, all of the defendants have reported record profits from their sales of natural gas, despite the reduction in volume of such sales. Defendants' claim of a shortage of natural gas is inconsistent with the increased reserves of natural gas reported each year by the U.S. Energy Information Agency.

**I.     DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE WITHOUT DISCOVERY ARE IMPROPER.**

> **A.     The Basic Standards Set by the U.S. Supreme Court Preclude Dismissal Under Rule 12(b)(6) Where Disputed Issues of Fact and Law Are Involved.**

The Supreme Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) established the general rule applicable to such motions.

> …In appraising the sufficiency of the complaint we follow, of course, the accepted rule that *a complaint should not be dismissed for failure to state a claim unless it  appears beyond doubt that the plaintiff can prove no set of facts in support of his claim* which would entitle him to relief.[8]

Emphasis added.  Furthermore, the Supreme Court in *Conley* specifically denied the contention now made by defendant Exxon Mobil that *specific facts* need to be contained in the complaint.

> The respondents also argue that the complaint failed to set forth specific facts to support its general allegations of discrimination and that its dismissal is therefore proper. The decisive answer to this is that the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the rules require is a "short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests… Such simplified "notice pleading" is possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense, and to define

---

[8] Defendant Exxon Mobil leaves out the first part of the Court's decision, namely "a complaint should not be dismissed for failure to state a claim." Exxon Mobil Br. at 3.

> more narrowly the disputed facts and issues. …The Federal Rules reject the
> approach that pleading is a game of skill in which one misstep by counsel
> may be decisive to the outcome and accept the principle that the purpose of
> pleading is to facilitate a proper decision on the merits. Cf. Maty v. The
> Grasselli Chemical Co., 303 U.S. 197… .

355 U.S. at 47-48. Since the plaintiffs' complaint meets the requirements of the Supreme

Court in *Conley v. Gibson*, the defendants' contrary analysis should be rejected. (*See* II to

IV *infra*.)

Subsequently, the Supreme Court has reiterated the importance of not dismissing

cases under Rule 12(b)(6) that deny any presentation of evidence. *Scheuer v. Rhodes*, 416

U.S. 232, 236 (1974) ruled:

> …We hold the dismissal was inappropriate at this stage of the litigation.
>
> \*      \*      \*
>
> The complaints were dismissed by the District Court for lack of
> jurisdiction without the filing of an answer to any of the complaints…
>
> \*      \*      \*
>
> When a federal court reviews the sufficiency of a complaint, before
> the reception of any evidence either by affidavit or admissions, its task is
> necessarily a limited one. The issue is not whether a plaintiff will ultimately
> prevail but whether the claimant is entitled to offer evidence to support the
> claims… Moreover, it is well established that, in passing on a motion to
> dismiss, whether on the ground of lack of jurisdiction over the subject
> matter or for failure to state a cause of action, the allegations of the
> complaint should be construed favorably to the pleader.
>
> \*      \*      \*
>
> …The District Court acted before answers were filed and without any
> evidence other than the copies of the proclamations issued by respondent…
> There was no opportunity for petitioners to contest the facts assumed in that
> conclusion.

416 U.S. at 235, 236, 249. This case provides a strong basis for denying defendants'

claims. *See also Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (holding that a complaint

should not be dismissed unless it appears complainant *can prove no set of facts in support

of its claim* that could entitle it to relief).

The Supreme Court has also made it clear that in federal antitrust cases, dismissal

even on the grounds of summary judgment (occurring after there has been discovery by

both sides of the case) is the exception rather than the rule; where questions of fact exist, essential to the determination of issues under the federal antitrust laws, dismissal is not proper. *Poller v. Columbia Broadcasting Company System, Inc.*, 368 U.S. 464, 473 (1962):

> …We believe summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "evenhanded justice."[9]

Numerous other courts have affirmed that dismissal under Rule 12(b)(6) should be rarely used. *Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996) (courts should be hesitant to dismiss a case under 12(b)(6) at the outset of a complex case without allowing discovery); *Newman v. Universal Pictures,* 813 F.2d 1519 (9th Cir. 1987), *cert. denied*, 486 U.S.1059 (in order to withstand motion to dismiss for failure to state claim, complainant need only allege sufficient facts from which the court can discern elements of injury from acts forbidden by antitrust laws); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148 (5th Cir. 1992), *cert. denied*, 506 U.S. 107 (securities investor sufficiently stated claim for antitrust conspiracy among brokers to include arbitration provision in brokerage contract where it was alleged that brokers attended seminars and conferences at which arbitration clause was discussed, and that they adopted such clauses knowing they could do so without fear of competition; broker was not required to offer plausible reason for brokers to have conspired in order to defeat motion to dismiss complaint); *Perrington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369 (10th Cir. 1979) (amended complaint charging conspiracy to violate antitrust laws was sufficient to

---

[9] *See also Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992) (dismissal of antitrust claims under §§ 1 and 2 of the Sherman Act on summary judgment are improper. "On a motion for summary judgment, non-movant's evidence is to be believed and all reasonable inferences are to be drawn in its favor"); *Lawrence v. The National Westminster Bank,* 98 F.3d 61 (3d Cir. 1996) (summary judgment is appropriate only if there are no genuine issues of fact.); *Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123 (3d Cir. 1994) (genuine issue of fact precludes summary judgment).

give fair notice of basis of claim where it asserted on information and belief that defendants conspired to cancel dealership agreement); *H.R.M. Inc. v. Tele-Communications, Inc.*, 653 F. Supp. 645 (D. Colo. 1987) (standard to be applied on motion to dismiss for failure to state claim is even more stringent in evaluation of antitrust claims, where proof is in hands of alleged conspirators, and dismissals prior to giving plaintiff ample opportunity for discovery should be granted very sparingly); *Hughes Automotive Inc. v. Mid-Atlantic Toyota Distributors, Inc.*, 543 F. Supp. 1056 (D. Md. 1982) (same conclusion as *H.R.M. Inc., supra*.); *Burch v. Goodyear Tire and Rubber Co.,* 420 F. Supp. 82, *aff'd,* 554 F.2d 633 (4th Cir. 1976) (to survive motion to dismiss complaint alleging violations of the Sherman Act, sections 1-7, all that was required was an allegation of conspiracy, contract, or combination which unreasonably restrained interstate commerce); *McCoy v. Major League Baseball*, 911 F. Supp. 454 (W.D. Wash. 1995) (summary dismissal is disfavored).

> **B.**     **The High Standard for Dismissal Under Rule 12(b)(6) Is Even Higher in Antitrust Cases, Because the Statutes Rely on Private Suits to Help Enforce the Antitrust Laws and Because the Evidence Proving the Allegations Is Often in the Hands of the Defendant.**

Defendants' rendition of the standard that courts observe for determining whether to dismiss a complaint under Rule 12(b)(6) is misleading, not only because it misstates the standard universally applied in all types of cases but also because it fails to acknowledge the even more stringent standard that must be met to justify dismissing an antitrust complaint. Defendants attempt to justify dismissal by decrying the conclusory nature of the allegations in the Complaint, which, according to them, merely tracks the language of the relevant antitrust statutes without offering any specifics. Defendants can arrive at this reading only by ignoring certain factual allegations of the complaint.

It is useful to summarize the basic principles employed by the courts in order to determine whether a complaint should be dismissed at the Rule 12(b)(6) stage. The burden

is on the movant to prove that no claim has been stated. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991), *cert. denied,* 501 U.S. 1222 (1991). The movant must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [which] would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Dart Drug Corp. v. Peoples Drug Store, Inc.*, Civil Action No. 76-0476, 1977 U.S. Dist. LEXIS 17439, *3 (D. D.C. Feb. 9, 1977).

Courts only grudgingly grant final dismissal of an action under Rule 12(b)(6) because it may well terminate a case on the merits prematurely.  *See, e.g.*, *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir. 1980) (dismissal under Rule 12(b)(6), if granted without leave to amend or plead further, amounts to summary disposition on merits and is disfavored).  As the Supreme Court put it, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

In ruling on a Rule 12(b)(6) motion, the court must accept the plaintiff's factual allegations as true. *Hoover v. Ronwin*, 466 U.S. 558 (1984) (plaintiff's allegations taken as true in determination of dismissal); *Scheuer v. Rhodes*, 416 U.S. 232 (1974) (plaintiff's allegations must be accepted as true); *Conley v. Gibson*, 355 U.S. at 45-46 (court must accept plaintiff's factual allegations). All reasonable inferences must be drawn in plaintiff's favor. *National Used Car Market Report, Inc. v. National Automobile Dealers Ass'n et al.*, 200 F.2d 359 (D.C. Cir. 1952); *Sanner v. Chicago Bd. of Trade*, 62 F.3d 918, 925 (7th Cir. 1995). Because the rules require only general or "notice" pleading, rather than detailed fact pleading, courts must construe a plaintiff's allegations liberally. *Swierkiewicz v. Sorema*, 534 U.S. 506, 514-515 (2002) (citing *Conley v. Gibson* for proposition that complaint need only "give respondent fair notice of what petitioner's claims are and the grounds upon which they rest"); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (rules do not require detailed facts; quoting *Conley v. Gibson*, 355 U.S. at 47; *Caribbean Broad. Sys. v.*

*Cable & Wireless PLC*, 148 F.3d 1080, 1085-1086 (D.C. Cir. 1998); *Sinclair v. Kleindienst*, 711 F.2d 291, 293 (D.C. Cir. 1983) ("All that is required is a short and plain statement of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests").  A complaint satisfies this criterion if it is not "so vague or ambiguous that a party cannot reasonably be expected to frame a responsive pleading." Fed.R.Civ.P. 12(e).  In other words, a plaintiff need not allege all the facts necessary to prove its claim so long as it provides enough factual information to make clear the substance of that claim. *See Atchinson v. District of Columbia*, 73 F.3d 418, 421-422 (D.C. Cir. 1996).

The standard for dismissal of an antitrust case is even more stringent than in other cases.  *See Hospital Bldg. Co. v. Trustees of Rex Hospital*, 511 F.2d 678, 680 (4th Cir. 1975), *rev'd on other grounds*, 425 U.S. 738 (1976); *KWF Industries, Inc. v. American Tel. & Tel. Co.*, 592 F. Supp. 795, 797 (D. D.C. 1984) ("[A] motion to dismiss under Rule 12...is merely a decision on pleadings, and for that reason, it is granted sparingly and with caution. This is especially true in antitrust cases."); *Rolite v. Wheelabrator Env. Sys., Inc.*, 958 F. Supp. 992 (E.D. Pa. 1997). This is so because, in an antitrust action, the proof may be available to the plaintiff only after discovery as the evidence is often in the hands of the defendants.  *See Continental Orthopedic Appliances v. Health Ins. Plan of Greater N.Y.*, 956 F. Supp. 367 (E.D.N.Y. 1997).

Plaintiffs submit that the complaint satisfies the notice pleading requirements summarized above; it contains enough factual information to make clear the substance of the claims and to enable defendants to frame a responsive pleading. Sections II through IV, *infra*, deal with the law and alleged facts applicable to each of the antitrust violations set forth in the complaint.

## II.     DEFENDANTS HAVE CONSPIRED TO FIX NATURAL GAS PRICES IN THE UNITED STATES IN VIOLATION OF SECTION I OF THE SHERMAN ACT.

The plaintiffs' complaint alleges that:

Defendants are engaged in activities to control and unlawfully increase the price of natural gas in the United States in restraint of trade.

\*       \*       \*

The unanimous participation and concurrence by the Defendants in these high new price levels for sales of natural gas in the United States constituted a "combination formed for the purpose and with the effect of raising, …fixing, pegging, or stabilizing the price of [natural gas] in interstate commerce or foreign commerce," in violation of Section 1 of the Sherman Act.

Complaint ¶¶ 8, 17. The defendants' participation as a group to set new high wellhead gas prices commenced in mid-2000. Since then, prices have exceeded the $2.74 per MMBtu figure projected as reasonable by the 1999 Report for the following decade through 2010. Complaint ¶ 17. "In 2002–2003, the defendants participated in a revision of the National Petroleum Council report of 1999," Complaint ¶ 17, and with their joint conspiracy to restrain trade in interstate commerce, Complaint ¶ 19, a new report was issued in September 2003. The new report prepared by them shows steadily increasing prices that never fall below $5.00 per MMBtu, the level reached in 2003, and that are projected to rise to approximately $6.00 in 2004 and to escalate above $6.00 by 2010. Complaint ¶¶ 15, 17.

The prices agreed to by the defendants after mid-2000 greatly exceed the natural gas prices existing in the United States before 2000,  which had averaged under $2.00 per MMBtu in the eight-year period from 1992 to 2000, as well as the average price of $2.74 projected in the 1999 Report for the ten years from 2000 through 2010. Complaint ¶ 15.

Since the defendants jointly conspired and agreed to the new high natural gas prices, actual gas prices in the United States have never fallen below those agreed-upon prices. These high gas prices have directly injured the plaintiffs' municipal gas distribution systems, which, having been forced for now over four years to pay prices two to three times above those paid prior to 2000, have suffered lower gas sales, mainly due to the high prices. Complaint ¶¶13-19, 25.

Also because of these high prices, planned new projects and uses of natural gas

14

have been shelved. Complaint ¶ 16.

The plaintiffs all purchase natural gas from production areas delivered from the wellhead by interstate pipelines to them as distributors, all in interstate commerce. Defendants constitute the major producers of natural gas in the United States, producing over 70% of the total natural gas used in the country. Complaint ¶¶ 6, 7, 8.

These facts alleged in the complaint establish a violation of Section 1 of the Sherman Act, which provides as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restrain of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal… . 15 U.S.C. § 1.

In *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), the Supreme Court held that:

> Thus for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or evils which these agreements were designed to eliminate or alleviate may be interposed as a defense.

310 U.S. at 218. In that case, a glut in the market for gasoline had prompted the major oil companies to engage in price-fixing agreements in a concerted effort to purchase and store surplus gasoline, in order to maintain stable prices. Absent the agreement, the companies argued, competition was cutthroat. The Supreme Court rejected that argument:

> …Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is

15

> to be made, it must be done by the Congress. Certainly Congress has not left us with any choice. Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike.

*Id*. at 221-222.

The Supreme Court applied the *per se* rule to maximum price-fixing agreements in

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211 (1951):

> The Court of Appeals erred in holding that an agreement among competitors to fix maximum resale prices of their products does not violate the Sherman Act. For such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. We affirm what we said in the *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223…: "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*."

340 U.S. 213. This principle of *Kiefer-Stewart* was reaffirmed in *Albrecht v. The Herald Co.*, 390 U.S. 145, 152 (1968):

> Maximum and minimum price fixing may have different consequences in many situations. But schemes to fix maximum prices, by substituting the perhaps erroneous judgment of the seller for the forces of the competitive market, may severely intrude upon the ability of the buyers to compete and survive in that market. …

The Supreme Court has confirmed its enforcement of the *per se* rule against price-fixing under Section 1 of the Sherman Act. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980); *Arizona v. Maricopa County Medical Society, et al.*, 457 U.S. 332 (1982). In *Maricopa County*, the Court rejected a contention that the *per se* rule should not apply to the health care industry by ruling:

> The argument quite obviously is inconsistent with *Socony-Vacuum*. In unequivocal terms we stated that, "[w]hatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike.

457 U.S. at 349.

The plaintiff municipal systems, which are directly injured by, but are not parties to

the price-fixing conspiracy, have standing to establish that the concerted action by the defendants constitutes an anticompetitive price-fixing conspiracy that harms the plaintiffs as competitors in the retail natural gas market or as buyers in the wholesale market. In *Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), the Supreme Court confirmed a Section 1 violation where "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" 465 U.S. at 764.

Under these established judicial principles, defendants' motions to dismiss plaintiffs' claim under Section 1 of the Sherman Act without evidentiary discovery should be denied.

## III.   THE DEFENDANTS VIOLATED SECTION 2 OF THE SHERMAN ACT.

Section 2 of the Sherman Act provides as follows:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony…

15 U.S.C. § 2.[10]

The plaintiffs' complaint alleges that the defendants have combined and conspired among themselves to monopolize wellhead sales of natural gas in interstate commerce in the United States, resulting in the unlawful increase in the price of natural gas to the plaintiffs, who are dependent on wholesale purchases of natural gas for their municipal systems. Complaint ¶¶ 21, 22. The complaint for a Section 2 violation also incorporates all of the facts discussed in Section II *supra* relating to defendants' violation of Section 1 of the Sherman Act. Complaint ¶ 20.

---

[10] Section 4 of the Clayton Act, 15 U.S.C. § 15, authorizes "any person who shall be injured in his business by any reason of anything forbidden in the antitrust laws may sue therefor in the district court of the United States in the district in which the defendant resides or is found…"

The relevant market is the entire United States. Complaint ¶ 22. The product is natural gas.[11] By so combining and conspiring, the defendants jointly obtained monopoly power through owning or controlling over 70% of the total proved reserves of natural gas available to serve plaintiffs as purchasers of such gas in the United States. By controlling production to achieve the prices previously agreed to from the market, except at the prices jointly agreed or consented to by the defendants, they have directly injured competition in violation of Section 2. Complaint ¶ 22.

This conduct constitutes a violation of Section 2: *Swift & Co. v. United States*, 196 U.S. 375 (1905) (dominant proportion of the dealers in fresh meat throughout the United States combining so as not to bid against each other in the livestock markets of the different states, with an intent to monopolize, is an unlawful combination under Section 2); *U.S. v. Griffith*, 334 U.S. 100 (1948) (monopoly power, whether lawfully or unlawfully acquired, constitutes an evil and stands condemned under provisions of Section 2 against monopolizing trade though it remains unexercised, and in a like manner a conspiracy to monopolize also violates this section); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436 (1940) (agreement for price maintenance of articles in interstate commerce are unreasonable restraints within the Sherman Act because they eliminate competition); *United States v. Trenton Potteries*, 273 U.S. 392 (1927); *American Tobacco Co. v. U.S.*, 328 U.S. 781(1946) (no formal agreement necessary, only a combination in restraint of interstate trade and commerce need exist; a conspiracy can be found in the course of dealing as well as in an exchange of words); *Northern Securities Co. v. U.S.*, 193 U.S. 197 (1904) (for a combination, it need not be shown that the combination results or will result in a total suppression of trade, or in a complete monopoly; it is only essential to show that

---

[11] Natural gas users have equipment which almost universally cannot use any other fuel. *See* Exhibit 3 hereto. While a small fraction of commercial and electric generation units are constructed for dual fuel use, this involves a substantial additional expense. Accordingly, the courts have ruled that natural gas is a separate product from other fuels.

it tends to restrain interstate commerce and to deprive the public of the advantages that flow from free competition); *Hartford-Empire Co. v. U.S.*, 323 U.S. 386 (1945), *supplemented* 324 U.S. 570, (mere cancellation of written agreement was not enough, in light of subsequent conduct, to acquit corporation of further participation in conspiracy to monopolize glass-making industry); *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110 (1948), *petition denied*, 334 U.S. 831 (1948) (an otherwise lawful device may be used as a weapon in restraint of trade or in an effort to monopolize a part of trade in violation of Section 2); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), *cert. denied*, 516 U.S. 987 (1995) (for purposes of Sherman Act attempted monopolization claim, aggregation of market shares of several rivals is justified in determining market share if rivals are alleged to have conspired to monopolize); *Monument Builders of Greater Kansas City, Inc. v. American Cemetery Assn. of Kansas*, 891 F.2d 1473 (10th Cir. 1989), *cert. denied*, 495 U.S. 930 (1990) (complaint stated cause of action under Section 2 alleging defendants controlled 70-75% of interstate market); *U.S. v. Yellow Cab Co.*, 332 U.S. 218 (1947) (Section 2 of Sherman Act aimed at substance rather than form, and corporate interrelationships of conspirators are not determinative of the applicability of the section).

Since the defendants have monopoly power through combining or conspiring under Section 2, their setting high prices for wellhead natural gas sales in the United States has damaged the plaintiffs and directly impaired their ability to compete for customers.

In *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), the Supreme Court upheld a judgment against an electric power company for violating Section 2 of the Sherman Act by seeking to prevent municipalities from establishing municipal electric systems to compete with the utility for retail electric customers who were either within the municipalities or seeking to relocate in those areas. The Court held that the existing provisions of the Federal Power Act did not immunize Otter Tail from compliance with the federal antitrust laws subject to the exclusive jurisdiction of the federal district courts. 410

U.S. at 372.[12]  The  Court confirmed the violation of Section 2 of the Sherman Act as

follows:

> The record makes it abundantly clear that Otter Tail used its monopoly
> power in the cities in its service area to foreclose competition or gain a
> competitive advantage, or to destroy a competitor, all in violation of the
> antitrust laws.

410 U.S. at 377.  The U.S. Supreme Court recently has unanimously reaffirmed the *Otter*

*Tail* case as vesting  jurisdiction in the federal district courts to adjudicate the federal

antitrust laws.  *New York, et al. v. FERC, et al.*, 535 U.S. 1, 9 n.6 (2002).[13]

Five U.S. Circuit Courts have confirmed the applicability of the federal antitrust

laws, citing *Otter Tail*, to suits by municipal systems under Section 2 of the Sherman Act

against companies using anticompetitive practices  to compete for customers. *Borough of*

*Lansdale v. Philadelphia Electric Co*., 692 F.2d 307, 311-312 (3d Cir. 1981); *City of*

*Kirkwood v. Union Electric Co.*, 671 F.2d 1173, 1177-1179 (8th Cir. 1981), *cert. denied*,

459 U.S. 1170 (district courts have exclusive jurisdiction to consider price squeeze claims

under Section 2 of the Sherman Act by municipalities against suppliers that compete for

retail customers); *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929-

930 (2nd Cir. 1981) ("…the district court's general findings of no competition cannot

stand.  CL&P is not immune [from the antitrust laws] to the extent that the rate claims

involve either customer competition or franchise competition"); *City of Mishawaka v.*

*Indiana and Michigan Electric Co.*, 560 F.2d 1314 (7th Cir. 1977), *cert. denied*, 436 U.S.

---

[12] In 1992, when Congress enacted the Energy Policy Act to grant the Federal Energy Regulatory Commission ("FERC") additional, but a limited authority to order wheeling, it expressly provided that its enactment did not disturb the exclusive jurisdiction of the federal district courts to enforce the antitrust laws. 16 U.S.C. § 824k(e)(2).

[13] The Supreme Court ruled as follows:

> "…In *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973)…the Court permitted the government to seek antitrust remedies against a utility company which, among other things, refused to sell power at wholesale to some municipalities and refused to transfer competitors' power over its lines.  *Id.* at 368.  The Court concluded that the Federal Power Act's existence did not preclude the applicability of the antitrust laws."  *Id.* at 371. *See* V, *infra*.

922 (1978) (price squeeze under Section 2 of Sherman Act involving competition in the relevant market areas is subject to adjudication in federal district court); *City of Chanute v. Kansas Gas & Electric Co.*, 754 F.2d 310 (10th Cir. 1985) (district court properly issued preliminary injunction under the antitrust laws where a utility refused to wheel competitive sources of power to municipalities unless they terminated existing favorable power supply contracts).

## IV.    THE DEFENDANTS VIOLATED SECTION 2 OF THE CLAYTON ACT (ROBINSON-PATMAN ACT).

Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, precludes discrimination in price, services or facilities:

### (a)    Price:  Selection of Customers

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different  purchasers of commodities of like grade and quality, where either or any of the purchasers  involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States…and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: …

15 U.S.C. § 13(a).

The gas that the plaintiffs purchase for their municipal systems at wholesale is of the "same grade and quality" as the natural gas that the defendants sell directly to large retail customers at lower prices. This substantially lessens competition. Complaint ¶¶ 23-24.

In *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 566-67 (1990), the Supreme Court construed Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), as providing a remedy where the oil company discriminated in price between wholesale buyers and retail customers, where the discrimination had a prohibitive

effect on competition.[14]

Any contention that natural gas is not a commodity has been rejected in *Yeager's Fuel, Inc., et al. v. Pennsylvania Power & Light Company, et al.*, 953 F. Supp. 617 (E.D. Pa. 1997), based on numerous precedents.[15]

## V.     THE FILED RATE DOCTRINE DOES NOT PROVIDE ANTITRUST IMMUNITY TO DEFENDANTS.

Only one of the defendants, Coral Energy Resources, L.P., contends that the complaint against the defendants should be dismissed because of the "filed rate doctrine," allegedly based on the regulatory jurisdiction of the Federal Energy Regulatory Commission under the Natural Gas Act, 15 U.S.C. § 717 *et seq.*

This contention must be rejected for the following reasons: (1) the Supreme Court has definitively rejected any claim of antitrust immunity based on the FERC's regulatory jurisdiction; (2) Congress in the Wellhead Decontrol Act of 1989 expressly terminated any regulatory jurisdiction of the FERC over wellhead sales of natural gas involved in this case, which FERC has confirmed in denying the earlier complaint of the NAGC seeking regulatory relief for unreasonable wellhead price increases; and (3) Congress in enacting the Energy Policy Act of 1992 expressly excluded the federal antitrust laws from any FERC regulatory jurisdiction.

### A.     The *Otter Tail* Case.

In *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), the Supreme Court definitively rejected the contention that the Federal Power Act and regulations thereunder

---

[14] *See also Perkins v. Standard Oil Co.*, 395 U.S. 642 (1969) (favored treatment by defendant in pricing products to different customers was price discrimination under the Robinson-Patman Act); *Stelwagon Mfg. Co. v. Tarmack Roofing Sys.*, 63 F.3d 1267, 1271 (3rd Cir. 1995) (affirming violation of the Robinson-Patman Act but finding insufficient evidence of antitrust damages to support jury verdict).

[15] *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 371, n.3 (3d Cir. 1985); *Kirkwood v. Union Electric Co.*, 671 F.2d 1173, 1181-82 (8th Cir. 1982), *cert. denied,* 459 U.S. 1170; *Rankin County Cable Vision v. Pearl River Valley Water Supply District*, 692 F. Supp. 691, 693 (S.D. Miss. 1988); *Concord v. Boston Edison Co.*, 676 F. Supp. 396 (D. Mass. 1988); *Elwood City v. Pennsylvania Power Co.*, 570 F. Supp. 553, 561 (W.D. Pa. 1983); *Gainesville v. Florida Power & Light Co.*, 488 F. Supp. 1258, 1282 (S.D. Fla. 1980).

immunize regulated companies from the federal antitrust laws. The Supreme Court held:

> There is nothing in the legislative history which reveals a purpose to insulate electric power companies from the operation of the antitrust laws. To the contrary, the history of Part II of the Federal Power Act indicates an overriding policy of maintaining competition to the maximum extent possible consistent with the public interest…

410 U.S. at 373-374. The Court then held:

> It is clear, then, that Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships. When these relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws.
>
> *          *          *
>
> Thus, there is no basis for concluding that the limited authority of the Federal Power Commission to order interconnections was intended to be a substitute for or immunize Otter Tail from antitrust regulation for refusing to deal with municipal corporations.

410 U.S. at 374-375.

The Supreme Court recently unanimously confirmed the *Otter Tail* decision in *New York, et al. v. FERC, et al.*, 535 U.S. 1, 8-9 n.6 (2002). The Court confirmed that *Otter Tail* permitted "antitrust remedies against a utility company which, among other things, refused to sell power at wholesale to some municipalities."

The Supreme Court has also confirmed in many cases that the Federal Power Act and the Natural Gas Act, the two regulatory statutes administered by the FERC, are to be construed identically:

> Montana-Dakota Utilities was a case under the Federal Power Act rather than under the Natural Gas Act, but as we have previously said, the relevant provisions of the two statutes "are in all material respects substantially identical." FPC v Sierra Pacific Power Co, 350 US 348, 353, …(1956). In this opinion we therefore follow our established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes. See, e.g., ibid.; Permian Basin Area Rate Cases, 390 US 747, 820-821, …(1968).

*Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981).

**B.** **Congress Has Confirmed in the 1992 Energy Policy Act That FERC Lacks Jurisdiction to Modify, Impair, or Supersede the Antitrust Laws.**

The Energy Policy Act of 1992, applicable to FERC, added a provision preserving the federal antitrust laws as a remedy and precluding any modification of those laws:

**(e)  Savings provisions**

\*        \*        \*

**(2)**  Sections 824i, 824j, 824*l*, 824m of this title, and this section, shall not be construed to modify, impair, or supersede the antitrust laws. For purposes of this section, the term "antitrust laws" has the meaning given in subsection (a) of the first sentence of section 12 of Title 15, except that such term includes section 45 of Title 15 to the extent that such section relates to unfair methods of competition.

U.S.C. 16 § 824k.

**C.** **The FERC Has Ruled That It Has No Jurisdiction to Regulate Wellhead Sales of Natural Gas.**

The FERC has ruled, in denying the complaint of the National Association of Gas Consumers (NAGC) filed February 1, 2001, that it lacks jurisdiction over wellhead sales of natural gas under the Wellhead Decontrol Act of 1989, 15 U.S.C. § 3431(a).  *National Association of Gas Consumers v. All Sellers of Natural Gas*, 106 FERC ¶ 61,072 at ¶ 7 (2004). For this reason, defendant Coral Energy Resources' claim of antitrust immunity, based on FERC's exclusive jurisdiction under the "filed rate doctrine," must fail.

**VI.  THE NPC IS NOT A "FEDERAL INSTRUMENTALITY" IMMUNE FROM LIABILITY UNDER THE ANTITRUST LAWS.**

Defendants ConocoPhillips and Coral Energy Resources assert that the "federal instrumentality" doctrine immunizes them from antitrust liability. They base this on a bootstrap argument that depends largely on the fact that the NPC is subject to the Federal Advisory Committee Act of 1972 ("FACA"), 5 U.S.C. § 2 (Appendix 2).  That statute expressly provided that advisory committees have no power to determine governing law:

(b)  The Congress further finds and declares that—

(6) the function of advisory committees shall be advisory only, and that all matters under their consideration should be determined in

accordance with law, by the official agency or officer involved.[16]

It should be said at the outset that neither the express language of FACA—nor, to plaintiffs' knowledge, any court construing that statute—has held that the conduct engaged in by the members of such an entity is immune from liability under the federal antitrust laws. Furthermore, defendants have not shown that the Department of Energy has any legislative authority to regulate wellhead natural gas in the United States—a subject Congress had entrusted solely to the FERC, and then removed pursuant to the Wellhead Decontrol Act.  *See* V above. Moreover, no "clear repugnancy"—to invoke the test used by the Supreme Court in *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 350-351 (1963)[17] —between application of the antitrust laws to the defendants' conduct and any provision of any statute or any regulatory order governing the NPC can be demonstrated. In addition, since the FACA, 5 U.S.C. § 2(b)(6) (Appendix 2), expressly bars the NPC from making any determination of law, which remains solely in the government's offices, and since NPC's function is "advisory only," no basis exists for a private party to share the federal agency's immunity simply because the private entity's allegedly anticompetitive conduct occurred in the course of participation in an NPC activity.

The cases relied on by the defendants are inapposite. Indeed, the D.C. Circuit has distinguished the *Southern Motor Carriers* decision,[18] one of the cases principally relied upon by defendants, on grounds equally applicable to the case at bar. In *Thomas v. Network Solutions, Inc.*, 176 F.3d 500 (D.C. Cir. 1999), *cert. denied* 528 U.S. 1115 (2000),

---

[16] In *Metcalf v. National Petroleum Council*, 553 F.2d 176 (D.C. Cir. 1977), the Court noted that of the 155 members of the National Petroleum Council (NPC), 140 were affiliated with the petroleum industry, *id.* at 179. Apart from some possible support services provided by the federal agency that it advises, the NPC is "financed entirely from funds provided by the petroleum industry." *Id.* at 180. The Court declined to determine if the NPC subgroups "are advisory committees within the meaning of the FACA."

[17]  *See also* North Carolina *ex rel. Edmisten v. P.I.A. Asheville, Inc.*, 740 F.2d 274, 281 (4th Cir. 1984) (antitrust immunity not implied in regulatory structure established by National Health Planning and Resources Department Act), *cert. denied*, 471 U.S. 1003 (1985); *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1178 (8th Cir. 1982) (no implied immunity because electric utility regulatory scheme and antitrust laws not "plainly repugnant" to each other), *cert. denied*, 459 U.S. 1170 (1983).

[18] *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 58-65 (1985).

the court rejected the company's argument that because the National Science Foundation was a federal agency immune from liability under the antitrust laws, "a private contractor automatically shares the federal agency's immunity simply because the contractor's allegedly anticompetitive conduct occurred…'pursuant' to a government contract." *Id.* at 508-509.  The court had this to say about *Southern Motor Carriers*:

> …*Southern Motor Carriers* arose in a different setting. The Supreme Court was there interpreting the effect of *Parker v. Brown* [317 U.S. 341, 352 (1943)], which *recognized the immunity of States under the Sherman Act for imposing a restraint on trade "as an act of government."* As to entities under State regulation, *Southern Motor Carriers* held that if they take action pursuant to a "clearly articulated and affirmatively expressed" State policy, even a policy simply permitting the anticompetitive conduct, and if the State actively supervises the conduct, such private parties are also immune from antitrust liability. 471 U.S. at 62. The Court's reasoning rested, in part, on considerations of federalism, considerations obviously not present when federal regulation is involved. *See id.* at 61; *Ricci v. Chicago Mercantile Exch.*, [409 U.S. 289, 300-301 (1973)].
>
> Just as important, *Southern Motor Carriers* dealt only with state *regulation* of private entities. *See also Greensboro Lumber Co. v. Georgia Power Co.*, 844 F.2d 1538 (11th Cir. 1988). Here we have instead a contractual relationship between a federal government agency and a private party. It is not obvious to us, particularly in view of *Otter Tail Power Co. v. United States* [410 U.S. 366, *reh'g denied*, 411 U.S. 910 (1973)], that a private contractor automatically shares the federal agency's immunity simply because the contractor's allegedly anticompetitive conduct occurred—as Network Solutions puts it and some courts suggest—"pursuant" to a government contract. A contractor might be free to perform the contract in any number of ways, only one of which is anticompetitive.

*Id.* (footnotes omitted; emphasis added).

The D.C. Circuit's acknowledgement of *Otter Tail* is significant because the Supreme Court decided that case (denying antitrust immunity to regulated entities under the FERC) some years after the cases cited by defendants for the proposition that private parties performing under the aegis of a government entity are immunized from antitrust liability to the same extent as the government entity.  Those cases might well have been decided differently today in light of *Otter Tail*.

More germane for present purposes is *National Gerimedical Hospital &*

*Gerontology Center v. Blue Cross*, 452 U.S. 378, 393 (1981). There, the Supreme Court found Blue Cross accountable under antitrust laws for its exclusion of the plaintiff from an insurance plan, even though Blue Cross argued that it did so in furtherance of a local health care planning framework created and federally funded under the National Health Planning and Resource Act of 1974, 42 U.S.C. § 300b. Blue Cross had rejected the plaintiff's application to participate in the plan on the grounds that the plaintiff had not obtained approval to construct a hospital from the local advisory group created under the federal statute. The Supreme Court rejected Blue Cross's antitrust immunity in part because the local advisory group, while created and funded under federal law, was a private planning body rather than a government agency charged with implementing a regulatory statute.  Moreover, there was no "clear repugnancy" between application of the antitrust laws to Blue Cross's decision and any provision of the statute or regulatory order.

        In sum, defendants' bootstrap argument for application of the "federal instrumentality" doctrine fails; defendants simply cannot ride on the coattails of any speculative immunity of the Department of Energy from liability under the antitrust laws.

## VII.    THE *NOERR-PENNINGTON* DOCTRINE IS NOT A BAR TO PLAINTIFFS' ANTITRUST CLAIMS.

        The *Noerr-Pennington* doctrine, which takes its name from two Supreme Court cases,[19] holds in general that efforts to influence governmental legislative or administrative actions are protected by the First Amendment and cannot be the basis for liability under the antitrust laws.  However, the Supreme Court and lower courts have recognized exceptions to the doctrine that are applicable to the case at bar.  For example, the "sham" exception, recognized in *Noerr* itself, "encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive

---

[19] *United Mine Workers v. Pennington*, 381 U.S. 657 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961).

weapon." *City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 380 (1991) (emphasis in original) (internal citations omitted). This Court has expressly acknowledged this distinction. *See United States v. Philip Morris USA, Inc.,* 337 F. Supp. 2d 15 (D. D.C. 2004).

The D.C. Circuit quoted extensively from another Supreme Court case when called upon to define the distinction between conduct that is protected by *Noerr* and conduct that is not. In *Superior Court Trial Lawyers Ass'n v. F.T.C.*, 856 F.2d 226 (D.C. Cir. 1988), *cert. granted*, 490 U.S. 1019 (1989), *reversed in part*, 493 U.S. 411 (1990), this Circuit held that a lawyer's concerted action was not immunized by First Amendment considerations from violating a section of the Federal Trade Commission Act. In doing so, the Court adhered to the explanation of the scope of *Noerr*'s protection that the Supreme Court provided in *Allied Tube*[20]:

> "The scope of [*Noerr's*] protection," the Court wrote, "depends…on the source, context, and nature of the anticompetitive restraint at issue." *Id.* at 1936. First, concerning the source of the restraint, a court must consider whether it is the result of valid governmental or private action. If the former, "those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Id.* If the latter, the restraint is immune from antitrust liability only if it is "'incidental' to a valid effort to influence governmental action**.**" *Id.* at 1940 (quoting *Noerr*, 365 U.S. at 143). The Court repeatedly stressed that not all efforts to secure government action merit protection under *Noerr*; instead, "the validity of such efforts, and thus the applicability of *Noerr* immunity, varies with the context and nature of the activity." *Id.* at 1936; *see also id.* at 1939. These two factors—context and nature—determine whether the conduct at issue is more appropriately characterized as "political activity with a commercial impact," immune from antitrust liability under *Noerr*, or as "commercial activity with a political impact," which must be evaluated "under the standards of conduct set forth in the antitrust laws." *Id.* at 1941, 1942.

> Here, as in *Allied Tube*, the restraint at issue, *i.e.*, the boycott, plainly resulted from private, rather than governmental, action. Thus, the

---

[20] *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492 (1988).

> conduct is immune under *Noerr* only if it was a valid effort to influence
> governmental action, which turns on whether it was primarily "commercial"
> or "political" in nature.

856 F.2d at 243. The Supreme Court on review held that respondents' boycott and price-

fixing were "a plain violation of the antitrust laws" and not immunized under the *Noerr*

doctrine as set forth in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492

(1988). *FTC v. Super. Ct. Trial Lawyers Assn.*, 493 U.S. 411, 428 (1990).  As Professor

Areeda has explained:

> In [*Superior Court Trial Lawyers Association*] the anticompetitive effects
> of the boycott were a result not of the government's independent action but
> rather of the action of the respondents themselves. This was so because the
> boycott preceded, rather than followed, the government action.
>
> It was [the] *means* by which respondents sought to obtain favorable
> legislation. The restraint of trade that was implemented while the boycott
> lasted would have had precisely the same anticompetitive consequences
> during that period even if no legislation had been enacted.

Areeda, *supra*, at ¶ 202 (citations and footnotes omitted).  It remains to apply these

analytical constructs—process versus outcome, context and nature of the activity, and

political activity with a commercial impact (or vice versa)—to the allegations of the

complaint in the instant action. It should first be noted that the anticompetitive activity

preceded—and was not dependent upon—any decision, if any was made, on the part of the

Secretary of Energy to recommend any legislation or the enactment of any such federal

legislation. The antitrust violations alleged by the plaintiffs involve anticompetitive

conduct by defendants in violation of the federal antitrust laws after the 1999 Report—

completely separate and apart from any requests for administrative or legislative action

that were drafted into the 2003 Report. Indeed, the modeling methodology underlying the

2003 Report was itself defective.[21]

      In short, as the complaint alleges, the defendants jointly agreed, and caused the

---

[21]   *See, e.g.*, K. Costello, H.G. Huntington and J.F. Wilson, "After the Natural Gas Bubble:  A Critique of the Modeling and Policy Evaluation Contained in the National Petroleum Council's 2003 Natural Gas Study (Second Draft for Comment, July 7, 2004)." *See* summary, Exhibit 2 hereto.

2003 Report to state, that "current and higher gas prices are the result of a fundamental

shift in the supply and demand balance":

> However, the September 2003 Report contains no evidence that the existing
> total resource base of natural gas in Canada and the United States has
> shrunk from that shown in the December 1999 Report, or that the present
> resource base is now inadequate to supply the substantially reduced loads
> that have occurred because of high natural gas prices. Furthermore, all of
> the Defendants have reported significant increases in profits since 2000,
> attributed to their sales of natural gas in the United States, despite the
> substantial reduction in sales resulting from high prices—indicating that
> their costs of producing the gas have not increased. The U.S. Energy
> Information Agency has reported that "high prices and a strong drilling
> effort in 2003 have tended to keep domestic dry gas output above levels
> seen in 2002."

Complaint at ¶ 18.

Certainly, to the extent that the defendants may have fashioned a report that was

materially misleading either because of its misstatements or omissions, their conduct

would not have been protected by the *Noerr-Pennington* doctrine. "'Misrepresentations,

condoned in the political arena, are not immunized when used in the adjudicatory

process.'" *General Aircraft Corp. v. Air America, Inc.*, 482 F. Supp. 3 (D. D.C. 1979)

(quoting *California Motor Transport*, 404 U.S. at 513); *Whelan v. Abell* , 48 F.3d 1247

(D.C. Cir. 1995) (*Noerr-Pennington* defense disallowed where defendants had made

material misrepresentations to state securities regulators).

Plaintiffs respectfully request that this Court give them the opportunity through

discovery to establish whether the Reports are materially misleading.  As this Court said in

*United States v. Philip Morris USA, Inc.*, 337 F. Supp. 2d 15, 17-19 (2004):

> Because a determination of whether the challenged predicate acts constitute
> petitioning is a fact-intensive inquiry that can only be resolved at trial,
> Defendants are not entitled to summary judgment on the basis of the *Noerr-*
> *Pennington* doctrine. See [*Allied Tube*, 486 U.S. at 499] (applicability of
> *Noerr* immunity "varies with the context and the nature of the activity").

This principle applies with even greater force at the motion-to-dismiss stage, at which

plaintiffs have had no opportunity whatsoever to conduct discovery.

**VIII.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED ANTITRUST INJURY AND HAVE STANDING TO BRING THIS CASE.**

"Antitrust injury" and "antitrust standing" are related concepts. As the Supreme Court explained in *Cargill*,[22] "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under section 4 of the Clayton Act, because a party may have suffered antitrust injury but may not be the proper plaintiff under section 4 for other reasons." The plaintiffs have adequately pleaded both injury and standing.

**A.      The Plaintiffs Have Properly Alleged Antitrust Injury.**

In order "to meet the constitutional requirements of standing under the Clayton Act, an antitrust plaintiff must establish 'injury-in-fact or threatened injury-in-fact caused by the defendant's alleged wrongdoing.'" *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001), (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983)). In addition, "an antitrust plaintiff must establish 'antitrust injury,' that is, "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,'" *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

In *Brunswick*, the Supreme Court noted that in order to constitute "antitrust injury," the injury should be "'the type of loss that the claimed violations'" of the Sherman Act "'would be likely to cause.'" *Brunswick*, 429 U.S. at 489 (quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969). The plaintiff municipal systems have been directly injured by the defendants' price-fixing conspiracy and are entitled to establish that the concerted action by the defendants constitutes an anticompetitive price-fixing conspiracy and price discrimination that harms the plaintiffs as competitors in the retail

---

[22] *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986).

natural gas market or as buyers in the wholesale market.[23]

**B.      Plaintiffs' Allegations Show That They Have Antitrust Standing.**

There remains the question of antitrust standing, *i.e.*, whether the parties that filed the complaint are "proper plaintiffs."  To determine this, the D.C. Circuit applies the criteria articulated in *Associated General Contractors*: "the directness of the injury, whether the claim for damages is 'speculative,' the existence of more direct victims, the potential for duplicative recovery and the complexity of apportioning damages." *Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 at 806 (D.C. Cir. 2001) (citing *Associated Gen. Contractors*, 459 U.S. at 542-45).

Some of the defendants[24] allege that the plaintiffs lack standing to bring this suit, citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) . In *Illinois Brick*, the Supreme Court was concerned primarily that antitrust suits brought by indirect purchasers would increase the risk of multiple recoveries and present complexities in the apportionment of damages that courts were ill-equipped to handle.  It should be noted at the outset that nothing in *Illinois Brick* bars equitable relief, which is one of the remedies that the plaintiffs seek in their complaint.  *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003), *cert. denied*, 124 S.Ct. 355 (2003) ; *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998) .

Nor does *Illinois Brick* bar relief in the form of monetary damages when, as is the case here, there is as a practical matter very little likelihood that marketers who are the direct purchasers of the natural gas produced by the defendants will initiate suit against their own suppliers. *See Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980) .  Motivation to sue is certainly likely to be lacking when, as plaintiffs allege, the marketers are under the control of the defendant-sellers and therefore have no

---

[23] *See* discussion under sections II, III, and IV, *supra*, and cases therein cited.

[24] Chevron Texaco, ConocoPhillips, BP America.

motivation to sue.

*Illinois Brick* itself noted two exceptions to its "indirect purchaser" doctrine, one of which was the situation in which an "indirect" purchase was in reality a "direct purchase" because the intermediary party was actually controlled by the plaintiff-purchaser. Subsequent cases have extended this concept to the situation in which the intermediary is controlled by the defendant-seller.[25]  In the case at bar, plaintiffs have alleged that

> Defendants own or control a number of transmission lines, as well as natural gas marketing entities for the sale and transportation of natural gas produced by them in interstate commerce, and Plaintiffs believe this will be supported by additional evidence after a reasonable opportunity for further investigation or discovery.

Complaint at ¶ 10.  Because the plaintiffs have alleged control and the facts asserted are in controversy, defendants' motions to dismiss under Rule 12(b)(6) must be denied.

Courts have applied a functional test in determining the existence of control and are willing to conclude that control exists in "relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale." *Jewish Hosp. Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971, 975 (6th Cir. 1980), *cert. denied*, 450 U.S. 966 (1981) (articulating the test but rejecting Hospital's rather strained argument that general contractor was controlled by—and therefore a mere conduit for an illegal overcharge imposed by—defendant subcontractors, merely because it was irrelevant to the subcontractors which general contractor was awarded the Hospital's contract); *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d at 326-327 (indirect purchaser could sue where direct purchaser was a division or subsidiary of a co-conspirator). *Dee-K Enters., Inc. v. Heveafil SDN. Bhd.*, 982 F. Supp. 1138, 1153 (E.D. Va. 1997)  (motion to dismiss denied where plaintiffs "assert that each of the distributor-defendants…is a subsidiary, or is controlled and/or owned by, one of the manufacturer-defendants"); *In re Mercedes-Benz*

---

[25]  *See* cases cited *infra*.

*Antitrust Litig.*, 157 F. Supp. 2d 355, 366 (D.N.J. 2001)  ("Although the courts most often contemplate the application of this 'owned or controlled' exception in the context of wholly owned subsidiaries or interlocking corporate directorates, this Court sees no reason why the rationale would not apply where the control exists through the contractual relationship or agency.").

The issue of control is very much fact-driven. Thus, in *Collins v. International Dairy Queen*, 59 F. Supp.2d 1305 (M.D. Ga. 1999) ), franchisees sued a franchisor over the latter's requirement that its franchisees purchase products coming from warehouses approved by the franchisor. The court said, "[i]t is beyond question that the control exception [to *Illinois Brick*] remains viable" and that the plaintiffs could recover "if they can show that defendants exercised sufficient control over the independent authorized warehouses so that ordinary market forces were superseded… ." *Id.* at 1308.  Based on its examination of the facts, which included the warehouses' obtaining credit from the franchisor, their refusal to stock products endorsed by the franchisee's cooperative, their collection of royalties for the franchisor and their allowing the franchisor to audit their books, the court concluded that such factors "fall short of establishing a sufficient degree of control to establish a 'functional economic unity' between defendants and the warehouse." *Id.* at 1311.  Nevertheless, *Collins* and similar cases point out the importance of allowing plaintiffs to elicit the facts through discovery: ````` disposing of the instant case on a motion to dismiss would unjustly deprive the plaintiffs of that opportunity.

Nor does *Illinois Brick* bar an action by plaintiffs who are competitors of the defendants and whose damages, therefore, are not based solely on a passed-on overcharge, as would be the case with a plaintiff who is merely an indirect purchaser. Under the Robinson-Patman antitrust violations alleged in the complaint, Section IV *supra*, the damages would be based on the level of the discriminatory pricing by defendants in their retail sales as compared to their wholesale sales to the plaintiffs. *Fontana Aviation, Inc. v. Cessna Aircraft Co.,* 617 F.2d 478, 481 (7th Cir. 1980)  (*Illinois Brick* not applicable

because plaintiff was a competitor as well as indirect customer of defendant); *Three Crown Ltd. P'ship v. Salomon Bros.*, No. 92 Civ. 3142, 1995 U.S. Dist. LEXIS 9961 (S.D.N.Y. 1995)  (*Illinois Brick* did not preclude action alleging price fixing in the cash and financing markets for government notes because plaintiffs competed in those markets and claimed injury from defendants' cornering of the markets); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F. Supp. 1246, 1253-56 (E.D. Pa. 1980) ) (actions against conspiring competitors selling through parallel distribution networks could proceed because damages sought were measured by injury to plaintiff rather than illicit gain of defendant).

It is important to keep in mind that *Illinois Brick* was decided before *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983). In that case, the Supreme Court rejected various post-*Illinois Brick* standing tests developed by the courts of appeals, remarking that "these labels may lead to contradictory and inconsistent results."  Instead, the Court said that each case should be examined using the following factors: (1) the causal connection between the antitrust violation and the harm to the plaintiff, including whether the harm was intended; (2) the nature of the injury, taking into account whether the plaintiff is a consumer or competitor in the relevant market; (3) the directness of the injury, and whether the damages are too speculative; (4) the potential for duplicative recovery, and the complexity of apportioning damages; and (5) the existence of more direct victims.  The primary concern of the Court in *Illinois Brick*—the potential for duplicative recovery and the complexity of apportioning damages—is but one of these five factors. Plaintiffs believe that through discovery they will be able to demonstrate that all of the factors listed in *Associated General* militate in favor of allowing this action to proceed.

The D.C. Circuit has stressed the relativistic nature of the *Associated General* test.  *See, e.g.*, *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001), *cert. denied*, 535 U.S. 931 (2002) ("'Inferiority' to another plaintiff does not necessitate that we deny standing but it is a relevant factor," *citing* 2 Phillip E. Areeda, Herbert Hovenkamp &

Roger D. Blair, *Antitrust Law* ¶ 339, at 332 (2d. ed. 2000)).  *Adams v. Pan American World Airways, Inc*., 828 F.2d 24, 29 (D.C. Cir. 1987), *cert. denied*, 485 U.S. 961 (1988) ("Of course the entire logic of *Associated General* supports such a relative approach: it is in large part to preserve the effectiveness of the superior plaintiffs that the inferior ones are denied standing.")  This "relative approach" should be applied in the case at bar.  Plaintiffs believe that the facts—if the Court will give them the opportunity to develop them by denying defendants' motions to dismiss—will show that there are no superior plaintiffs who are even remotely likely to sue, and that the marketers of defendants' natural gas to plaintiffs are effectively under the control of defendants.

## IX.   NEITHER THE STATUTE OF LIMITATIONS NOR CLAIM OF NO PERSONAL JURISDICTION APPLY.

### A.   The Statute of Limitations.

Defendants misconstrue plaintiffs' complaint.  None of the alleged unlawful acts of defendants which caused injury to plaintiffs occurred more than four years before the filing of the complaint. The complaint is based on anticompetitive conduct of the defendants after the 1999 Report, when, beginning in mid-2000, they increased natural gas prices far above the levels projected in the 1999 Report. In any event, it is well established that a cause of action for a continuous antitrust violation accrues each time a plaintiff is injured by an act of the defendant. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L. Ed. 2d 77 (1971); *Poster Exchange, Inc. v. Nat'l Screen Service Corp.*, 517 F.2d 117, 126-28 (5th Cir. 1975);  *KWF Industries, Inc. v. American Tel. & Tel. Co.*, 592 F. Supp. 795 (D. D.C. 1984)  Thus, an alleged conspiracy is deemed to consist of a "continuing series of acts upon which successive causes of actions may accrue." *Postal Exchange, Inc.*, 517 F.2d at 125. The statute of limitations begins to run from the time the illegal act occurs. *Zenith Radio Corp.*, 401 U.S. at 338.

### B.   The Claim of No Personal Jurisdiction in This Court by One Defendant Is Defective.

The claim by Chevron Texaco Corporation that this Court lacks jurisdiction over it, Memorandum at 13, should be denied. Chevron Texaco Corporation has disclosed in its Rule 7.1 certificate that it is the parent of numerous subsidiaries or affiliates named therein. Chevron Texaco Corporation has a corporate office in the District of Columbia at 1401 I Street, N.W., at which it has a Vice President permanently assigned.

When the complaint in this case was originally served on Chevron Texaco at that office, someone there refused service and said it should be served on the company at its headquarters at 6001 Bollinger Canyon Road, San Ramon, CA 94583. Process was then served on the defendant at that address. Subsequently, defendant Chevron Texaco Corporation entered its appearance in this case.

Defendant Chevron Texaco Corporation was a participant with the other defendants in the 2003 subcommittee of the NPC that prepared the pricing for natural gas at high levels. The NPC is located in the District of Columbia.

The federal antitrust laws expressly authorize a complaint "in any district court of the United States in which the defendant resides or is found or has an agent…" 15 U.S.C. § 15(a). Section 12 of the Clayton Act authorizes suits by private persons to enforce the antitrust laws specifically authorize this action.

### § 22.   District in which to sue corporation

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.

## **CONCLUSION**

For the above reasons, defendants' motions to dismiss should be denied.

Respectfully submitted,

WHEATLEY & RANQUIST, P.A.


By:   /s/ Charles F. Wheatley, Jr.
      Charles F. Wheatley, Jr. #121533
      John F. Woods #234310
      James F. Fairman #14464
      34 Defense Street
      Annapolis, MD 21401
      (410) 266-7524
      (301) 261-8608 (Washington, DC line)
      (301) 261-8699 (fax)
      wheatlaw@aol.com

      Robert C. Huntley
      HUNTLEY PARK, L.L.P.
      250 S. 5th Street, Suite 660
      P.O. Box 2188
      Boise, ID 83702
      (208) 388-1230
      (208) 388-0234 (fax)

      *Attorneys for Plaintiffs*

November 19, 2004

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Memorandum by Plaintiffs in Opposition to Defendants' Motions to Dismiss was sent via first-class mail this 19th day of November 2004 to the following individuals:

Stuart H. Harris
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
harriss@howrey.com

*Attorneys for Defendant Exxon Mobil Corporation*

Francis A. Vasquez, Jr.
WHITE & CASE LLP
601 13th Street, NW
Suite 600 South
Washington, DC 20005-3807
fvasquez@whitecase.com

*Attorney for Defendant ConocoPhillips Corporation*

Mark L. Kovner
James W. Draughn, Jr.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005-5793
mkovner@kirkland.com

J. Robert Robertson
Catherine Fazio
Richard C. Godfrey, P.C.
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
rrobertson@kirkland.com
cfazio@kirkland.com

*Attorneys for Defendant BP America, Inc.*

Robert A. Burgoyne
Fulbright & Jaworski
801 Pennsylvania Avenue N.W.
Washington, DC 20004-2604
rburgoyne@fulbright.com

*Attorney for Defendant Coral Energy Resources, L.P.*

/s/ Charles F. Wheatley, Jr.
Charles F. Wheatley, Jr.
WHEATLEY & RANQUIST
34 Defense Street
Annapolis, Maryland  21401
wheatlaw@aol.com

39