UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
———————————————————————————  )
CITY OF MOUNDRIDGE, et al.    )
                             )
        Plaintiffs,          )
                             )
             v.              )     Civil Action No. 04-940 (RWR)
                             )
EXXON MOBIL CORPORATION,     )
     et al.                  )
                             )
        Defendants.          )
———————————————————————————  )
```

MEMORANDUM OPINION AND ORDER

Eighteen municipalities[1] sued Exxon Mobil Corporation, BP America, Inc., Coral Energy Resources, L.P., ChevronTexaco Corporation, and ConocoPhillips Corporation for violations of the antitrust laws including agreeing to artificially inflate the price of natural gas; monopolizing, attempting to monopolize, and conspiring to monopolize; and price discrimination. The cities now seek preliminary injunctive relief to prevent defendants from refusing to sell natural gas for delivery to these cities, and from raising the average wellhead price above $5.85 per thousand cubic feet ("Mcf") for the cities until the matter is resolved on

---

[1]     The plaintiffs are the cities of Moundridge, Kansas; Winfield, Kansas; Coffeyville, Kansas; Denison, Kansas; Garnett, Kansas; Greensburg, Kansas; Halstead, Kansas; Humboldt, Kansas; Iola, Kansas; La Cygne, Kansas; Macon, Missouri; Minneapolis, Kansas; Osage City, Kansas; Rensselaer, Indiana; Sabinal, Texas; Shelbina, Missouri; and Wellington, Kansas, and the Village of Stonington, Illinois.

- 2 -

the merits.  Because the plaintiffs have failed to show
irreparable harm and a likelihood of success on the merits, the
preliminary injunction will be denied.

BACKGROUND

In December of 1999, the National Petroleum Council ("NPC")[2]
released Natural Gas: Meeting the Challenges of the Nation's
Growing Natural Gas Demand ("the 1999 Report").  (Pls.' Statement
of Facts, Ex. 3.)  The 1999 Report indicated that the supply of
natural gas in the United States had increased since 1992, that
natural gas usage in the U.S. would increase between 1999 and
2010, and that this increase in demand could be met by the
industry at "an average production weighted U.S. wellhead gas
price through 2010 of approximately $2.74 per million British
thermal units ("MMBtu")."  (Pls.' Statement of Facts, Ex. 3
at 20.)  The average price of natural gas, however, exceeded the
estimate projected in the 1999 Report by early 2000.  (See Pls.'
Statement of Facts, Ex. 5 at 137.)

On February 1, 2001, plaintiffs, as members of the National
Association of Gas Consumers ("NAGC"), filed a complaint with the

_____

[2]     The NPC is an advisory committee to the Department of
Energy that operates pursuant to the Federal Advisory Committee
Act of 1972.  (ConocoPhillips Mot. to Dismiss at 3.)  "Members of
the [NPC] are appointed by the Secretary of Energy and are drawn
from geographically diverse segments of the oil and gas
industries, academia, financial and research institutions, public
interest entities, Native American tribes, and other groups."
Id.

- 3 -

Federal Energy Regulatory Commission ("FERC").  (Pls.' Mot. and Application for Prelim. Inj. ("Pls.' Mot. for Prelim. Inj.") at 3.)  The complaint asked that FERC "set a benchmark price for natural gas at the wellhead of $2.74 per MMBtu - - the same figure declared as a reasonable average by the NPC in its 1999 Report."  (Id.)  On November 4, 2002, FERC dismissed plaintiffs' complaint and held that the Wellhead Decontrol Act of 1989 divested the FERC of jurisdiction over the matter.  (Id.) Plaintiffs filed for a rehearing, and FERC declined to rehear plaintiffs' complaint, citing reasons it stated in its initial dismissal.  (Id. at 4.)

On March 13, 2002, Secretary of Energy Spencer Abraham requested a new study on natural gas that would "provide insights on energy market dynamics, including price volatility ... and an outlook on the longer-term sustainability of natural gas supplies."  (Defs.' Joint Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Opp'n"), Ex. E at A-1.)  The NPC formed a new subcommittee and several "Task Groups," including the Supply Task Group in which all defendants, except Coral Energy Resources, participated and which an executive from Exxon Mobil chaired, to undertake the inquiry.  (Defs.' Opp'n, Ex. E at B-15.)  In September of 2003, the NPC released the report Balancing Natural Gas Policy: Fueling the Demands of a Growing Economy ("the 2003 Report").  (Id., Ex. E.)  The 2003 Report concluded that there

- 4 -

was a shortage of natural gas in the United States and that
higher gas prices were required to meet increasing demand.
(Pls.' Mot. for Prelim. Inj. at 3.)  According to the 2003
Report, the price of natural gas would continue to rise unless
the United States government adopted a series of legislative
policies recommended by the NPC.  (See Defs.' Opp'n, Ex. E
at 11.)  The price of natural gas in the U.S. has not fallen
below the price projections of the 2003 report.  (Pls.' Mot. for
Prelim. Inj. at 4.)  In fact, "[t]he wellhead price of natural
gas in the United States in 2003 increased dramatically, from an
average of $2.95 per [Mcf] in 2002 to $4.88 Mcf in 2003, almost
double."  (Id.)

After Hurricanes Rita and Katrina made landfall on the Gulf
Coast, the price of natural gas was expected to average $14.00
per MMBtu between December 2005 and March 2006.  (Pls.' Statement
of Facts at 5.)  Five plaintiff cities provided the prices they
have been or will be paying for natural gas during the 2005-2006
winter (Pls.' Reply, Ex. 24-27), although no city has indicated
from whom the natural gas was purchased.[3]  Defendants note,

_____

[3]    Winfield, Kansas paid $10.89 in November 2005, $9.95 in
December 2005 and $10.42 in January 2006.  (Pls.' Reply, Ex. 24
at 2 (no unit provided).)  La Cygne, Kansas paid $10.8533 MMBtu
in November 2005, $11.2257 MMBtu in December 2005, and $12.46
MMBtu in January 2006.  (Id., Ex. 25 at 2.)  Garnett, Kansas
cited an estimated cost of $10.57 for 2005-2006 winter season.
(Id., Ex. 26 at 2 (no unit provided).)  Denison, Kansas is
committed to pay $11.67 for December 2005, $11.67 for January
2006, $11.89 for February 2006, and $11.82 for March 2006.  (Id.,

- 5 -

however, that after the plaintiffs filed their preliminary
injunction motion, the price of natural gas began to fall.
Specifically, between December 21, 2005 and January 5, 2006 the
prices decreased 27 percent due to unseasonably warm weather.
(Defs.' Opp'n at 7, Ex. F.)  The price of the futures contract
for natural gas decreased 29 percent from December 21, 2005, two
days before plaintiffs filed their motion, to January 4, 2006.
(Defs.' Opp'n at 7.)  Plaintiffs are locked into the higher
prices, however, under contracts formed in the fall of 2005
before the prices dropped.  (Pls.' Reply at 1-2, 7.)

Plaintiffs allege they will lose business and customers as a
result of this price increase.  (Pls.' Mot. for Prelim. Inj.
at 16.)  In Moundridge, Kansas, the owners of a family-run
grocery store have told the city that, although they remain in
business, the high natural gas prices make it increasingly
difficult to stay open.  (Pls.' Statement of Facts, Ex. 1B ¶ 6.)
In Macon, Missouri, the higher natural gas prices have "adversely
impacted" the city's major employer so much so that the major
employer's parent company continuously monitors the utility costs
"with an eye toward moving the Macon operation" to where utility
costs are lower. (Id., Ex. 1C ¶¶ 5, 6.)  In La Cygne, Kansas, the

Ex. 27 at 2 (units not provided).)  Moundridge, Kansas paid
$10.14 in September 2005, $11.0695 in October 2005, $12.2542 in
November 2005 and $11.171 in December 2005.  (Pls.' Mot. for
Leave to File Supp. Aff., Ex. A (units not provided).)

- 6 -

major commercial consumer of natural gas may cease operations in
the city, but the consumer has not established a "time frame for
adverse action." (Id., Ex. 1E ¶ 6.)  Plaintiffs allege that this
loss of customers will result in their collection for gas sold
being lower than their liability for gas purchased.  According to
plaintiffs, the loss of revenue will prevent them from providing
"vital social programs" and hamper their ability to fund other
city programs.  (Pls.' Mot. for Prelim. Inj. at 16; Pls.'
Statement of Facts, Ex. 1B ¶ 5, Ex. 1D ¶ 4.)

Plaintiffs argue that defendants have no legitimate
justification for raising the price of natural gas because there
is no shortage in the United States.  (Pls.' Mot. for Prelim.
Inj. at 7-8.)  According to plaintiffs, technically recoverable
natural gas resources are currently 1,769.6 trillion cubic feet
("Tcf").  (Pls.' Statement of Facts at 7.)  Working gas, or gas
available in the marketplace, in storage was 3.225 Tcf as of
November 25, 2005.  (Id. at 7-8.)  Plaintiffs claim that the
amount of natural gas "shut-in," or temporarily unavailable, as a
result of Hurricanes Katrina and Rita is 0.519 Tcf.  (Id. at 8.)
When compared to the total consumption of natural gas in the
United States per year - - 22.4 Tcf - - the plaintiffs assert
that no shortage of natural gas exists.  (Pls.' Statement of
Facts at 6-7, Ex. 2 at 73.)  Defendants, however, cite to
evidence that the supply disruptions caused by Hurricanes Katrina

- 7 -

and Rita exacerbated an already tight supply.  (Defs.' Opp'n
at 7, Ex. B ¶ 6, Ex. G at 2; <u>see also</u> Pls.' Statement of Facts,
Ex. 1G ¶ 19 (plaintiffs' expert Dr. Wilson noting that
"relatively small available supply curtailments can have
substantial price impacts" in inelastic markets, meaning markets
where demand varies little in response to price changes).)

　　　Plaintiffs also claim that defendants have gained, or are
attempting to gain, control of the natural gas market.
Plaintiffs' expert, Dr. John W. Wilson, alleges in his affidavit
that defendants "influence, and in some cases control, gas
production owned or attributed to smaller independent producers"
which amounts to 60 to 70% of the total natural gas production.
(Pls.' Mot. for Prelim. Inj. at 22-23.)  Defendants respond that
their "reported U.S. natural gas reserves amount to no more than
3% of technically recoverable U.S. reserves cited by plaintiffs."
(Defs.' Opp'n, Ex. B ¶ 4.)  Plaintiffs dispute this calculation,
noting that a more accurate formula using the defendants' numbers
shows that defendants control 21% of the proved reserves in the
United States.  (Pls.' Reply at 2, 11-13.)

　　　Plaintiffs filed their complaint in June of 2004.  Over a
year later on December 23, 2005, plaintiffs moved for a
preliminary injunction.[4]

---

[4]　　　This memorandum opinion will assume, without deciding,
that plaintiffs have standing to bring this antitrust action.

DISCUSSION

A motion for a preliminary injunction generally seeks to
maintain the status quo pending a final determination of the suit
on the merits.  Univ. of Texas v. Camenisch, 451 U.S. 390, 395
(1981); WMATA v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C.
Cir. 1977).  Where the effect of the preliminary injunction would
be to alter rather than maintain the relative positions of the
parties, some courts, including judges in this district, have
held that such "mandatory injunctive intervention" requires the
movant to meet an even higher standard than the one applied to a
preliminary injunction seeking only to maintain the parties'
relative positions.  Vietch v. Danzig, 135 F. Supp. 2d 32, 35
(D.D.C. 2001)(citing Phillip v. Fairfield Univ., 118 F.3d 131,
133 (2d Cir. 1997) and Dorfmann v. Boozer, 414 F.2d 1168, 1173
(D.C. Cir. 1969)); but see Friends for All Children, Inc. v.
Lockheed Aircraft Corp., 746 F.2d 816, 835 n.31 (D.C. Cir. 1984)
(stating that no case in this Circuit has clearly imposed a
heightened standard for mandatory injunctions).

"The power to issue a preliminary injunction, especially a
mandatory one, should be sparingly exercised."  Dorfmann, 414
F.2d at 1173 (quotation and citation omitted); see also Cobell v.
Norton, 391 F.3d 251, 258 (D.C. Cir. 2004) (holding that "[a]
preliminary injunction is an extraordinary remedy that should be
granted only when the party seeking relief, by a clear showing,

- 9 -

carries the burden of persuasion"); <u>Mazurek v. Armstrong</u>, 520

U.S. 968, 972 (1997) (stating that a preliminary injunction is

"an extraordinary and drastic remedy").  A request for a

mandatory injunction, as opposed to a prohibitive injunction,

should be viewed "with even greater circumspection than

usual...."  <u>Mylan Pharms., Inc. v. Shalala,</u> 81 F. Supp. 2d 30, 36

(D.D.C. 2000).

A party seeking a preliminary injunction must show that (1)

there is a substantial likelihood the party will succeed on the

merits; (2) the party will be irreparably injured if an

injunction is not granted; (3) an injunction will not

substantially injure other parties; and (4) the public interest

will be furthered by the injunction.  <u>Serono Labs., Inc. v.</u>

<u>Shalala</u>, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).  The factors

"must be viewed as a continuum, with more of one factor

compensating for less of another."  <u>Bradshaw v. Veneman</u>, 338 F.

Supp. 2d 139, 141 (D.D.C. 2004).  Thus, "[i]f the arguments for

one factor are particularly strong, an injunction may issue even

if the arguments in other areas are rather weak."  <u>CityFed Fin.</u>

<u>Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 747 (D.C.

Cir. 1995) (internal citations omitted).

Some showing of irreparable harm, however, is a threshold

requirement for a preliminary injunction.  <u>Id.</u> (explaining that

"[d]espite the flexibility [in weighing the four factors in

- 10 -

relation to each other], we require the moving party to

demonstrate at least 'some injury'") (citing Sea Containers Ltd.

v. Stena AB, 890 F.2d 1205, 1210-11 (D.C. Cir. 1989)); Miami

Bldg. & Constr. Trades Council v. Sec'y of Defense, 143 F. Supp.

2d 19, 27 (D.D.C. 2001) ("For the Court to grant a preliminary

injunction, plaintiffs must make some showing that irreparable

harm will result absent immediate intervention by the Court.").

I.    IRREPARABLE HARM

     "Irreparable harm" is an imminent injury that is both great

and certain, and that legal remedies cannot repair.  Wis. Gas Co.

v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)(citing Sampson v.

Murray, 415 U.S. 61, 88 (1974); Connecticut v. Massachusetts, 282

U.S. 660, 674 (1931); Ashland Oil, Inc. v. FTC, 409 F. Supp. 297,

307 (D.D.C. 1976)).

          The key word in this consideration is
          irreparable.  Mere injuries, however
          substantial, in terms of money, time and
          energy necessarily expended in the absence of
          a stay, are not enough.  The possibility that
          adequate compensatory or other corrective
          relief will be available at a later date, in
          the ordinary course of litigation, weighs
          heavily against a claim of irreparable harm.

Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921,

925 (D.C. Cir. 1958); Davenport v. Int'l Bhd. of Teamsters, 166

F.3d 356, 367 (D.C. Cir. 1999)(holding that eliminating flight

attendants' per diem pay and hotel allowances was not an

irreparable injury because assuming the attendants could prevail,

- 11 -

the change could be remedied with money damages); <u>Sampson</u>, 415
U.S. at 90 (explaining that "the temporary loss of income,
ultimately to be recovered, does not usually constitute
irreparable injury").

In addition to demonstrating a substantial injury, a movant
for a preliminary injunction must demonstrate that the injury has
already taken place or is going to take place in the near future.
"[T]he party seeking injunctive relief must show that 'the injury
complained of [is] of such imminence that there is a clear and
present need for equitable relief to prevent irreparable harm.'"
<u>Wis. Gas Co.</u>, 758 F.2d at 674 (quoting <u>Ashland Oil, Inc.</u>, 409
F. Supp. at 307) (internal quotation marks omitted).

A.   <u>Imminence of the Harm</u>

Plaintiffs claim that the price of natural gas is expected
to average $14.00 per MMBtu between December 2005 and March 2006.
(Pls.' Statement of Facts at 5.)  This projected price is the
basis for plaintiffs contention that they will suffer immediate
harm without an injunction.  These prices, they argue, will
"irreparably injure the Cities and their consumer-owners."  (<u>Id.</u>)
Although plaintiffs have provided the current prices for five
cities, they give no indication of what the remaining cities are
actually paying or may be able to contract for in the future.
Additionally, those cities that divulged their actual costs also
entered these contracts in the fall of 2005, undercutting the

plaintiffs' assertion that on December 23, 2005 when they filed
the preliminary injunction motion, these high prices would cause
plaintiffs immediate harm.  (Pls.' Memo. in Support of their Mot.
for Leave to File Supp. Aff. at 1.)

     As defendants contend, ever since the plaintiffs submitted
their motion for a preliminary injunction, price projections for
natural gas have decreased because "unseasonably mild weather
moved into most of the Lower 48 States [and] mitigated heating
demand for natural gas."  (Defs.' Opp'n at 7 (internal quotation
marks omitted).)  According to defendants, the price of the
futures contract for natural gas decreased almost thirty percent
from December 21, 2005, two days before plaintiffs filed their
motion for a preliminary injunction, to January 4, 2006.  (Id.)
Although some cities are locked into higher prices for this
winter, the dropping natural gas prices undermines plaintiffs'
claim that "irreparable injury is likely to occur."  Wis. Gas.
Go., 758 F.2d at 674 (emphasis added)(internal quotation marks
omitted).

     Although the projected winter prices of 2005-2006 form the
basis of plaintiffs claim of irreparable harm, they seek an order
setting the price of natural gas at a level of $5.85 per Mcf, the
average price of natural gas from November 2004 through March
2005.  Notably, the $5.85 price was exceeded in November 2004,
over one year before plaintiffs filed their motion for a

- 13 -

preliminary injunction.  (Pls.' Statement of Fact, Ex. 10.)
"Though such a delay is not dispositive of the issue, it further
militates against a finding of irreparable harm."  Mylan Pharms.,
Inc., 81 F. Supp. 2d at 44.  Plaintiffs' delay in filing their
application for a preliminary injunction suggests that the
alleged harm is not imminent.

    B.   Economic Harm

    Recoverable monetary injuries ordinarily are not irreparable
and subject to being remedied by an injunction unless "the loss
threatens the very existence of the movant's business."  Wis.
Gas. Go., 758 F.2d at 674.  Although several plaintiffs contend
that business consumers are contemplating relocating, in the
worst case scenario, the City of Macon, Missouri might lose a
customer that comprises 19 to 20 percent of the city's utility
revenue.  (Pls.' Mot. for Prelim. Inj. at 16, Ex. 1C ¶¶ 5,6.)
Other cities, like Winfield, Kansas, claim that the "gas utility
budget will be seriously in the red at the end of the year...,"
as a result of the purported loss of customers (id., Ex. 1A,
¶ 10), or that the loss of revenue will prevent them from
providing "vital social programs" and hamper their ability to
fund other city programs.  (Pls.' Mot. for Prelim. Inj. at 17.)
The cities' fear and speculation, however, does not establish
that the loss of revenue threatens the existence of the public
utilities plaintiffs run, or the municipalities themselves.

- 14 -

<u>Varicon Int'l v. Office of Personnel Mgmt.</u>, 934 F. Supp. 440, 448
(D.D.C. 1996)(noting that "even if MVM were to lose the contract
to USIS a ten percent decrease in revenues would not threaten
MVM's existence").  Nor is plaintiffs' claim of irreparability
aided by their own suggestion that the defendants pay the
plaintiffs as part of the preliminary injunctive remedy the
difference between their price of natural gas and the price they
propose that the injunction fix.  (Pls.' Reply at 17-18.)
Plaintiffs' "mere economic loss [] will not support a finding of
irreparable injury."  <u>Wis. Gas. Go.</u>, 758 F.2d at 675 (internal
quotation marks omitted).

     C.   <u>Harm to the Public</u>

     Plaintiffs also claim that the cities' customers will suffer
irreparable harm if the injunction does not issue.  (Pls.' Mot.
for Prelim. Inj. at 17-18.)  Although the Supreme Court has held
that monetary remedies - - like refunds to consumers for illegal
overcharges - - are not adequate remedies at law to compensate
consumers in some circumstances, these cases have involved claims
by the consumers themselves or their representative seeking an
injunctive remedy.  <u>See</u> <u>Miss. Power & Light Co. v. United Gas</u>
<u>Pipe Line Co.</u>, 760 F.2d 618, 625 (5th Cir. 1985) (involving the
Mississippi Public Service Commission intervening on behalf of
consumers in the state); <u>Fed. Power Comm'n v. Tenn. Gas</u>
<u>Transmission Co.</u>, 371 U.S. 145, 150 (1962) (involving the city of

- 15 -

Pittsburgh representing its resident consumers of natural gas).
Here, however, no public interest or state entities have
intervened purporting to represent the consumers of the cities'
utilities.  In any event, considering the "broad public interest"
in addition to the interest of the consumers of the product at
issue is appropriate in assessing the public interest prong of
the preliminary injunction test,  Tri-State Generation &
Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351,
358 (10th Cir. 1986), but does not relieve the movants of
demonstrating irreparable harm to themselves.

     With plaintiffs' irreparable harm allegation based upon
outdated price projections, with a delay of over one year after
prices exceeded their suggested level before plaintiffs filed
their motion for a preliminary injunction, with no proof that the
utilities plaintiffs run or the cities themselves will be forced
out of business by the high prices of natural gas, and with no
ability to substitute proof of irreparable harm to the public for
their own, plaintiffs have not met their burden of establishing
they will suffer irreparable harm if an injunction does not
issue.

II.  LIKELIHOOD OF SUCCESS ON THE MERITS

     The plaintiffs must show that they have a likelihood of
success on the merits for their price-fixing claim under § 1 of
the Sherman Act, 15 U.S.C. § 1 (2000), and the conspiracy to

- 16 -

monopolize claim under § 2 of the Sherman Act.  15 U.S.C. § 2.
The defendants dispute that the plaintiffs will succeed on the
merits.  In addition, defendant Coral claims that the plaintiffs
are not likely to succeed on the merits as to it because its
rates are regulated by FERC.

    A.   Conspiracy

    In an antitrust case, "[i]t is well settled that concerted
action may be established by circumstantial evidence."  FTC v.
Lukens Steel Co., 454 F. Supp. 1182, 1189 (D.D.C. 1978).
"Indeed, it is axiomatic that the typical conspiracy is rarely
evinced by explicit agreements, but must almost always be proven
by inferences that may be drawn from the behavior of the alleged
conspirators."  ES Dev., Inc. v. RWM Enters., Inc., 939 F.2d 547,
553 (8th Cir. 1991)(internal quotation marks omitted).  To permit
such an inference, however, "[t]he correct standard is that there
must be evidence that tends to exclude the possibility of
independent action . . ..  That is, there must be direct or
circumstantial evidence that reasonably tends to prove . . . a
conscious commitment to a common scheme designed to achieve an
unlawful objective."  Monsanto Co. v. Spray-Rite Serv. Corp., 465
U.S. 752, 768 (1984);  see also Cooper v. Forsyth County Hosp.
Auth., Inc., 789 F.2d 278, 281 (4th Cir. 1986).  "An inference of
concerted action is warranted where the totality of circumstances
reveals a 'unity of purpose or a common design and understanding,

- 17 -

or a meeting of the minds in an unlawful arrangement.'" Lukens
Steel Co., 454 F. Supp. at 1189 (quoting Am. Tobacco Co. v.
United States, 328 U.S. 781, 810 (1946)).

First, a plaintiff must "br[ing] forth sufficient
circumstantial evidence from which a conspiracy may be inferred."
Kreuzer v. Am. Acad. of Periodontology, 735 F.2d 1479, 1488 (D.C.
Cir. 1984). Then "the defendant may deny the existence of a
conspiracy and offer an innocent explanation of the questioned
conduct." Id. "If this explanation is plausible and more
logical than a theory of concerted action, then a conspiracy may
not be found. At all times, of course, the ultimate burden of
persuading the factfinder that a conspiracy exists is on the
plaintiff." Id. "Facing the sworn denial of the existence of
conspiracy, it [is] up to plaintiff to produce significant
probative evidence by affidavit or deposition that conspiracy
existed if summary judgment [is] to be avoided." Lamb's Patio
Theatre, Inc. v. Universal Film Exchanges, Inc., 582 F.2d 1068,
1070 (6th Cir. 1978).

Conspiracy may be inferred from evidence of "parallel
business behavior" if the evidence tends to exclude the
possibility of independent action. Lukens Steel Co., 454 F.
Supp. at 1189; see also Apex Oil Co. v. DiMauro, 822 F.2d 246,
253 (2nd Cir. 1987); Fragale & Sons Beverage Co. v. Dill, 760
F.2d 469, 473 (3rd Cir. 1985). "Tacit collusion, sometimes

called oligopolistic price coordination or conscious parallelism,
describes the process, not in itself unlawful, by which firms in
a concentrated market might in effect share monopoly power,
setting their prices at a profit-maximizing, supracompetitive
level by recognizing their shared economic interests and their
interdependence with respect to price and output decisions."
Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S.
209, 227 (1993).

To prove a conspiracy based on consciously parallel
behavior, a plaintiff must show: "(1) that the defendants'
behavior was parallel; (2) that the defendants were conscious of
each other's conduct and that this awareness was an element in
their decision-making processes; and (3) certain 'plus' factors."
Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,
998 F.2d 1224, 1242-43 (3rd Cir. 1993).  The plus factors are
necessary to showing concerted action because parallel behavior,
such as parallel price increases, is often consistent with
independent reactions to a competitive market.  Apex Oil Co., 822
F.2d at 253; see also Brooke Group Ltd., 509 U.S. at 237 (noting
that "rising prices do not themselves permit an inference of a
collusive market dynamic").  The D.C. Circuit has held that to
show that parallel behavior is not the result of independent
conduct, the plaintiff must (1) show that the "acts by the
defendants [are] in contradiction of their own economic

interests," and (2) make a "satisfactory demonstration of a
motivation to enter into a conspiracy." Kreuzer, 735 F.2d
at 1488 n.12.; see also Fed. Prescription Serv., Inc. v. Am.
Pharm. Ass'n, 663 F.2d 253, 267 (D.C. Cir. 1981)(noting that
"parallel behavior may support an inference of conspiracy when
the alleged co-conspirators have acted in a way inconsistent with
independent pursuit of economic self-interest, [but] that
inference is warranted only when a theory of rational,
independent action is less attractive than that of concerted
action"); see also Lukens Steel Co., 454 F. Supp. at 1190-1191.
But see Petruzzi's IGA Supermarkets, Inc., 998 F.2d at 1242
(Third Circuit opinion noting that a range of circumstantial
evidence can be a plus factor, "'[f]or example, have they
attended meetings or conducted discussions at which they had the
opportunity to conspire; have they acted against their own
economic best interests; have they engaged in parallel behavior
that is economically irrational unless an agreement exists; has
at least one participant expressly invited common action by the
other'")(quoting William C. Holmes, 1992 Antitrust Law Handbook
§ 1.03[3], at 154).

     Generally, conspiracy by conscious parallelism is unlikely
because it is difficult to achieve coordination without an
express agreement.  See, e.g., Brooke Group Ltd., 509 U.S.
at 239-240.  Some types of markets, however, lend themselves

better to consciously parallel behavior. "Tacit coordination is facilitated by a stable market environment, fungible products, and a small number of variables upon which the firms seeking to coordinate their pricing may focus." Id. at 238. Susceptible markets also have inelastic demand, customers with low bargaining power and a homogenous product. See Petruzzi's IGA Supermarkets, Inc., 998 F.2d at 1232.

Here, representatives of each of the gas-producing defendants have submitted affidavits swearing that no conspiracy exists and that each company sets its prices independently. (Defs.' Opp'n, Ex. A-1 ¶ 5, Ex. A-2 ¶ 4, Ex. A-4 ¶ 3, Ex. A-5 ¶ 4-6; but see id., Ex. A-3 ¶ 4 (noting that defendant Coral Energy Resources is a marketer of natural gas, not a producer of natural gas).) This raises the plaintiffs' burden to show "significant probative evidence" of a conspiracy. Lamb's Patio Theatre, Inc., 582 F.2d at 1070. Plaintiffs claim that "defendants acted in concert to withhold output." (Pls.' Mot. for Prelim. Inj. at 29 n.20.) To support this assertion, plaintiffs note that the natural gas market is one that is highly susceptible to tacit collusion because natural gas is a homogenous product and in the short-term no viable alternatives exist, causing the market for natural gas to be price inelastic. (Pls.' Mot. for Prelim. Inj. at 22, Ex. 1G ¶ 19.) Plaintiffs, however, must point to evidence

that tends to show that the defendants were involved in a
conspiracy to restrain trade.

      1.   Parallel behavior

     Without identifying from whom they purchase natural gas,
five cities submitted reply affidavits describing the contract
prices for natural gas that they currently pay.  (Pls.' Reply,
Ex. 24 at 2, Ex. 25 at 2, Ex. 26 at 2, Ex. 27 at 2; Pls.' Mot.
for Leave to File Supp. Aff., Ex. A.)  Plaintiffs also cite to
the average wellhead price, and gas prices and futures listed on
the New York Mercantile Exchange.  (Pls.' Mot. for Prelim. Inj.
at 4-6.)  The plaintiffs do not reveal the prices at which
defendants were selling gas to them or to anyone, or any such
prices which lead them to believe the defendants were colluding.
(See Pls.' Statement of Facts, Ex. 1A-1F.)  Without evidence of
actual prices charged by these defendants, the plaintiff cannot
show that the defendants' behavior was in fact parallel, the
first element necessary in showing a conspiracy with conscious
parallelism.  See, e.g., Petruzzi's IGA Supermarkets, Inc., 998
F.2d at 1242-43.  In fact, the reply affidavits make clear that
all of the five cities who revealed their prices are paying
different prices for natural gas this winter.[5]

     It does seem likely, however, that in a market for a
fungible product, the defendants' prices would have been similar.

---

    [5]    See n.3 above.

- 22 -

"Even in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of conscious parallelism or supracompetitive pricing." Brooke Group Ltd., 509 U.S. at 237.  Even if the plaintiffs had shown that the defendants did charge parallel prices, however, the plaintiffs would still have to provide evidence to show an awareness of the pricing conduct as an element of defendants' decision-making, and to support the "plus factors" necessary to demonstrate that the defendants did not act independently.

> 2.   Awareness of the conduct as element of decision-making

The plaintiffs' claim of conscious parallelism requires a showing that the defendants were aware of each other's conduct and relied upon that conduct in their own decision-making.  See Petruzzi's IGA Supermarkets, Inc., 998 F.2d at 1242-43. Plaintiffs cite to the defendants' joint participation in the National Petroleum Council and the defendants' historical relationships as possible opportunities for the defendants to learn about the pricing and business practices of the other companies.  (See Pls.' Statement of Facts, Ex. 1G ¶ 21, and Pls.' Mot. for Prelim. Inj. at 3.)  Evidence that competitors merely exchanged information does not establish a conspiracy.  See Kreuzer, 735 F.2d at 1487.  "Evidence of an opportunity to conspire, although relevant, is not enough to sustain an antitrust plaintiff's burden, and, without more, does not create

a jury question on the issue of concerted action." <u>Fragale &</u>
<u>Sons Beverage Co.</u>, 760 F.2d at 473.

While the defendants' historical relationship and their
participation on the NPC might be relevant to whether they knew
about each others pricing practices, it is far from clear that
plaintiffs have explicitly demonstrated it.  (<u>See</u> Pls.' Statement
of Facts, Ex. 1G ¶ 16-18.)  Plaintiffs also have not addressed
whether defendants used this pricing information in making their
own pricing choices.  (Pls.' Mot. for Prelim. Inj. at 20-32.)
Although defendants do not specifically dispute this element of
the test, they do dispute that they ever conspired.  (<u>See</u> Defs.'
Opp'n at 13.)  Even if the plaintiffs had offered sufficient
proof of the defendants' parallel behavior or have shown
defendants' use of each others' prices in their own decision-
making, plaintiffs would still need to demonstrate the presence
of required plus factors.

        3.   Plus factors

Proof of plus factors tending to exclude the possibility of
independent action is important given the similarity between a
competitive market and a conspiracy based on conscious
parallelism.  <u>Apex Oil Co.</u>, 822 F.2d at 254; <u>see also</u> <u>Dimidowich</u>
<u>v. Bell & Howell</u>, 803 F.2d 1473, 1479 (9th Cir. 1986) (applying
the Cartwright Act, a California state prohibition on restraint

of trade).  The factors should be viewed in the context of all of the evidence presented.  See Apex Oil Co., 822 F.2d at 255.

Here, the plaintiffs' expert reviewed evidence that defendants are closely associated through joint leasing operations, that defendants as large natural gas producers control the majority of the available natural gas supply, and that the available and uncommitted supply of natural gas directly affects the price of natural gas.  (Pls.' Statement of Facts, Ex. 1G ¶ 16-19, 21.)  He asserts only that the defendants' behavior is "consistent with the Plaintiffs' allegations" of a conspiracy. (Id. ¶ 12.)  However, as defendants point out, the plaintiffs' burden of proof it to exclude the possibility that the defendants acted independently.  (Defs.' Opp'n at 14.)  The additional evidence the plaintiffs offer of the defendants' participation on the NPC that issued the 1999 and 2003 Reports standing alone also fails to add support for any fair inference of a conspiracy. Although opportunity to conspire is relevant, it cannot alone raise an inference of conspiracy.  See Fragale & Sons Beverage Co., 760 F.2d at 473.

The plaintiffs do not attempt, however, to support their claim of conspiracy under the D.C. Circuit's plus factors. Instead, plaintiffs assert that the court should consider another plus factor - - high prices existing in a time of oversupply and a pretextual reason given for these prices.  (Pls.' Mot. for

Prelim. Inj. at 26-27.)  Some courts have held that "price increases which occur in times of surplus or when the natural expectation would be a general market decline, must be viewed with suspicion." <u>C-O-Two Fire Equip. Co. v. United States</u>, 197 F.2d 489, 497 (9th Cir. 1952).  In <u>C-O-Two Fire Equipment Co.</u>, however, the court also considered evidence of historical use of illegal licensing agreements, artificial standardization of products, and policing of dealers to effectuate the conspiracy in addition to high prices in a time of oversupply to conclude that uniform high prices were the result of an illegal conspiracy. 197 F.2d at 497.  The court found that this combination of evidence supported the inference of a conspiracy and eliminated the possibility of independent action.  <u>Id.</u>

Here, the plaintiffs' expert does not assert that an oversupply of natural gas existed in the market during the relevant time.  (<u>See, e.g.</u>, Pls.' Statement of Facts, Ex. 1G ¶ 19, 20, 22, 23.)  The plaintiffs' expert also fails to address the plaintiffs' comparison of the levels of proved reserves of natural gas, working natural gas levels in storage and the losses and shut-in of natural gas as a result of the hurricanes with the estimated total consumption of natural gas in the United States. (<u>See</u> Pls.' Statement of Facts ¶ 12-19.)  The defendants, however, offer a report from the Federal Energy Regulatory Commission which describes the natural gas market as having a tight supply

because "[n]atural gas production in the United States has fallen slightly in the past few years, and imports have grown only slightly," while demand for natural gas has grown.  (Defs.' Opp'n, Ex. G at 2.)  The evidence tends to show that natural gas was not oversupplied, but tight.

Courts have also held that pretextual reasons given for a defendant's actions can give rise to an inference of a conspiracy in certain cases.  In Dimidowich, the Ninth Circuit held that a "jury reasonably could conclude that [the defendant's] stated reason for refusing to sell to [plaintiff] was a mere pretext" when the plaintiff offered evidence that the defendant lied.  803 F.2d at 1480 (applying a California antitrust statute to a claim of refusal to deal).  This pretext constituted "evidence that tends to support an inference of concerted action by [the defendants] and tends to exclude the possibility of independent action."  Id.  For evidence of pretext to support an inference of conspiracy, however, it must be supported by additional evidence of opportunity to conspire, direct evidence of an agreement, or other circumstantial evidence of restraint of trade.  See, e.g., Fragale & Sons Beverage Co., 760 F.2d at 474 (holding that the defendant's pretextual reason for refusing to deal with the plaintiff could give rise to the inference of a conspiracy where the plaintiff also offered direct evidence of a meeting between

- 27 -

defendants and evidence that the defendant deals with all other
distributors other than the plaintiff.)

Plaintiffs here present no evidence to rebut the claim that
the hurricanes affected the price of natural gas or even to show
that the defendants lied about the reason for the increase in the
price of natural gas.  The defendants offer a FERC report that
noted that the hurricanes' disruption in the natural gas
production and distribution exacerbated the already tight supply.
(Defs.' Opp'n, Ex. G at 2.)  In fact, the plaintiffs' expert
notes that "relatively small available supply curtailments can
have substantial price impacts," which tends to support the
defendants' view that the hurricanes exacerbated a market that
had an already tight supply of natural gas.  (Pls.' Statement of
Facts, Ex. 1G ¶ 19; <u>see also</u> Defs.' Opp'n, Ex. G at 2.)

Based on the evidence presented by the plaintiffs, and the
sworn statements and justifications provided by the defendants,
the plaintiffs have not shown that the defendants conspired.

B.   <u>Price Fixing: § 1 of the Sherman Act</u>

"Every contract, combination in the form of trust or
otherwise, or conspiracy, in restraint of trade or commerce among
the several States, or with foreign nations, is declared to be
illegal."  15 U.S.C. § 1.  "Under the Sherman Act a combination
formed for the purpose and with the effect of raising,
depressing, fixing, pegging, or stabilizing the price of a

commodity in interstate or foreign commerce is illegal per se."
United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940).
"Functionally, an agreement to restrict output works in most
cases to raises prices above a competitive level."  United States
v. Andreas, 216 F.3d 645, 667 (7th Cir. 2000).  "A prototypical
output restriction raises prices by reducing supply below
demand."  Id.  In American Tobacco Co., 328 U.S. at 805-806, the
Supreme Court found that where "[n]o economic justification for
this raise was demonstrated" and where the companies had made
record profits after a raise in price, in addition to detailed
evidence of identical price lists, the inference of a conspiracy
to raise prices had been supported.

Here, as is discussed above, the plaintiffs have not
sufficiently supported their claim of a conspiracy and thus their
§ 1 price fixing claim does not have a likelihood of success on
the merits.  The plaintiffs have shown that the defendants reaped
staggeringly high profits in the third quarter of 2005 (Pls.'
Statement of Facts ¶ 20), and that could ordinarily add some
circumstantial evidence to support an inference of conspiracy.
Id.  However, the defendants have offered a reasonable economic
justification for the increase in price, namely, a tight supply
exacerbated by a destructive hurricane season.  Defendants'
justification is corroborated by the falling natural gas prices
since the end of January, attributed to reports of mild winter

weather and a corresponding decrease in demand.  (Defs.' Opp'n at 7, Ex. F (noting that gas prices "continued their downward trend from a relative peak on December 13 . . . [a]s a result of the mild temperatures mitigating heating demand").)

Because plaintiffs have not shown that the defendants conspired and have not shown that the rising prices are unjustified, they have not shown a likelihood of success on the merits of the § 1 price fixing claim.

C.  Conspiracy to Monopolize: § 2 of the Sherman Act

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony," 15 U.S.C. § 2.  "A plaintiff must demonstrate the existence of four elements to state a claim for conspiracy to monopolize: (1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize a designated segment of commerce."  Genetic Sys. Corp. v. Abbott Laboratories, 691 F. Supp. 407, 420 (D.D.C. 1988).

In addition to failing to support their claim that the defendants conspired to monopolize, plaintiffs have failed to show that the defendants had the specific intent to do so.  "In

- 30 -

determining whether the plaintiff satisfies the specific intent to monopolize element, a court can infer intent from conduct that has no legitimate business justification but to destroy or damage competition." GTE New Media Servs., Inc. v. Ameritech Corp., 21 F. Supp. 2d 27, 45 (D.D.C. 1998). This element is proven where "it is otherwise apparent from the character of the defendants' actions," such as eliminating viable means of competition or by channeling customers away from the competition. Id. Where the illegal purpose of driving competitors from the market with predatory or exclusionary means is apparent, specific intent is sufficiently shown. See id. Where the plaintiffs' claim is not sufficiently supported by a factual assertion, however, specific intent is not supported. Genetic Sys. Corp., 691 F. Supp. at 422. Plaintiffs' unsupported allegation cannot remedy this deficiency.

"[N]o particular level of 'market power' or 'dangerous probability of success' has to be alleged or proved here." GTE New Media Servs., Inc., 21 F. Supp. 2d at 45 (citing Am. Tobacco Co., 328 U.S. at 789); see also Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n of Kan., 891 F.2d 1473, 1484 (10th Cir. 1989) (holding that market power need not be proven to sustain a conspiracy to monopolize claim). Some courts, however, have found aggregate market share relevant to the issue of specific intent. See e.g., Rebel Oil Co., Inc. v. Atl. Richfield

Co., 51 F.3d 1421, 1437-1438 (9th Cir. 1995) (applying the
aggregate market share number to an attempt to monopolize claim);
Brager & Co., Inc. v. Leumi Sec. Corp., 429 F. Supp. 1341, 1346
(S.D.N.Y. 1977) (holding that if the plaintiff's allegation that
defendant controls more than 60% of the market share "if proven,
could be taken as some evidence that the requisite intent to
monopolize existed").

Here, plaintiffs have alleged that together the defendants
own or control 70% of the relevant market.  (Pls.' Mot. for
Prelim. Inj. at 31.)  Defendants have challenged this allegation,
noting that together they control not more than 3% of the
technically recoverable reserves in the United States.  (Defs.'
Opp'n at 5 and Ex. B ¶ 4.[6])  Plaintiffs challenge this
calculation, and assert that using the defendants numbers, the
defendants control 21% of natural gas production in the United
States.  (Pls.' Reply at 2, 11-13.)  Beyond their experts'
opinion that defendants directly or indirectly control 60-70% of
domestic natural gas, plaintiffs offer no further documentation
or evidence to rebut the defendants' contrary evidence.  (Pls.'
Statement of Facts, Ex. 1G ¶ 18.)  Other than the assertions of
the aggregate market share of the defendants, the plaintiffs have

---

[6]    Plaintiffs assert that 1,769.6 Tcf of "technically
recoverable" reserves of natural gas exist in the United States.
(Pls.' Statement of Facts ¶ 15.)  Defendants assert that they
collectively control only 41 Tcf.  (Defs.' Opp'n, Ex ¶ 4.)

alleged no predatory or exclusionary acts that would further an inference of the defendants' specific intent to monopolize.  Even if defendants raised their prices artificially, this would not have harmed their competitors because higher prices would make it easier for competitors to compete in the market, would not evince an anti-competitive intent, and thus could not qualify as a predatory practice.  See GTE New Media Servs., Inc., 21 F. Supp. 2d at 45 (holding that evidence of conduct that "effectively eliminated a viable means of competing" demonstrates specific intent).  Plaintiffs have failed to support their claim that the defendants have a specific intent to monopolize.

Plaintiffs have failed to carry their burden of showing that the defendants have conspired to monopolize, as they have not shown that the defendants have conspired and they have not shown that the defendants had specific intent to monopolize.  The plaintiffs have not shown a likelihood of success on the merits of the § 2 claim of conspiracy to monopolize.

D.   Coral Energy Resources, L.P. Opposition

Coral Energy Resources, L.P. ("Coral") argues that plaintiffs will not likely succeed on the merits as to it because of the filed rate doctrine.  As a natural gas marketer, as opposed to a producer, Coral claims to be subject to the jurisdiction of the FERC.  Coral, unlike the other defendants, does not produce natural gas and thus does not offer it for first

- 33 -

sale in the market place.  (See Coral Opp'n at 1.)  Only first

sales[7] were deregulated under the Natural Gas Policy Act, leaving

the secondary sales by Coral subject to the FERC's regulation.

See 15 U.S.C. § 3431(a)(1)(a).  Other sales of natural gas in

interstate commerce continue to be subject to FERC regulations

under 15 U.S.C. § 717.[8]  FERC then allows sellers under its

jurisdiction to make sales of gas at negotiated rates, under a

blanket marketing certificate, of which Coral is a holder.  (See

Coral Opp'n at 2.)

The filed rate doctrine "provides that state law, and some

federal law (e.g. antitrust law), may not be used to invalidate a

filed rate nor to assume a rate would be charged other than the

rate adopted by the federal agency in question."  Transmission

Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 929

(9th Cir. 2002).  Under this doctrine, "[n]o court may substitute

---

[7]     First sale is defined as "any sale of any volume of
natural gas (i) to any interstate pipeline or intrastate
pipeline; (ii) to any local distribution company; (iii) to any
person for use by such person; (iv) which precedes any sale
described in clauses (i), (ii), or (iii); and (v) which precedes
or follows any sale described in clauses (i), (ii), (iii), or
(iv) and is defined by the Commission as a first sale in order to
prevent circumvention of any maximum lawful price established
under this chapter."  15 U.S.C. § 3301(21)(A).

[8]     "The provisions of this chapter shall apply to the
transportation of natural gas in interstate commerce, to the sale
in interstate commerce of natural gas for resale for ultimate
public consumption for domestic, commercial, industrial, or any
other use, and to natural-gas companies engaged in such
transportation or sale, and to the importation or exportation of
natural gas in foreign commerce and to persons engaged in such
importation or exportation . . .."  15 U.S.C. § 717(b).

its own judgment on reasonableness for the judgment of the
[FERC].  The authority to decide whether the rates are reasonable
is vested by § 4 of the Act solely in [FERC]."  <u>Ark. L.A. Gas Co.
v. Hall</u>, 453 U.S. 571, 577 (1981).  This doctrine applies even
though FERC has moved to a market-based rate system.  <u>In re: W.
States Wholesale Natural Gas Antitrust Litig.</u>, 368 F. Supp. 2d
1110, 1116 (D. Nev. 2005) ("The essential purpose of the filed
rate doctrine is to protect the jurisdiction of a regulatory body
that Congress has designated to determine whether rates charged,
such as those in the natural gas market, are just and reasonable.
Under the Natural Gas Act, FERC retains statutory authority over
wholesale natural gas prices and therefore the filed rate
doctrine applies even though FERC, in exercising its authority,
chose to move toward a market-based system.").  When "[t]he
relief sought by [plaintiff] would require the court to set
damages by assuming a hypothetical rate," it violates the filed
rate doctrine.  <u>Pub. Util. Dist. No. 1 of Grays Harbor County
Wash. v. IDACORP Inc.</u>, 379 F.3d 641, 651 (9th Cir. 2004).

    The filed-rate doctrine precludes this court from setting a
new rate for the sale of natural gas as to Coral since Coral is
likely subject to the jurisdiction of FERC and only FERC can deem
unreasonable its sales of natural gas.  In addition, because the
plaintiffs have not offered evidence supporting the claim of
conspiracy to restrain trade, and have failed to support the

remaining elements under the Sherman Act claims of price fixing
and conspiracy to monopolize, they have not shown that they will
likely succeed on the merits.

III. BALANCING THE HARMS

"'[A]s a general matter, the Sherman Act does not restrict
the long recognized right of [a] trader or manufacturer engaged
in an entirely private business, freely to exercise his own
independent discretion as to parties with whom he will deal.'"
(Defs.' Opp'n at 28-29)(quoting Verizon Communications Inc. v.
Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408
(2004))(internal quotation marks omitted).  Defendants, with one
exception, contend they do not currently sell natural gas to
plaintiffs.[9]  (Defs.' Opp'n, Ex. A-1 ¶ 2, Ex. A-2 ¶ 3, Ex. A-3
¶ 5, Ex. A-4 ¶ 4.)  The plaintiffs' proposed injunction would
require the defendants to sell to customers against their will at
prices set by this court, which defendants argue would deprive
them of their fundamental freedom of contract.

Defendants also maintain that the injunction would require
them "to invest in assets or acquire some means ... to deliver
gas to plaintiffs' city-gates" because plaintiffs do not
currently purchase natural gas from the wellhead from defendants.
(Defs.' Opp'n at 29.)  Defendants claim they are unable to

---

[9]     Defendant ConocoPhillips sold on a spot basis to
Wellington, Kansas after this lawsuit was initiated.  (Defs.'
Opp'n, Ex. A-5 ¶ 3.)

estimate the amount of money or resources that would be necessary to comply with the proposed injunction.  (Defs.' Opp'n at 29.)

Plaintiffs' have not met their burden of establishing that they "will *in fact*" suffer a substantial harm, and the balancing of the harms weighs in favor of defendants.  Wis. Gas. Go., 758 F.2d at 674 (emphasis original).  Plaintiffs base their allegation that they will suffer irreparable harm on high and outdated price projections for the 2005-2006 winter season, and have failed to provide proof that they will "be forced out of business" by the high prices of natural gas.  Id. at 675. Defendants' corporate officers claim defendants do not currently sell natural gas to plaintiffs and plaintiffs have offered no evidence to establish otherwise.  (Defs.' Opp'n, Ex. A-1 ¶ 2, Ex. A-2 ¶ 3, Ex. A-3 ¶ 5, Ex. A-4 ¶ 4, Ex. A-5 ¶ 3.)  The plaintiffs do not dispute that the defendants would have to expend an undetermined amount of resources and money to comply with the proposed injunction, and their proposed alternative - - ordering the defendants to pay the plaintiffs the difference between their natural gas costs and the requested price - - further undermines the plaintiffs' claim of greater and irreparable harm.  (See Pls.' Reply at 17-18.)

IV.  PUBLIC INTEREST

When considering whether the public interest will be furthered by an injunction, the broad public interest often outweighs the limited interests of the consumers.  See Tri-State Generation & Transmission Ass'n, 805 F.2d at 357-58 (finding that the interests of power consumers had to give way to concerns about the viability of the Rural Electrification Administration). Although courts have sometimes found that injunctive relief is in the public interest because of the difficulty in getting refunds to consumers to whom they are due, Tenn. Gas Transmission Co., 371 U.S. at 154-155, the broader public interest must be evaluated here.

Plaintiffs argue that money damages in the form of refunds would be insufficient to alleviate their customers' hardships. (Pls.' Mot. for Prel. Inj. at 18-19.)  Plaintiffs point to Macon, Missouri where "more than 16 percent of the 2,385 households in Macon have less than $10,000 income."  (Id.)  In Winfield, Kansas, high gas prices will have "an absolutely devastating effect on [its] customers," many of whom live on a limited income.  (Id., Ex. 1A ¶ 10.)  The only full-service grocery store in Moundridge, Kansas is in danger of closing because of high natural gas prices, endangering the economic health of the town. (Id., Ex. 1B ¶ 6.)  Several plaintiffs fear that important social programs, once funded by natural gas revenues, will be cut or

- 38 -

eliminated as the price of natural gas rises.  (Id., Ex. 1D ¶ 4,
Ex. 1E ¶ 5.)  Plainly relevant to assessing the public interest
are the numerous low-income households in plaintiffs' localities
whom an injunction may rescue from having to choose between
paying for food and paying for winter heating.  Nevertheless,
plaintiffs do not address the effects of the injunction on the
broader public interest.  (Pls.' Mot. for Prelim. Inj. at 18-19.)

Defendants take a broader view of the public interest,
arguing that plaintiffs' proposed injunction is contrary to the
public policy that deregulated the natural gas industry, that it
would thrust the court into a supervisory role for which it is
ill-suited, and that it would discourage the private sector from
voluntarily providing market projections to the government.
(Defs.' Opp'n at 30-32.)  Their argument has merit.  Through
deregulation, Congress has determined that government-mandated
price ceilings for natural gas run counter to the nation's
interests because artificially low prices adversely affect the
supply and the conservation of natural gas.  (Defs.' Opp'n, Ex. B
¶ 7.)  Also, the judicial forum is not tooled to be the most
efficient and efficacious one for determining reasonable prices
in a volatile market.  (Id. at 31.)  Judicial price regulation
may be "inconsistent with antitrust's fundamental 'market'
orientation to problems of lack of competition."  (Id. at 31-32
(citing II Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law

(2d ed. 2000 & 2005 Suppl.), ¶ 771).)  Finally, as defendants
note, if they are penalized for helping to produce government-
sponsored NPC reports, private entities would be discouraged from
voluntarily providing information to the government or
participating in governmental advisory commissions, which would
ultimately harm the public.  (Defs.' Opp'n at 32.)

If plaintiffs are correct about their antitrust claims, many
consumers, especially low-income consumers, will have been harmed
by high natural gas prices this winter, and the interests of
consumers would weigh in favor of injunctive relief.  However,
the dangers and difficulties of judicially-mandated price
regulation outweigh those concerns, especially in light of
plaintiffs unlikely chances for success on the merits and their
scant proof of irreparable harm.  For those reasons, the public
interest will not be furthered by issuing the proposed
injunction.

## CONCLUSION AND ORDER

Plaintiffs have failed to meet their burden of establishing
that there is a substantial likelihood they will succeed on the
merits, and that they will be irreparably injured if an
injunction is not granted.  These failings are not overcome by
plaintiffs' insufficient showings concerning the public interest
and the balance of harms to the parties.  Accordingly, it is
hereby

- 40 -

ORDERED that plaintiffs' motion [41] for a preliminary injunction be, and hereby is, DENIED.  It is further

ORDERED that plaintiffs' motions [53] & [59] for leave to file supplemental affidavits be, and hereby are, GRANTED.

SIGNED this 19th day of April, 2006.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge