**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
CITY OF MOUNDRIDGE, et al.          )
                                    )
        Plaintiffs,                 )
                                    )
        v.                          )     Civil Action No. 04-940 (RWR)
                                    )
EXXON MOBIL CORPORATION,            )
        et al.                      )
                                    )
        Defendants.                 )
_____)

<u>**MEMORANDUM OPINION AND ORDER**</u>

Eighteen municipalities[1] sued Exxon Mobil Corporation, BP America, Inc., Coral Energy Resources, L.P., ChevronTexaco Corporation, and ConocoPhillips Corporation for violating the antitrust laws by agreeing to artificially inflate the price of natural gas; monopolizing, attempting to monopolize, and conspiring to monopolize; and engaging in price discrimination. The defendants moved to dismiss the amended complaint for lack of standing, for lack of personal jurisdiction, for failure to state a claim as to all claims, and because defendants are protected under the <u>Noerr/Pennington</u> doctrine. The plaintiffs have moved to file a first and a second supplemental complaint.

_____

[1]     The plaintiffs are the cities of Moundridge, Kansas; Winfield, Kansas; Coffeyville, Kansas; Denison, Kansas; Garnett, Kansas; Greensburg, Kansas; Halstead, Kansas; Humboldt, Kansas; Iola, Kansas; La Cygne, Kansas; Macon, Missouri; Minneapolis, Kansas; Osage City, Kansas; Rensselaer, Indiana; Sabinal, Texas; Shelbina, Missouri; and Wellington, Kansas, and the Village of Stonington, Illinois.

- 2 -

The plaintiffs' motions will be granted, and because the supplemental complaints reallege the principal claims set forth in the amended complaint, the defendants' motions to dismiss will be treated as directed at the second supplemental complaint. Plaintiffs have sufficiently pled standing.  Because the plaintiffs failed to make out a *prima facie* case of personal jurisdiction as to defendant ChevronTexaco, though, ChevronTexaco's motion to dismiss will be granted.  Plaintiffs have stated a claim for conspiracy to fix prices, but have failed to state a claim for actual or attempted monopolization, conspiracy to monopolize and price discrimination.  Accordingly, the motions to dismiss by BP America, ConocoPhillips and Exxon Mobil will be denied in part and granted in part.  Because defendant Coral is subject to the exclusive jurisdiction of the Federal Energy Regulatory Commission ("FERC"), Coral's motion to dismiss for failure to state a claim will be granted.

<u>BACKGROUND</u>

Natural gas is sold at three general levels.  First, producers who gather and produce the natural gas sell it to transmitters, such as pipeline operators.  (2d Supp. Compl. ¶ 6.) Pipelines or transmission lines then transport the natural gas from the producers' sites (known as "wellheads") to retail distribution systems, like municipal or other utilities, or to large direct users.  Municipal distribution systems and other

- 3 -

utilities then sell the natural gas directly to consumers.  (Id.)
The plaintiffs, municipalities who own and operate natural gas
distribution systems, supply their residents with natural gas.
(Id. ¶ 3.)  For a number of years, their efforts to provide their
residents' requirements of natural gas at "reasonable prices"
were frustrated by the high price of natural gas.  (Id. ¶ 5.)
Together, the defendants constitute the five major producers of
natural gas in the United States, who control over 70% of the
natural gas consumed in the United States.  (Id. ¶ 7.)

In December of 1999, the National Petroleum Council ("NPC")[2]
released Natural Gas: Meeting the Challenges of the Nation's
Growing Natural Gas Demand ("the 1999 Report").  (ConocoPhillips
Mem. of P. & A. in Supp. of Mot. to Dismiss ("Mot. to Dismiss")
at 3.)  The 1999 Report stated that the supply of natural gas in
the United States had increased since 1992, that natural gas
usage in the U.S. would increase between 1999 and 2010, and that
this increase in demand could be met by the industry at "an
average production weighted U.S. wellhead gas price through 2010
of approximately $2.74 per million British thermal units

---

[2]     The NPC is an advisory committee to the Department of
Energy that operates pursuant to the Federal Advisory Committee
Act of 1972.  (ConocoPhillips  Mem. of P. & A. in Supp. of Mot.
to Dismiss ("Mot. to Dismiss") at 3.)   "Members of the [NPC] are
appointed by the Secretary of Energy and are drawn from
geographically diverse segments of the oil and gas industries,
academia, financial and research institutions, public interest
entities, Native American tribes, and other groups."  Id.

- 4 -

('MMBtu')."  (Pls.' Mem. in Opp'n to Defs.' Mot. Dismiss ("Pls.'
Opp'n") at 5.)  The price of natural gas, however, began to
exceed the estimate projected in the 1999 Report in early 2000
and has continued to increase since then.  (Id. at 6.)

On March 13, 2002, Secretary of Energy Spencer Abraham
"requested a new study on natural gas that would provide insights
on energy market dynamics, including price volatility ... and
natural gas supplies."  (ConocoPhillips Mot. to Dismiss at 4
(internal quotations omitted).)  The NPC formed a new
subcommittee and several "Task Groups," one of which all
defendants participated in and one defendant chaired, to
undertake the inquiry.  (Pls.' Opp'n at 6.)  In September of
2003, the NPC adopted and released one of the "Task Force"
reports, Balancing Natural Gas Policy: Fueling the Demands of a
Growing Economy ("the 2003 Report").  (Id.; ConocoPhillips Mot.
to Dismiss at 3.)  The 2003 Report concluded that there was a
shortage of natural gas in the United States and that higher gas
prices were required to meet increasing demand.  (Pls.' Opp'n
at 7.)  According to the 2003 Report, the price of natural gas
would continue to rise unless the United States government
adopted a series of legislative policies recommended by the NPC.
(Id.)  The 2003 report projected a steady increase in price over
the period of 2003 through 2010.  Since the NPC issued the 2003
report, the price of natural gas in the U.S. has not fallen below

- 5 -

the level projected in the report.  (<u>Id.</u> at 7.)  In fact, the
average wellhead price for 2004 increased to $5.49 per thousand
cubic feet ("Mcf") and then increased to $6.26 per Mcf in August
2005.[3]  (2d Supp. Compl. ¶ 20.)  The average wellhead price of
natural gas in 2006 was $7.05 per Mcf, an increase over the $2.00
per Mcf average price from 1992 to 1999.  (<u>Id.</u> ¶ 26.)

After Hurricanes Rita and Katrina made landfall on the Gulf
Coast in the fall of 2005, the price of natural gas was expected
to average $14.00 per MMBtu between December 2005 and March 2006.
(1st Supp. Compl. ¶ 26.)  In December 2005, New York Mercantile
Exchange ("NYMEX") futures prices for the 2005-2006 winter
reached $15.42 per MMBtu, which was $7.61 per MMBtu higher than
the average wellhead price for the 2004-2005 winter months.  (2d
Supp. Compl. ¶ 23.)  Similar increases for natural gas futures
prices occurred at the Henry Hub futures market[4] at the same
time.  (<u>Id.</u> ¶ 24.)

---

[3]    Plaintiffs shift natural gas unit measures from MMBtu
to McF without explanation.  The conversion rate is 1 Mcf equals
approximately 1.027 MMBtu.  James L. Sweeney, <u>Energy Policy and
Economics Overview</u> (2001),
http://siepr.stanford.edu/about/Energy.pdf.

[4]    The Henry Hub is a pipeline hub on the Louisiana Gulf
Coast which is the delivery point for the natural gas futures
contracts on the NYMEX.  (2d Supp. Compl. ¶ 24.)  All defendants
use Henry Hub prices in their third quarter 2005 financial
reports, with the exception of Exxon Mobil which does not break
out natural gas prices.  (<u>Id.</u>)

- 6 -

Plaintiffs assert that no legitimate justification exists for raising the price of natural gas because there is no shortage in the United States.  (2d Supp. Compl. ¶ 27.)  Technically recoverable natural gas resources are currently 1,769.6 trillion cubic feet ("Tcf"), representing a 80.9-year supply of natural gas.  (Id. ¶ 30.)  Working gas, or gas available in the marketplace, in storage was 3.177 Tcf as of September 21, 2006.  (Id. ¶ 31.)  The amount of natural gas "shut-in," or temporarily unavailable, as a result of Hurricanes Katrina and Rita between August 26, 2005 and December 9, 2005 was only 0.519 Tcf.  (Id. ¶ 32.)  When compared to the total consumption of natural gas in the United States in 2005 - - 21.87 - - the plaintiffs allege that no shortage of natural gas exists.  (Id. ¶ 28.)  Additionally, plaintiffs do not receive their natural gas from the Gulf of Mexico or any other areas that were affected by the 2005 hurricane season.  (Id. ¶ 36.)

The defendants, in turn, have reaped substantial profits in the first half of 2006.  (Id. ¶ 35.)  These profits greatly exceeded the defendants' reported profits for the first half of 2005.  (Id.)  The defendants have moved to dismiss, raising as issues standing, personal jurisdiction, the Noerr-Pennington doctrine, and failure to state a claim.  The plaintiffs have sought leave to supplement their amended complaint.

- 7 -

DISCUSSION

I.  SUPPLEMENTAL COMPLAINT

"Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."  Fed. R. Civ. P. 15(d).  A court should liberally grant a party's request to file a supplemental pleading if those supplemental facts connect to the facts asserted in the original pleading.  See Quaratino v. Tiffany & Co., 71 F.3d 58, 66 (2d Cir. 1995).  However, leave to file a supplemental complaint should be granted only where supplementation "will not cause undue delay of trial, inconvenience and will not prejudice the rights of any other party."  Wells v. Harris, 185 F.R.D. 128, 132 (D. Conn. 1999); see Foman v. Davis, 371 U.S. 178, 182 (1962) (holding that in the absence of an "apparent or declared reason" such as bad faith, prejudice to opposing party or futility, leave to file should be "freely given").  Cf. Health Ins. Ass'n v. Goddard Claussen Porter Novelli, 213 F.R.D. 63, 67 (D.D.C. 2003) (holding that the supplemental complaint prejudiced defendants because it raised issues that did not pertain to the original action).

Here, plaintiffs request leave to supplement the amended complaint they filed in 2004.  The first supplemental complaint

- 8 -

provides information related to the rise in natural gas prices on the futures market in 2005, the effects of Hurricanes Rita and Katrina in 2005 on gas reserves, and defendants' large profits for the third quarter of 2005.  (Supp. Compl. ¶¶ 20-36.)  The second supplemental complaint updates the first supplemental complaint with the most recent data from 2006 to substantiate plaintiffs' allegations.  Otherwise, the supplemental claims substantially mirror those in the amended complaint.  (Am. Compl. ¶¶ 13-25.)  They do not unfairly prejudice the defendants or unduly delay the proceedings.  There is no showing that the supplements were added in bad faith.  The claims would be subject to the same legal analysis as would those in the amended complaint in regard to defendants' motions to dismiss.  Therefore, the plaintiffs' motions for leave to file a first and a second supplemental complaint will be granted and the motions to dismiss will be treated as directed at the second supplemental complaint.

## II.  STANDING

In order to establish antitrust standing, "[a]n antitrust plaintiff must establish an injury-in-fact or a threatened injury-in-fact caused by the defendant's alleged wrongdoing." Andrx Pharm., Inc. v. Biovail Corp. Int'l., 256 F.3d 799, 806 (D.C. Cir. 2001) (citing Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535

- 9 -

(1983)).  Plaintiffs must also prove an antitrust injury, which must be of the type that "the antitrust laws were intended to prevent; it must 'flow[] from that which makes defendants' acts unlawful.'"  Id. at 806 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)) (emphasis removed).  In assessing antitrust standing, a court must also consider "the directness of the injury, whether the claim for damages is 'speculative,' the existence of more direct victims, the potential for duplicative recovery and the complexity of apportioning damages."  Id. (citing Associated Gen. Contractors of Cal., Inc., 459 U.S. at 542-45).

A.  Injury-in-Fact

A plaintiff must plead an injury-in-fact to its property or business.  See Hecht v. Pro-Football, Inc., 570 F.2d 982, 993 (D.C. Cir. 1977).  Business or property refers to "commercial interests or enterprises."  Hawaii v. Standard Oil Co., 405 U.S. 251, 264 (1972).  An alleged loss of market share constitutes an injury-in-fact to business or property.  See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 116 (1969).

Here, the cities allege that defendants have undermined the cities' effort to provide natural gas at affordable prices to users in their markets because the defendants have conspired to restrain trade or commerce and have acted to monopolize and increase the price of natural gas.  (2d Supp. Compl. ¶ 5.)

- 10 -

Plaintiffs allege that because of defendants' behavior, the plaintiffs have been "denied the benefit of . . . an expanded revenue base [and] . . . revenues and potential profits from customers not served."  (Id. ¶ 44(c), (d).)  Because the loss of revenue and profits is a measure of the injury done to business comparable to the loss of market share, plaintiffs have sufficiently pled an injury-in-fact to their business or property.

    B.   The Type of Injury

    The injury a plaintiff alleges should "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  Brunswick, 429 U.S. at 489.  Competitors cannot suffer an antitrust injury from a conspiracy to raise prices.  See id. at 488-89; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582-83 (1986).  Artificially raising prices does not harm competition among competitors because "[e]xisting firms know that if they collude or exercise market power to charge supracompetitive prices, entry by firms currently not competing in the market becomes likely, thereby increasing the pressure on them to act competitively."  Fed. Trade Comm'n v. H.J. Heinz Co., 246 F.3d 708, 717 n.13 (D.C. Cir. 2001).

    The cities have alleged that they are forced to pay higher prices for natural gas than a competitive market would allow.

- 11 -

(2d Supp. Compl. ¶ 44(c).)  Plaintiffs' allegation that
defendants have violated the antitrust laws, through a conspiracy
to monopolize and price-fixing, could cause the alleged injury
suffered by plaintiffs.  Plaintiffs claim that prices above
market price are precisely the anticompetitive effect that the
antitrust laws are designed to prevent.  (2d Supp. Compl. ¶ 17.)

Defendants argue that because plaintiffs are their
competitors on the retail market, plaintiffs have not suffered an
antitrust injury because they cannot, as a matter of law, be
injured by a conspiracy to raise market prices.  (ChevronTexaco
Corp.'s Mem. of P. & A. in Supp. of Mot. to Dismiss ("Mot. to
Dismiss") at 10-11.)  ChevronTexaco asserts that unlawfully
increased gas prices form "the basis of plaintiffs' Sherman Act
Claims."  (Id. at 10.)  Although it is true that plaintiffs'
Sherman Act claims are grounded in defendants' alleged price
inflation, plaintiffs do not claim that they compete with
defendants in the wholesale market, where defendants allegedly
raised prices.  Rather, plaintiffs claim they compete with
defendants in the retail market, where defendants allegedly sold
natural gas at a reduced price.  (2d Supp. Compl. ¶ 11.)  Because
plaintiffs do not claim they compete with defendants in the
wholesale market, where defendants allegedly inflated prices,
their alleged antitrust injury is not barred as a matter of law.

- 12 -

C.   The Directness of the Injury

The antitrust laws have never been interpreted "to allow suit by every party affected by an antitrust violation's 'ripple of harm.'"  Adams v. Pan Am. World Airways, Inc., 828 F.2d 24, 26 (D.C. Cir. 1987) (quoting Blue Shield of Va. v. McCready, 457 U.S. 465, 476-77 (1982)).  Indirect purchasers are barred "from asserting claims for damages based on any overcharges they may have paid as an indirect purchaser of defendants."  In re Vitamins Antitrust Litig., No. 99-197, 2001 WL 855463, at *1 (D.D.C. July 2, 2001); see also Stern v. Lucy Webb Hayes Nat'l Training School for Deaconesses & Missionaries, 367 F. Supp. 536, 538 (D.D.C. 1973).

It is inappropriate, however, to deny indirect purchasers antitrust standing where "the direct purchaser is owned or controlled by its customer."  Ill. Brick Co. v. Illinois, 431 U.S. 720, 737 n.16 (1977).  Control is a "functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser [such that] there effectively has been only one sale."  Jewish Hosp. Ass'n of Louisville, Ky., Inc., v. Stewart Mech. Enters., 628 F.2d 971, 975 (6th Cir. 1980).  This type of economic unity can exist "through the contractual relationship of agency."  In re Mercedes-Benz Anti-trust Litig., 157 F. Supp. 2d 355, 366 (D.N.J. 2001).

- 13 -

Although plaintiffs concede they are not direct purchasers
from defendants, they allege that "[d]efendants own or control a
number of transmission lines, as well as natural gas marketing
entities for the sale and transportation of natural gas produced
by them in interstate commerce, and [p]laintiffs believe this
will be supported by additional evidence after a reasonable
opportunity for further investigation or discovery."  (2d Supp.
Compl. ¶ 10).  If plaintiffs can establish they purchased natural
gas from entities under defendants' control, plaintiffs would
fall under the exception delineated in Illinois Brick.  See 431
U.S. at 737 n.16.  At this stage of the lawsuit, the cities have
sufficiently pled control even though they have failed to specify
the nature of the alleged control.  See, e.g., In re Mercedes-
Benz Anti-trust Litig., 157 F. Supp. 2d at 365-66 (declining to
grant defendants motion to dismiss where it was unclear what role
the intermediary played in the transactions).

Because plaintiffs have alleged defendants controlled
intermediaries in the natural gas market that may have sold to
plaintiffs, plaintiffs' indirect purchaser status does not bar
their claims.

D.   The Remaining Factors

First, there is nothing speculative about plaintiffs' claims
for damages.  Plaintiffs seek damages for the alleged loss of
revenue and profits (2d Supp. Compl. ¶ 44(c)), which are the

- 14 -

types of damages that courts have been willing to calculate in antitrust cases.  See Long Island Lighting Co. v. Standard Oil Co. of Cal., 521 F.2d 1269, 1276 (2d Cir. 1975) (reversing dismissal of plaintiff's claim where plaintiff sought damages for loss of customers as well as other damages).

Second, it is unlikely, based on the record, that other entities who are more direct victims than these plaintiffs exist. Neither defendants nor plaintiffs have identified other potential plaintiffs that compete with defendants in the retail natural gas market.  In addition, if plaintiffs' allegations are proven true, entities engaged in natural gas transmission and marketing would be unlikely to enforce their rights if they are controlled by defendants.

Finally, it is also unlikely that there is any danger of duplicative recovery or complex apportionment of damages. Because plaintiffs' alleged damages are not based on a pass through overcharge, it would not be necessary in this case to divide the alleged damages "between direct and indirect purchasers on some consistent theory governing the extent to which direct purchasers would pass on the overcharge and the damage recovery."  Adams, 828 F.2d at 31.

Because plaintiffs' claim for damages is not "speculative," victims who are more direct victims likely do not exist, there is low potential for duplicative recovery, and apportioning damages

- 15 -

would not appear to be complex, plaintiffs have sufficiently established standing.

III. PERSONAL JURISDICTION

Under Fed. R. Civ. P. 12(b)(2), "[t]he plaintiff bears the burden of proof" that defendants are subject to the court's jurisdiction. United States v. Smithfield Foods, Inc., 332 F. Supp. 2d 55, 60 (D.D.C. 2004) (citing Jacobsen v. Oliver, 201 F. Supp. 2d 93, 104 (D.D.C. 2002)). To meet this burden, "[a] plaintiff must establish a factual basis for the court's exercise of personal jurisdiction . . . [by] alleg[ing] specific facts connecting the defendant with the forum." Arista Records, Inc. v. Sakfield Holding Co., 314 F. Supp. 2d 27, 30 (D.D.C. 2004). "When personal jurisdiction is challenged, the plaintiff 'cannot rest on bare allegations or conclusory statements and must allege specific facts connecting each defendant with the forum.'" Smithfield Foods, Inc., 332 F. Supp. 2d at 60 (quoting GTE New Media Servs., Inc. v. Ameritech Corp., 21 F. Supp. 2d 27, 36 (D.D.C. 1998)). The court must, however, "resolve factual discrepancies in favor of the plaintiff." Arista Records, 314 F. Supp. 2d at 30 (citing Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990)).

When evaluating a motion to dismiss under Rule 12(b)(2), a court is generally permitted to look outside the pleadings to determine if a plaintiff has established a *prima facie* showing of

- 16 -

personal jurisdiction.  Brunson v. Kalil & Co., 404 F. Supp. 2d
221, 223 n.1 (D.D.C. 2005); Smithfield Foods, Inc., 332 F. Supp.
2d at 59-60 (citing Land v. Dollar, 330 U.S. 731, 735 n.4
(1947)).[5]

Defendant ChevronTexaco claims that this court lacks
personal jurisdiction over it and that plaintiffs have failed to
meet their burden of establishing that ChevronTexaco is subject
to the court's jurisdiction.  (ChevronTexaco Corp.'s Mot. to
Dismiss at 13.)  Plaintiffs argue that ChevronTexaco is subject
to this court's jurisdiction because ChevronTexaco has an office
located in the District of Columbia permanently staffed by a
Vice-President, and because of ChevronTexaco's participation in
the 2002-2003 NPC meeting in the District of Columbia which forms
the basis of plaintiffs' complaint.  (Pls.' Opp'n at 37.)  These
facts are insufficient to meet plaintiffs' burden of establishing
a *prima facie* case of personal jurisdiction under either the
District's jurisdictional statutes or Section 12 of the Clayton
Act.

---

[5]    To establish personal jurisdiction, a plaintiff "is
entitled to reasonable discovery" if the plaintiff requests it.
Second Amendment Found. v. U.S. Conference of Mayors, 274 F.3d
521, 525 (D.C. Cir. 2001).  Plaintiffs in this case have not
sought jurisdictional discovery.

A.    <u>Due Process and the District of Columbia long-arm</u>
<u>statute</u>

"To establish personal jurisdiction over a non-resident, a
court must engage in a two-part inquiry: A court must first
examine whether jurisdiction is applicable under the state's
long-arm statute and then determine whether a finding of
jurisdiction satisfies the constitutional requirements of due
process." <u>GTE New Media Servs., Inc. v. BellSouth Corp.</u>, 199
F.3d 1343, 1347 (D.C. Cir. 2000) (citing <u>United States v.</u>
<u>Ferrara</u>, 54 F.3d 825, 828 (D.C. Cir. 1995)).  Plaintiffs'
arguments can reasonably be read to assert jurisdiction under
both the District of Columbia's general jurisdiction statute and
its specific jurisdiction statute.  (2d Supp. Compl. ¶ 2; Pls.'
Opp'n at 37.)

1.    General jurisdiction

The District of Columbia's general jurisdiction statute,
D.C. Code § 13-334(a), "authorizes the courts in this
jurisdiction to 'exercise "general jurisdiction" over a foreign
corporation as to claims not arising from the corporation's
conduct in the District, if the corporation is doing business in
the District.'" <u>AGS Int'l Servs. S. A. v. Newmont USA Ltd.</u>, 346
F. Supp. 2d 64, 74 (D.D.C. 2004) (quoting <u>Gorman v. Ameritrade</u>
<u>Holding Corp.</u>, 293 F.3d 506, 509 (D.C. Cir. 2002)).  Because
"[t]he 'doing business' test of this [statute] was found by the
District of Columbia Circuit to be coextensive with the due

process requirements of the Constitution[,]" the test for general jurisdiction is whether ChevronTexaco's contacts with the District have been "so continuous and systematic that it could foresee being haled into court in the District of Columbia." Newmont USA Ltd., 346 F. Supp. 2d at 74.  "However, some presence in the District of Columbia is not alone grounds to exercise general jurisdiction in every situation."  Id.

According to plaintiffs, ChevronTexaco "has a corporate office in the District of Columbia at 1401 I Street, N.W., at which it has a Vice President permanently assigned."  (Pls.' Opp'n at 37.)  Plaintiffs report, though, that they unsuccessfully attempted to serve ChevronTexaco at that office and service was eventually accepted in an office in California. (Id.)

The facts provided by plaintiffs fail to establish a sufficient "factual basis for the court's exercise of personal jurisdiction," Arista Records, 314 F. Supp. 2d at 30, within the meaning of D.C. Code § 13-334(a).  Plaintiffs have failed to provide any information showing what if any business ChevronTexaco conducts in its office in the District of Columbia. Such facts are necessary to determine if ChevronTexaco's activity in its District of Columbia office is the "type of contact worthy of consideration for jurisdictional purposes under § 13-334(a)." Newmont USA Ltd., 346 F. Supp. 2d at 76 (holding that federal

district court did not have personal jurisdiction over foreign corporation whose only contact with the District was an office engaged in federal governmental liaison activities); see Fandel v. Arabian Am. Oil Co., 345 F.2d 87 (D.C. Cir. 1965) (same). Because plaintiffs have failed to allege specific facts regarding the nature of ChevronTexaco's business activity in its District of Columbia office, plaintiffs have failed to meet their burden of establishing that ChevronTexaco is subject to the court's jurisdiction under the District of Columbia's general jurisdiction statute.

2. Specific jurisdiction

Under the District of Columbia's long-arm statute, a court in the District of Columbia may exercise personal jurisdiction over a person outside the District if the plaintiff's claim arises from the defendant's "transacting any business in the District of Columbia." D.C. Code § 13-423(a)(1). Like the District of Columbia's general jurisdiction statute, "[s]ection (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements and thus to merge into a single inquiry." GTE New Media Servs., Inc. v. BellSouth Corp., 199 F.3d at 1347. "While general personal jurisdiction permits a court to hear 'a suit . . . without regard to the underlying claim's relationship to the defendant's activity' in the forum, specific personal

- 20 -

jurisdiction allows only those claims 'based on acts of a
defendant that touch and concern the forum.'"  Kalil & Co., 404
F. Supp. 2d at 227 (citing Schwartz v. CDI Japan, Ltd., 938 F.
Supp 1, 5 (D.D.C. 1996)).

Plaintiffs appear to assert that this court has specific
personal jurisdiction over ChevronTexaco by virtue of
ChevronTexaco's participation in the "2003 subcommittee of the
NPC that prepared the pricing for natural gas at high levels."
(Pls.' Opp'n at 37.)  This allegation is insufficient to subject
ChevronTexaco to the jurisdiction of this court because it is
merely a conclusory assertion that lacks factual particularity.

First, to the extent that plaintiffs contend that
ChevronTexaco is subject to this court's personal jurisdiction
based on ChevronTexaco's alleged conspiratorial activities, the
allegation that ChevronTexaco conspired with other defendants
"represents nothing more than a legal conclusion, which we have
held 'does not constitute the *prima facie* showing necessary to
carry the burden of establishing personal jurisdiction.'"  Second
Amendment Found. v. U.S. Conference of Mayors, 274 F.3d 521, 524
(D.C. Cir. 2001) (quoting Naartex Consulting Corp. v. Watt, 722
F.2d 779, 787-88 (D.C. Cir. 1983)).  In order to establish a
*prima facie* showing of specific jurisdiction based on the
conspiracy theory of personal jurisdiction, plaintiffs must
allege specific acts showing that defendants agreed to illegally

- 21 -

inflate the price of natural gas or monopolize the natural gas market.  See id.  Plaintiffs have failed to allege any such specific facts showing that ChevronTexaco agreed with other defendants to illegally inflate the price of natural gas.

Second, the fact that ChevronTexaco participated in the 2003 NPC meeting does not alone satisfy plaintiffs' burden of establishing a *prima facie* case of personal jurisdiction because the "government contacts exception precludes the assertion of personal jurisdiction over a non-resident whose only contact with the District of Columbia is with Congress or a federal agency." Kalil & Co., Inc., 404 F. Supp. 2d at 235 (citing Dooley v. United Technologies Corp., 786 F. Supp 65, 75 (D.D.C. 1992)). See United States v. Ferrara, 54 F.3d 825, 831 (D.C. Cir. 1995) ("The scope of [D.C.'s long arm statute's] otherwise broad 'transacting any business' clause is limited by the rule that contact with a federal instrumentality located in the District will not give rise to personal jurisdiction.").  Plaintiffs therefore have failed to meet their burden of establishing that ChevronTexaco is subject to the court's jurisdiction under the District of Columbia's specific jurisdiction statute.

B.   Personal jurisdiction under the Clayton Act

Section 12 of the Clayton Act contains both a venue provision and service of process provision:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the

> judicial district whereof it is an inhabitant, but also
> in any district wherein it may be found or transacts
> business; and all process in such cases may be served in
> the district of which it is an inhabitant, or wherever it
> may be found.

15 U.S.C. § 22.  "'Section 12 is essentially a long-arm statute

which permits service of process in a non-forum district [and

personal jurisdiction in the forum district], so long as the

venue provision is met.'"  <u>Diamond Chem. Co. v. Atofina Chems.,</u>

<u>Inc.</u>, 268 F. Supp. 2d 1, 10 (D.D.C. 2003) (quoting <u>Chrysler Corp.</u>

<u>v. General Motors Corp.</u>, 589 F. Supp. 1182, 1195 (D.D.C. 1984)).

"The difference between jurisdiction under the Clayton Act and

D.C.'s longarm statute is that while both look at contacts with

the district, under Section 12 of the Clayton Act 'the

transactions do not have to be related to the cause of action or

the subject matter of the suit,' while under the D.C. long-arm

statute there must be a connection between the jurisdiction

contacts and the cause of action."  <u>Diamond</u>, 268 F. Supp. 2d at

10 (quoting <u>Chrysler</u>, 598 F. Supp. at 1204).  In order to take

advantage of Section 12's "liberalized service provision" for

jurisdictional purposes, a corporation must first be found to be

an inhabitant of, be found in, or transact business in a judicial

district under the venue prong.  <u>GTE New Media Servs., Inc. v.</u>

<u>BellSouth Corp.</u>, 199 F.3d at 1351.  "[T]he D.C. Circuit has held

that a local contacts inquiry is required under Section 12 of the

- 23 -

Clayton Act . . . ."   In re Vitamins Antitrust Litig., 94 F.

Supp. 2d 26, 31 (D.D.C. 2000).

To demonstrate inhabitancy in the District of Columbia, a

plaintiff must show that the defendant is incorporated here.  See

MCI Commc'ns Corp. v. Am. Telephone and Telegraph Co., Civil

Action No. 79-1182, 1983 WL 1881, at *3 (D.D.C. Oct. 4, 1983) ("A

corporation is said to be an inhabitant of the state of its

incorporation."); Caribe Trailer Sys., Inc. v. Puerto Rico Mar.

Shipping Auth., 475 F. Supp. 711, 716 (D.D.C. 1979).  A plaintiff

must show that a corporation has "presence" and "continuous local

activity" in the District of Columbia to establish that it can be

found here.  See Armco Steel Co. v. CSX Corp., 790 F. Supp. 311,

319 (D.D.C. 1991).  Finally, "'[w]hether a defendant has

transacted business is largely a factual question to be

determined in each case.  In making this determination, courts

look for tangible manifestations of doing business.'"  MCI

Commc'ns Corp., 1983 WL 1881, at *4 (internal citation omitted).

The business transacted must be of a "substantial character."

Armco Steel Co., 790 F. Supp. at 319-20 (quoting Chrysler Corp.

v. General Motors Corp., 589 F. Supp. at 1195).

Plaintiffs have made none of these showings.  Plaintiffs do

not allege that ChevronTexaco is incorporated in the District of

Columbia.  In addition, plaintiffs provide no factual support,

aside from allegations of ChevronTexaco's participation in the

2003 NPC meeting, that ChevronTexaco engaged in continuous local activities in the District of Columbia.  While plaintiffs allege that ChevronTexaco has an office here permanently staffed by a Vice-President, they do not allege additional facts showing that ChevronTexaco directly conducts business in the District of Columbia.  See e.g., MCI Commn'cs Corp., 1983 WL 1881, at *3 (granting defendants' motion to dismiss because plaintiffs failed to establish that defendants were licensed to do business in the District of Columbia).  Finally, plaintiffs do not plead that ChevronTexaco conducted business of a substantial character.  See Square D Co. v. Niagara Frontier Tariff Bureau, Inc., Civil Action No. 83-2978, 1984 WL 2929, at *2-3 (D.D.C. Jan. 24, 1984) (holding that the totality of defendant's activities, including the development and publication of tariffs establishing rates for traffic in the District of Columbia and meetings with individuals and organizations in matters relating to those tariffs, were sufficiently of a substantial character).  Plaintiffs have not met their burden of showing that ChevronTexaco is subject to personal jurisdiction in the District of Columbia under the

- 25 -

Clayton Act.[6]  Accordingly, ChevronTexaco's motion to dismiss
will be granted.

IV.  NOERR-PENNINGTON

"[T]he Sherman Act does not prohibit two or more persons
from associating together in an attempt to persuade the
legislature or the executive to take particular action with
respect to a law that would produce a restraint or a monopoly."
E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365
U.S. 127, 136 (1961).  This exemption applies to efforts to
influence the political process "regardless of intent or
purpose."  United Mine Workers of Am. v. Pennington, 381 U.S.

---

[6]      Plaintiffs rightfully carry a heavier burden in
answering a jurisdictional challenge under Rule 12(b)(2) than a
12(b)(6) challenge to the sufficiency of pled claim.  Generally,
a claim is adequately pled if it satisfies Rule 8(a)(2)'s
threshold of a short and plain factual statement which if proven
would entitle the pleader to relief.  That entitles a plaintiff
to proceed with litigation.  Stokes v. Cross, 327 F.3d 1210, 1215
(D.C. Cir. 2003).  However, under Rule 12(b)(2), a plaintiff must
prove with a fuller and determinative factual presentation that a
court has authority over a challenging party if that party is to
be subject to the burdens of defending further litigation.  See
Zhu v. Gonzales, Civil Action No. 04-1408, 2006 WL 1274767, at *3
(D.D.C. May 8, 2006) (holding that "'[t]he plaintiff must allege
specific acts connecting the defendant with the forum.'  A
plaintiff cannot merely make unsupported allegations or
conclusory statements" (internal citations omitted)).  Cf. Kopff
v. Battaglia, 425 F. Supp. 2d 76, 81 (D.D.C. 2006) (holding that,
unlike in the 12(b)(6) context in which a court must treat a
plaintiff's well-pleaded allegation as true, "'[w]hen considering
challenges to personal jurisdiction, the Court need not treat all
of plaintiffs allegations as true and may receive and weigh
affidavits and any other relevant material to assist it in
determining the jurisdictional facts'" (internal citation
omitted)).

657, 670 (1965).  "Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act."  Id.  Attempts to influence the legislative or executive branches are not susceptible to Sherman Act challenges because "these branches of government act on behalf of the people, and to a very large extent, the whole concept of representation depends upon the ability of people to make their wishes known to their representatives."  Noerr Motor Freight, Inc., 365 U.S. at 137.

"The same philosophy governs the approach of citizens or groups of them to the administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government."  Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972); Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am., Civil Action No. 84-2942, 1985 WL 1635, at *2 (D.D.C. May 24, 1985).  Collective efforts to petition administrative agencies and courts are protected because "it would be destructive of rights of association and petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view . . . ."  Trucking Unlimited, 404 U.S. at 510-11; cf. Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp., 185 F.3d 154, 160 (3d Cir. 1999)

- 27 -

(concluding that "where, as here, all of the plaintiff's alleged injuries result from state action, antitrust liability cannot be imposed on a private party who induced the state actions by means of concerted anticompetitive activity").

Not all conduct intended to influence the political process is immune from Sherman Act liability.  The scope of <u>Noerr</u> protection depends on "the source, context, and nature of the anticompetitive restraint at issue."  <u>Allied Tube & Conduit Corp. v. Indian Head, Inc.</u>, 486 U.S. 492, 499 (1988).  When government action is the source of an alleged antitrust violation, the private party is immune because "the intervening government action breaks the causal chain."  <u>Andrx</u>, 256 F.3d at 817.  When the alleged violation is the result of purely private action, it "constitutes a private restraint of trade subject to liability under the antitrust laws."  <u>Id.</u> at 818 (quoting <u>In re Cardizem CD Antitrust Litig.</u>, 105 F. Supp. 2d 618, (E.D. Mich. 2000)).  In addition, <u>Noerr</u> recognized that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified."  <u>Noerr Motor Freight, Inc.</u>, 365 U.S. at 144.

- 28 -

Here, plaintiffs claim that defendants conspired to influence the NPC 2003 Report so that it would reflect that "there now was a shortage of natural gas in the United States, and that in order to meet the 1999 Report's goals of increased gas usage in the future, much higher gas prices would be required." (Pls.' Opp'n at 7.) According to plaintiffs, there is no shortage of natural gas because output levels have grown and the defendants have a seen significant increase in profits since 2000. (2d Supp. Compl. ¶ 18.) Plaintiffs conclude, therefore, that the defendants' agreement to the projections contained in the NPC report, after defendants were convened through the NPC by the Secretary of Energy, constitutes defendants' violation of Section 1 of the Sherman Act. (2d Supp. Compl. ¶ 17.) Plaintiffs claim that because defendants' violation is the result of purely private action which was only "ostensibly directed toward influencing government action," defendants are not immune from suit.

Defendants argue that their membership in the NPC shields them from antitrust liability because their participation in the NPC is protected by the <u>Noerr/Pennington</u> doctrine.[7]  Defendants

---

[7]     Defendant ConocoPhillips also contends that the NPC is immune from federal antitrust laws because the NPC is a federal instrumentality and NPC's immunity should be extended to defendants. (ConocoPhillips Mot. to Dismiss at 9-11, 20.) "It is well-established that the antitrust laws do not extend to actions of agencies or instrumentalities of the federal government, even when those agencies operate in competition with

argue that the 2003 NPC report represents "solicitation of governmental action with respect to the passage and enforcement of laws." Noerr Motor Freight, Inc., 365 U.S. at 138.  In support of this proposition, defendants point out that the 2003 Report recommends that policy makers "enact enabling legislation for the Alaskan gas pipeline," "stream[line] permitting processes

---

and to the detriment of private enterprise."  IT & E Overseas, Inc. v. RCA Global Commc'ns, Inc., 747 F. Supp. 6, 11 (D.D.C. 1990).  Federal instrumentality immunity, however, applies only to situations where either the federal government or a federal instrumentality is complicit in the alleged antitrust violation.  See Sea-Land Serv., Inc. v. Alaska R.R., 659 F.2d 243, 245 (D.C. Cir. 1981) (defendant immune from antitrust laws because of its status as "an entity wholly owned and operated by the United States"); IT & E Overseas, Inc., 747 F. Supp. at 8-10 (defendant immune from antitrust laws because the basis of defendant's alleged unlawful activity was a contract between defendant and a federal instrumentality); U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd., 540 U.S. 736, 746 (2004) (defendant United States Postal Service immune from antitrust laws because the Postal Service is a federal instrumentality); see also S. Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 65 (1985) (defendants immune from antitrust laws because state agency approved defendants' allegedly unlawful activity).  Federal instrumentality immunity does not apply here because plaintiffs have not alleged that the NPC was complicit in defendants' alleged violation of the Sherman Act.  Although defendants convened as members of the NPC at the request of the Secretary of Energy, plaintiffs have not alleged that the Secretary of Energy or other members of the NPC participated in defendants' alleged conspiracy to influence the outcome of the 2003 Report.  Even assuming plaintiffs sufficiently claim that defendants conspired to manipulate the results of the NPC report, and caused actual gas prices to reflect or surpass the projections of the NPC report by "reduc[ing] or exclud[ing] supplies for a sustained period of time and thereby increas[ing] wholesale prices" (2d Supp. Compl. ¶ 9), the plaintiffs allege only that defendants used the NPC as a tool, and not that the NPC itself fixed prices or reduced supply.  Therefore, defendants are not immune from antitrust liability on that basis.

- 30 -

to allow increased drilling[,]" and "promot[e] efficiency of
markets." (BP P.L.C.'s Mem. of P. & A. in Supp. of Mot. to
Dismiss ("Mot. to Dismiss") at 20.) Defendants contend that the
basis of plaintiffs' complaint is defendants' participation in
the NPC, and that plaintiffs' claim must be dismissed because
participation in the NPC is an activity that the Noerr/Pennington
doctrine immunizes from liability under the antitrust laws. (Id.
at 19-22; ConocoPhillips Mot. to Dismiss at 12-15; ChevronTexaco
Corp.'s Mot. to Dismiss at 3-7.)

Although it is true that defendants, through their
participation in the NPC, recommended policies to the Secretary
of Energy, the Supreme Court has made clear that the Noerr
doctrine does not protect "every concerted effort that is
genuinely intended to influence government action." Allied Tube,
486 U.S. at 503. If such a broad view of Noerr's protection were
sanctioned, then "competitors would be free to enter into
horizontal price agreements as long as they wished to propose
that price as an appropriate level for government ratemaking or
price supports." Id. Instead of focusing on the nature of the
supposed advocacy, as defendants urge, "the source, context, and
nature of the anticompetitive restraint at issue" is the
appropriate focus. Id. at 499.

Plaintiffs allege defendants caused the gas prices to
reflect or surpass the projections of the 2003 NPC report by

"reduc[ing] or exclud[ing] supplies for a sustained period of time and thereby increas[ing] wholesale prices."  (2d Supp. Compl. ¶ 9.)  Plaintiffs have not alleged that the NPC as a whole participated in the act of illegally raising the price of natural gas, nor have they alleged that defendants raised the price of natural gas pursuant to a valid legislative or administrative directive.  The anticompetitive restraint alleged - - price fixing - - is not "'the consequence of legislation or other governmental action . . . .'"  <u>Andrx</u>, 256 F.3d at 819 (quoting <u>In re Brand Name Prescription Drugs Antitrust Litig.</u>, 186 F.3d 781, 789 (7th Cir. 1999)).  Plaintiffs' allegation that defendants attempted to inflate the price of natural gas artificially can be construed only as a purely private action.  As such, that conduct does not enjoy <u>Noerr</u> immunity.  <u>Andrx</u>, 256 F.3d at 818-19.

V.   FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) should be granted only where it appears that there is no set of facts in support of the claims which would entitle a plaintiff to relief.  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  The complaint must be construed in the light most favorable to the plaintiff and "the court must assume the truth of all well-pleaded allegations."  <u>Warren v. District of Columbia</u>, 353 F.3d 36, 39 (D.C. Cir. 2004).  "However, the court need not accept inferences drawn by plaintiffs if such inferences

are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations." <u>Kowal v. MCI Commc'ns Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  "A mere allegation that 'the defendants violated the antitrust laws as to a particular plaintiff and commodity' is insufficient to survive a Rule 12(b)(6) motion." <u>Estate Const. Co. v. Miller & Smith Holding Co.</u>, 14 F.3d 213, 221 (4th Cir. 1994) (internal citations omitted).  If a plaintiff fails to allege sufficient facts to support a claim, that claim must be dismissed.  <u>Dial A Car, Inc. v. Transp., Inc.</u>, 82 F.3d 484, 487 (D.C. Cir. 1996) (holding that although motions to dismiss in antitrust actions should be "granted sparingly," appellant's failure to allege any facts supporting its claim justified dismissal of the case).  <u>But see</u> <u>Hosp. Bldg. Co. v. Trustees of Rex Hosp.</u>, 425 U.S. 738, 746 (1976) (cautioning that in the antitrust context, "where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted sparingly" (internal citation omitted)).

   A.   <u>Price Fixing under Sherman Act § 1</u>

   "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  "Under the Sherman Act a combination

- 33 -

formed for the purpose and with the effect of raising,
depressing, fixing, pegging, or stabilizing the price of a
commodity in interstate or foreign commerce is illegal per se."
United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940).
"Functionally, an agreement to restrict output works in most
cases to raise prices above a competitive level . . . ." United
States v. Andreas, 216 F.3d 645, 667 (7th Cir. 2000).  "A
prototypical output restriction raises prices by reducing supply
below demand."  Id.

     To allege a conspiracy, the plaintiffs must allege more than
just that the defendant violated the antitrust laws.  Ass'n of
Retail Travel Agents, Ltd. v. Air Transport Ass'n of Am., 635 F.
Supp. 534, 536 (D.D.C. 1986) (holding that the plaintiff had not
alleged a conspiracy where it "merely alleges that [the
defendant] conspired with its members [with] . . . no factual
basis for this allegation"); Estate Const. Co., 14 F.3d at 221
(internal quotation marks omitted) (finding dismissal of a "bare
boned" allegation of an antitrust conspiracy appropriate).  An
allegation that a defendant is a member of an industry
organization "does not give rise to an inference of conspiracy."
Ass'n of Retail Travel Agents, Ltd., 635 F. Supp. at 536
(regarding membership in a trade association).  But see
Mardirosian v. Am. Inst. of Architects, 474 F. Supp. 628, 636
n.16 (D.D.C. 1979) (holding that "the requisite element of

concerted activity under section 1 can be found in joint
associational activities and, in particular, agreement by members
of an association to abide by the association's canons of
ethics").

However, "concerted action may be established by
circumstantial evidence." Fed. Trade Comm'n v. Lukens Steel Co.,
454 F. Supp. 1182, 1189 (D.D.C. 1978).  Because the typical
conspiracy is rarely evinced by explicit agreements, "plaintiffs
must allege 'that the challenged restraint is not the result of
independent action by the defendants,' but rather that 'the
defendants consciously committed to a common agreement on the
unreasonable restraint of trade.'"  Jung v. Ass'n of Am. Med.
Colls., 300 F. Supp. 2d 119, 158 (D.D.C. 2004) (internal
citations omitted); Halberstam v. Welch, 705 F.2d 472, 477 (D.C.
Cir. 1983) ("Proof of a tacit, as opposed to explicit,
understanding is sufficient to show agreement."); Alvord-Polk,
Inc. v. F. Schumacher & Co., 37 F.3d 996, 1000 (3d Cir. 1994)
("An agreement need not be explicit to result in section 1
liability . . . and may instead be inferred from circumstantial
evidence.").  Consequently, in the Section 1 context, "courts
have . . . allowed 'inferences [to be] fairly drawn from the
behavior of the alleged conspirators' to prove conspiracy.'"
Binder v. Dist. of Columbia, Civil Action No. 90-0255, 1991 WL
11255755, at *3 (D.D.C. May 22, 1991) (quoting Michelman v.

Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir.
1991)); see also Fed. Trade Comm'n v. Mylan Labs., Inc., 62 F.
Supp. 2d 25, 55-56 (D.D.C. 1999) (holding that plaintiff's
allegations of circumstantial evidence of a price-fixing
conspiracy were sufficient to survive a motion to dismiss).

Here, plaintiffs allege that the defendants conspired to fix
prices through their participation in drafting the NPC reports in
which they projected future price projections and suggested that
the higher price of natural gas was due to fluctuations in supply
and demand.  (2d Supp. Compl. ¶¶ 17, 18.)  Plaintiffs argue that
despite defendants' claim of a natural gas shortage in the 2003
report, there is "no evidence that the existing total resource
base of natural gas in Canada and the United States has shrunk
from that shown in the December 1999 Report."  (2d Supp. Compl.
¶ 18.)  Instead, defendants' projection constituted an attempt to
"ensure unnecessarily high prices for natural gas" (2d Suppl
Compl. ¶ 20) and "actual gas prices in the United States have
never fallen below those agreed-upon prices."  (Pl.'s Opp'n at
14.)  Based on this circumstantial evidence, plaintiffs have
alleged an agreement that may constitute a violation of Section 1
of the Sherman Act particularly at this stage of the litigation.

Plaintiffs' additional allegations about the high price of
natural gas on the futures market, the supply of natural gas for
the United States after Hurricanes Rita and Katrina in the fall

- 36 -

of 2005, and the staggering profits reported by the defendants

further create an inference that the defendants conspired to fix

the price of natural gas.  First, the facts alleged concerning

the high price of natural gas could support an inference that

defendants conspired to raise prices to reap the enormous

benefits described by plaintiffs.  Second, facts alleged about

the amount of proved reserves and the total usage of natural gas

could support an inference that defendants falsified their

statement about the shortage of natural gas to increase their

profits.

Plaintiffs have sufficiently alleged that the defendants

agreed to fix prices in violation of Section 1 of the Sherman

Act.  See Mylan, 62 F. Supp. 2d at 55.

B.   Monopolization under Sherman Act § 2

"Every person who shall monopolize, or attempt to

monopolize, or combine or conspire with any other person or

persons, to monopolize any part of the trade or commerce among

the several States, or with foreign nations, shall be deemed

guilty of a felony . . . ."  15 U.S.C. § 2.[8]  To plead a

_____

[8]    Although defendants moved to dismiss claims that they
have monopolized or attempted to monopolize, plaintiffs failed to
address those arguments in their opposition to the defendants'
motions to dismiss.  (Pls.' Opp'n at 17-21.)  The defendants'
motions to dismiss the claims of monopolization and attempted
monopolization, therefore, are deemed conceded.  Stephenson v.
Cox, 223 F. Supp. 2d 119, 121 (D.D.C. 2002) ("[W]hen a plaintiff
files a response to a motion to dismiss but fails to address
certain arguments made by the defendant, the court may treat

colorable Section 2 claim for actual monopolization, a plaintiff
must make factual allegations showing "(1) the possession of
monopoly power in the relevant market and (2) the willful
acquisition or maintenance of that power as distinguished from
growth or development as a consequence of a superior product,
business acumen, or historical accident." United States v.
Grinnell Corp., 384 U.S. 563, 570-71 (1966).  "In economic terms,
'monopoly power is the power to raise prices well above
competitive levels before customers will turn elsewhere.'"
Mylan, 62 F. Supp. 2d at 54 (quoting Town of Concord v. Boston
Edison Co., 915 F.2d 17, 31 (1st Cir. 1990)).  To allege
attempted monopolization, a plaintiff must plead "(1) predatory
or anticompetitive conduct, (2) with specific intent to
monopolize, (3) creating a dangerous probability of monopoly
power."  Ideal Elec. Sec. Co. v. Scientech, Inc., Civil Action
No. 97-2098, 1998 U.S. Dist. LEXIS 11484, at *20 (D.D.C. July 8,
1998) (citing Dial A Car, Inc. v. Transp., Inc., 884 F. Supp.
584, 589 (D.D.C. 1995)).  Finally, to state a claim for
conspiracy to monopolize, a plaintiff must make factual
allegations demonstrating "(1) the existence of a combination or
conspiracy to monopolize; (2) overt acts done in furtherance of
the combination or conspiracy; (3) an effect upon an appreciable

those arguments as conceded . . . .").  In any event, as is
discussed below, plaintiffs have failed to state claims of actual
or attempted monopolization.

amount of interstate commerce; and (4) a specific intent to monopolize a designated segment of commerce." <u>Genetic Sys. Corp. v. Abbott Labs.</u>, 691 F. Supp. 407, 420 (D.D.C. 1988).

1.   Actual Monopolization

Plaintiffs have failed to state a claim that defendants possess monopoly power.  Monopolization and attempted monopolization claims must address the unilateral actions of a single firm.  <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 454 (1993) (noting that § 2 of the Sherman Act "addresses the actions of *single* firms that monopolize or attempt to monopolize") (emphasis added); <u>Copperweld Corp. v. Indep. Tube Corp.</u>, 467 U.S. 752, 767 (1984) (concluding that "[t]he conduct of a single firm is governed by § 2 alone" unless under conspiracy to monopolize).  Here, plaintiffs do not allege that any one defendant unilaterally acted to monopolize or attempted to monopolize.  Plaintiffs have alleged only that the defendants together have a market share of 70%, and that they together have withheld supply of natural gas to monopolize or attempt to monopolize the market.  (2d Supp. Compl. ¶ 40.)  This shared monopoly argument is insufficient to state a claim that defendants have monopolized or attempted to monopolize the natural gas market in violation of Section 2 of the Sherman Act when Section 2 liability requires actual or attempted monopolization by one defendant.  <u>See</u> <u>Flash Elecs., Inc. v.</u>

<u>Universal Music & Video Distrib. Corp.</u>, 312 F. Supp. 2d 379, 396
(E.D.N.Y. 2004) ("The idea of a 'shared monopoly' giving rise to
Section 2 liability repeatedly has been received with skepticism
by courts who have squarely addressed the issue.").

    In determining monopoly power, courts typically assess a
defendant's aggregate market share.  <u>See e.g.</u>, <u>Rebel Oil Co., v.
Atl. Richfield Co.</u>, 51 F.3d 1421, 1437 (9th Cir. 1995) (applying
the aggregate market share number to an attempt to monopolize
claim); <u>Brager & Co. v. Leumi Sec. Corp.</u>, 429 F. Supp. 1341, 1346
(S.D.N.Y. 1977) (holding that the plaintiff's allegation that
defendant controls more than 60% of the market share "if proven,
could be taken as some evidence that the requisite intent to
monopolize existed").  <u>But see</u> <u>Monument Builders of Greater Kan.
City, Inc. v. Am. Cemetery Ass'n of Kan.</u>, 891 F.2d 1473, 1484
(10th Cir. 1989) (holding that market power need not be proven to
sustain a conspiracy to monopolize claim).  Plaintiffs allege
that together the defendants own or control a large percentage of
the relevant market share.  (2d Supp. Compl. ¶ 40.)  However, to
sustain a charge of monopolization or attempted monopolization,
"'a plaintiff must allege the necessary market domination of a
*particular* defendant.'"  <u>Sun Dun, Inc. v. Coca-Cola Co.</u>, 740 F.
Supp. 381, 390 (D. Md. 1990) (internal citation omitted)
(emphasis added).  Plaintiffs have failed to do so.  <u>See</u> <u>id.</u>
("Allegations that a group of defendants together possess

- 40 -

dominant market power may state a Section 1 claim of oligopoly,
but . . . 'an oligopoly, or shared monopoly, does not in itself
violate Section 2 of the Sherman Act.'") (internal citation
omitted)).

2.   Attempted Monopolization

Plaintiffs have also failed to factually allege attempted
monopolization.  Specific intent to engage in predatory or
anticompetitive conduct is a required element of attempted
monopolization.  Ass'n for Intercollegiate Athletics for Women v.
Nat'l Collegiate Athletic Ass'n, 735 F.2d 577, 584 n.9 (D.C. Cir.
1984).  "[T]he gravamen of that offense is the intent to achieve
the unlawful result."  Perington Wholesale, Inc. v. Burger King
Corp., 631 F.2d 1369, 1377 (10th Cir. 1979).  "In determining
whether the plaintiff satisfies the specific intent to monopolize
element, a court can infer intent from conduct that has no
legitimate business justification but to destroy or damage
competition."  GTE New Media Servs., Inc. v. Ameritech Corp., 21
F. Supp. 2d at 45.  Specific intent is sufficiently pled where
"it is otherwise apparent from the character of the defendants'
actions" alleged, such as eliminating a viable means of
competition or by channeling customers away from the competition.
Id.  If plaintiffs' claim is not supported by a factual
assertion, however, specific intent is not sufficiently pled.
Genetic Sys. Corp., 691 F. Supp. at 422.

- 41 -

Here, the plaintiffs have alleged no predatory or exclusionary acts that would support an inference of the defendants' specific intent to monopolize.  Even if defendants raised their prices artificially, this would not have harmed their competitors because higher prices would make it easier for competitors to compete in the market, would not evince an anti-competitive intent, and thus could not qualify as a predatory practice.  See GTE New Media Servs., Inc. v. Ameritech Corp., 21 F. Supp. 2d at 45 (holding that evidence of conduct that "effectively eliminated a viable means of competing" demonstrates specific intent).  Although plaintiffs assert in a conclusory fashion that "[d]efendants have . . . the specific intent of monopolizing the market," they have failed to allege any facts to support that claim.  (2d Supp. Compl. ¶ 41.)

3.   Conspiracy to Monopolize

Plaintiffs have not sufficiently alleged that defendants conspired to monopolize the natural gas retail market.  Cf. Perington Wholesale, Inc., 631 F.2d at 1377 ("Conspiring to monopolize is a separate offense under section 2, requiring less in the way of proof than the other section 2 offenses.").  Plaintiffs adequately allege overt acts in furtherance of a conspiracy through circumstantial evidence of defendants' participation in the NPC committees and their projections of the future gas prices based on their analysis of the availability of

natural gas reserves and usage.  However, just as plaintiffs fail to support an allegation of a specific intent to monopolize, they also fail regarding a potential conspiracy to monopolize. Plaintiffs' conspiracy to monopolize allegation seems largely dependent upon the facts alleged in their claim of defendants' conspiracy to fix prices.  "However, successfully asserting a section 1 violation does not necessarily constitute an adequate section 2 conspiracy to monopolize claim, since section 1 does not require a specific intent to monopolize." Standfacts Credit Servs. v. Experian Info. Solutions, Inc., 405 F. Supp. 2d 1141, 1153 (C.D. Ca. 2003).  Because plaintiffs have not amply alleged that defendants specifically intended to conspire to create a monopoly, they fail to state a claim that defendants violated Section 2 of the Sherman Act.

   C.   Price Discrimination under Robinson-Patman Act § 2

   Under § 2(a) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a)-(f), sellers are precluded from discriminating in price between purchasers.  Section 2(a) reads in pertinent part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, whether either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any

- 43 -

> line of commerce, or to injure, destroy, or prevent
> competition with any person who either grants or
> knowingly receives the benefit of such discrimination, or
> with customers of either of them[.]

15 U.S.C. § 13(a).  In order to state a claim under Section 2(a),

a plaintiff must allege "(1) two or more consummated sales, (2)

reasonably close in point of time, (3) of commodities, (4) of

like grade and quality, (5) with a difference in price, (6) by

the same seller, (7) to two or more different purchasers, (8) for

use, consumption, or resale within the United States or any

territory thereof, (9) which may result in competitive injury."

Bus. Equip. Ctr., Ltd. v. DeJur-Amsco Corp., Civil Action No. 76-

1680, 1978 WL 1292, at *1 (D.D.C. Jan. 16, 1978); Texaco, Inc. v.

Hasbrouck, 496 U.S. 543, 556 (1990) (requiring two sales at

different prices of commodities of the same grade and quality in

interstate commerce that had a prohibited effect on competition

in order to establish a violation of Section 2(a) of the

Robinson-Patman Act).  In addition, "the price discrimination

must occur between persons in 'actual, functional competition

with one another'" in order to violate the Robinson-Patman Act.

Newberry v. Washington Post Co., 438 F. Supp. 470, 480 (D.D.C.

1977) (internal citation omitted).

     Here, plaintiffs allege that "[d]efendants have maintained

discriminatory price differentials between sales of natural gas

available to [p]laintiffs at wholesale and direct sales to large

retail customers, which has in the past and continues now to

- 44 -

substantially lessen competition." (2d Supp. Compl. ¶ 43.) This claim is faulty for several reasons. It fails to allege "two or more consummated sales . . . reasonably close in point of time" or the existence of a "different purchaser[]" who purchased natural gas "reasonably close in point of time." Bus. Equip. Ctr., Ltd., 1978 WL 1292, at *1. It fails to state when any alleged "direct sales to large retail customers" took place. It does not allege that any defendant made a sale of natural gas to any plaintiff. The omission of an actual sale to a plaintiff is fatal since a single sale to another cannot form the basis of a claim under Section 2(a) of the Robinson-Patman Act. See id. (holding that "[t]he case law is clear that a sale to one and a refusal to sell to another do not satisfy the requirement of sales at discriminatory prices to *two or more purchasers*") (emphasis in original); see also Hasbrouck, 496 U.S. at 556; Newberry v. Washington Post Co., 438 F. Supp. at 480. The plaintiffs fail to state a claim under Section 2(a) of the Robinson-Patman Act. Fed. R. Civ. P. 12(b)(6).

D.   FERC Jurisdiction

Unlike the other defendant gas producers in this action, Coral is a natural gas marketer and is subject to the jurisdiction of the FERC. Because Coral does not produce gas as a marketer, it does not offer natural gas for first sale[9] in the

---

[9]   A first sale is defined as "any sale of any volume of

- 45 -

relevant market.  FERC has exclusive jurisdiction to regulate secondary sales of natural gas.  (Coral's Mem. of Law in Supp. of Mot. to Dismiss ("Mot. to Dismiss") at 2 (citing 15 U.S.C. § 717(b)).)  FERC allows sellers under its jurisdiction to make sales of gas at negotiated rates under blanket marketing certificates, and Coral holds such a certificate.  (Id. at 3.) Under Section 5 of the Natural Gas Act, FERC has authority to modify the rates of all natural gas sales under its jurisdiction. "Whenever [FERC] . . . upon complaint of any State, *municipality*, State commission, or gas distributing company, shall find that any rate . . . charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of [FERC] . . . is unjust, unreasonable, unduly discriminatory, or preferential, [FERC] shall determine the just and reasonable rate . . . to be thereafter observed and in force, and shall fix the same by order."  15 U.S.C. § 717d(a) (emphasis added).

---

natural gas (i) to any interstate pipeline or intrastate pipeline; (ii) to any local distribution company; (iii) to any person for use by such person; (iv) which precedes any sale described in clauses (i), (ii), or (iii); and (v) which precedes or follows any sale described in clauses (i), (ii), (iii), or (iv) and is defined by the Commission as a first sale to prevent circumvention of any maximum lawful price established under this chapter."  15 U.S.C. § 3301(21)(A).

The filed rate doctrine "provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate [or] to assume a rate would be charged other than the rate adopted by the federal agency in question." <u>Transmission Agency of N. Cal. v. Sierra Pac. Power Co.</u>, 295 F.3d 918, 929 (9th Cir. 2002) (internal citation omitted).  Under this doctrine, "[n]o court may substitute its own judgment on reasonableness for the judgment of the [FERC].  The authority to decide whether the rates are reasonable is vested by § 4 of the Act solely in [FERC]." <u>Ark. La. Gas Co. v. Hall</u>, 453 U.S. 571, 577 (1981).  This doctrine applies even though FERC has moved to a market-based rate system.  <u>In re W. States Wholesale Natural Gas Antitrust Litig.</u>, 368 F. Supp. 2d 1110, 1116 (D. Nev. 2005) ("The essential purpose of the filed rate doctrine is to protect the jurisdiction of a regulatory body that Congress has designated to determine whether rates charged, such as those in the natural gas market, are just and reasonable.  Under the Natural Gas Act, FERC retains statutory authority over wholesale natural gas prices and therefore the filed rate doctrine applies even though FERC, in exercising its authority, chose to move toward a market-based system.").  When "[t]he relief sought by [plaintiff] would require the court to set damages by assuming a hypothetical rate," it violates the filed rate doctrine.  <u>Pub.</u>

Util. Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc.,
379 F.3d 641, 651 (9th Cir. 2004).

Plaintiffs may not seek damages from Coral in this action
stemming from the rates that Coral charges for natural gas over
which FERC maintains exclusive jurisdiction.  Coral's motion to
dismiss for failure to state a claim due to the preemption of the
claims by the filed rate doctrine will be granted.

## CONCLUSION

Plaintiffs have standing to raise their claims that the
defendants violated the antitrust laws.  Plaintiffs have failed
to make out a *prima facie* case of personal jurisdiction as to
ChevronTexaco, and its motion to dismiss will be granted.  The
plaintiffs have stated a claim to price fix, but have failed to
state a claim for monopolization, attempted monopolization,
conspiracy to monopolize, or price discrimination as to any
defendants.  Thus, the motions by BP America, ConocoPhillips and
Exxon Mobil to dismiss will be denied in part and granted in
part.  Because FERC maintains exclusive jurisdiction over Coral's
rates, Coral's motion to dismiss will be granted.  Plaintiffs'
motion for leave to file a first and a second supplemental
complaint will be granted.  It is hereby

ORDERED that ChevronTexaco's Motion to Dismiss [28] be, and
hereby is, GRANTED.  It is further

- 48 -

ORDERED that Coral's Motion to Dismiss [27] be, and hereby is, GRANTED.  It is further

ORDERED that the motions to dismiss by BP America [23], ConocoPhillips [24], and Exxon Mobil [26] be, and hereby are, GRANTED IN PART and DENIED IN PART.  Plaintiffs' claims of monopolization, attempted monopolization, conspiracy to monopolize and price discrimination are DISMISSED.  Plaintiffs' claim of conspiracy to fix prices survives.  It is further

ORDERED that plaintiffs' motions [43, 69] for leave to file supplemental complaints be, and hereby are, GRANTED.

SIGNED this 9th day of January, 2007.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge