# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

City of Moundridge
225 S. Christian, P.O. Box 636
Moundridge, KS 67107-0636,

City of Winfield
2701 E. Ninth Ave., P.O. Box 646
Winfield, KS 67156,

City of Chanute
101 S. Lincoln, P.O. Box 667
Chanute, KS 66720,

City of Coffeyville
616 Spring Street, P.O. Box 1629
Coffeyville, KS 67337,

City of Denison
111 Central
Denison, KS 66419,

City of Garnett
131 West 5th Avenue, P.O. Box H
Garnett, KS 66032,

City of Greensburg
239 South Main
Greensburg, KS 67054,

City of Halstead
303 Main, P.O. Box 312
Halstead, KS 67056-0312,

City of Humboldt
701 Bridge St.,  P.O. Box 228
Humboldt, KS 66748,

JURY TRIAL REQUESTED

Case No. 1:04-cv-00940
Judge Richard W. Roberts

filed: June 8, 2004
amended: September 8, 2004
supplemented: January 4, 2006
supplemented: September 27, 2006
amended: May 24, 2007

City of Iola
2 West Jackson, P.O. Box 308
Iola, KS 66749-0308,

City of Kechi
220 W. Kechi Road, P.O. Box 88
Kechi, KS 67067,

City of La Cygne
210 Commercial, P.O. Box 600
La Cygne, KS 66040,

City of Larned
417 Broadway, P.O. Box 70
Larned, KS 67550,

City of Lyons
217 East Ave. South, P.O. Box 808
Lyons, KS 67544,

City of Macon
106 W. Bourke Street, P.O. Box 569
Macon, MO 63552,

City of Minneapolis
218 N. Rock Street
Minneapolis, KS 67467,

City of Osage City
201 S. 5th Street, P.O. Box 250
Osage City, KS 66523,

City of Rensselaer
122 South Van Rensselaer
Rensselaer, IN 47976,

City of Sabinal
501 N. Center, P.O. Box 838
Sabinal, TX 78881,

City of Shelbina
116 E. Walnut Street
Shelbina, MO 63468,

City of Spearville
101 West Avenue A, P.O. Box 441
Spearville, KS 67876,

Village of Stonington
416 N. Main, P.O. Box 290
Stonington, IL 62567, and

City of Wellington
317 South Washington
Wellington, KS 67152,

               Plaintiffs,

     v.

Exxon Mobil Corporation
(CSC, Agent)
1090 Vermont Avenue, N.W.
Washington, DC 20005,

BP America, Inc.
1776 I Street, N.W.
Washington, DC 20036,

Coral Energy Resources, L.P.
c/o Robert A. Burgoyne, Esq.
Fulbright & Jaworski
801 Pennsylvania Avenue N.W.
Washington, DC 20004-2604,

ChevronTexaco Corporation
1401 I Street, N.W., Suite 1200
Washington, DC 20005,

ConocoPhillips Corporation
(United States Corporation
    Company, Agent)
1090 Vermont Avenue, N.W.
Washington, DC 20005, and

Shell Oil Company
(CT Corporation System, Agent)
1015 15th Street, N.W.
Suite 1000
Washington, DC 20005

                    Defendants.

## AMENDED SECOND SUPPLEMENTAL COMPLAINT

The Cities of Moundridge, Kansas; Winfield, Kansas; Chanute, Kansas; Coffeyville, Kansas; Denison, Kansas; Garnett, Kansas; Greensburg, Kansas; Halstead, Kansas; Humboldt, Kansas; Iola, Kansas; Kechi, Kansas; La Cygne, Kansas; Larned, Kansas; Lyons, Kansas; Macon, Missouri; Minneapolis, Kansas; Osage City, Kansas; Rensselaer, Indiana; Sabinal, Texas; Shelbina, Missouri; Spearville, Kansas; Stonington, Illinois; and Wellington, Kansas; Plaintiffs, by their attorneys, bring this action against the Defendants, named herein, and allege as follows:

# I

## <u>JURISDICTION AND VENUE</u>

1.      This Complaint is filed and this action is instituted against the Defendants under Sections 4 and 16 of the Act of Congress of October 15, 1914, as amended, 15 U.S.C. §§ 15, 26,  commonly known as the Clayton Act, in order to restrain, and to provide compensation to the Plaintiffs for, the past and continuing violation by the Defendants as hereinafter set forth, of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and Section 2 of the Clayton Act (15 U.S.C. § 13); and pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and the Court's general venue statutes, 28 U.S.C. §§ 1391(c), 1391(e), 1392(a), 1393(a)(b).

2.      This Court has personal jurisdiction over the Defendants pursuant to either the District of Columbia's general jurisdiction statute (D.C. Code § 13-334(a)), its long-arm statute (D.C. Code § 130423(a)(1)), and/or Section 12 of the Clayton Act (15 U.S.C. § 22). The Defendants are found or transact business in the District of Columbia. Without in any way limiting the generality of the first two sentences of this paragraph, Defendant Shell Oil Company is registered to do business as a foreign corporation in the District of Columbia, where it has a registered agent authorized to accept service of process, and maintains a permanent office in the District at 1401 I Street, N.W., which is headed by a vice president or other officer and whose personnel transact business in the District of Columbia not only with Congress and federal agencies and instrumentalities, but also with the embassies and consulates of foreign governments, non-governmental organizations ("NGOs"), and global institutions.

## II
## <u>THE PARTIES</u>

3.     The Plaintiffs, public corporations organized and existing under the laws of their respective states, own and operate natural gas distribution systems in their respective municipalities, and receive their natural gas supplies at wholesale in interstate commerce through interstate natural gas transmission systems, which convey the natural gas from wellhead sources to the delivery points (city gates) of the Plaintiffs.

4.     Defendants are companies that own and control major supplies of natural gas presently available to serve users of natural gas in the United States. Each of the Defendants "resides or is found or has an agent" in the District of Columbia, under 15 U.S.C. § 15(a), and 15 U.S.C. § 26.

5.     The Plaintiffs have been seeking for a number of years to supply the natural gas requirements of users located within their respective municipalities at reasonable prices, but have been thwarted in their efforts by the Defendants, who have entered combinations or conspiracies in restraint of trade or commerce, and who have also acted to monopolize and increase the wholesale prices for natural gas available to the Plaintiffs in the market.

## III
## <u>TRADE AND COMMERCE</u>

6.     The natural gas industry is composed generally of three functional levels: production, transmission, and distribution. Production encompasses the actual gathering and production of natural gas. Transmission refers to the moving of natural gas via pipeline transmission facilities from points where the natural gas is produced to points of interconnection, where

the gas is delivered to purchasers, which would include municipally owned distribution systems like those of the Plaintiffs, or other utilities, or direct users.

7.      Defendants constitute the major producers of natural gas operating throughout the United States, as well as in Canada. Almost all of the natural gas used in the United States is produced in the United States (including its offshore territories) or in Canada, and the Defendants either directly or indirectly through their interests in other entities that produce natural gas, produce over 70% of the total natural gas used in the United States.

8.      Defendants are engaged in activities to control and unlawfully increase the price of natural gas in the United States in restraint of trade or commerce in the United States. Defendants sell natural gas to natural gas utilities and marketers located in numerous states, and sell such natural gas to such persons across state lines. These sales of natural gas at wholesale by Defendants are in interstate commerce. The alleged violations hereinafter described have prevented and are preventing the flow of natural gas in interstate commerce.

9.      Defendants' ownership or control of natural gas supplies available for sale in the United States give them monopoly power over the sale of natural gas in the wholesale market in the United States, which adversely affects the Plaintiffs' cost of wholesale natural gas. Defendants' ownership of the available supplies of natural gas gives them market power to run up the price for firm natural gas supplies and to reduce or exclude supplies for a sustained period of time, and thereby increase wholesale prices.

10.      Defendants own or control a number of transmission lines, as

well as natural gas marketing entities for the sale and transportation of natural gas produced by them in interstate commerce, and Plaintiffs believe this will be supported by additional evidence after a reasonable opportunity for further investigation or discovery.

## IV

## VIOLATIONS ALLEGED

COUNT I
VIOLATION OF SECTION I OF THE SHERMAN ACT

11.    Plaintiffs incorporate the allegations in paragraphs 1–10 above.

12.    Defendants have imposed unreasonable restraints on the aforesaid trade in commerce of natural gas in the United States in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

13.    In 1999, the Defendants participated in a report issued December 15, 1999 by the National Petroleum Council relating to the availability and price of natural gas in the United States, projected through 2010 (the "December 1999 Report"). The Defendants concluded at that time that the existing and projected supplies of natural gas available for users in the United States could be increased above the 1999 total usage of 22 trillion cubic feet ("Tcf") to a total usage in the United States of approximately 29 Tcf by the year 2010, and that this could be accomplished at an average wellhead sales price of $2.74 per one million British Thermal Units ("MMBtu") over the entire 10-year period. The $2.74 projected average price, at that point, was higher than the existing average wellhead prices, which for the previous eight years had not exceeded $2.00 per MMBtu. However, the Plaintiffs' actual cost of natural gas supplies at the wellhead exceeded $2.74 in 2000, and has

continued to grow substantially higher to the present.

14.    At the same time, because of the high prices, the total U.S. demand was not increasing up to the projected 29 Tcf by 2010, as had been projected in the 1999 National Petroleum Council report, but in fact was decreasing. For 2002, usage was only 19.5 Tcf, and in 2003, natural gas demand had declined to 19.3 Tcf, which the U.S. Energy Information Agency concluded was "due mainly to high prices."

15.    In 2002–2003, the Defendants participated in a revision of the National Petroleum Council report of 1999, which resulted in a new report entitled "Balancing Natural Gas Policy: Fueling the Demands of Our Growing Economy," issued in September 2003 (the "September 2003 Report"). The Defendants, who participated in the study, jointly concluded that "[s]upply and demand are projected to balance at higher price ranges than historical levels" —unless certain new federal legislation was enacted granting substantial subsidies and benefits to natural gas producers. The report showed steadily increasing prices that never fall below $5.00, the level reached in 2003; it projected them to rise to approximately $6.00 in 2004, and to escalate above $6.00 through 2010. The actual sales of natural gas by the Defendants in interstate commerce since mid-2000 have exceeded the $2.74 per MMBtu price projected through 2010 in the original December 1999 Report—and now, exceed the new prices Defendants jointly agreed to in the September 2003 Report. The unanimous participation and concurrence by the Defendants in these high new price levels for sales of natural gas in the United States constituted a "combination formed for the purpose and with the effect of raising, …fixing, pegging, or stabilizing the price of [natural gas] in interstate commerce or foreign commerce," in violation of Section 1 of the Sherman

Act.

16.     The Defendants jointly participated and agreed in the September 2003 Report that "current and higher gas prices are the result of a fundamental shift in the supply and demand balance." However, the September 2003 Report contains no evidence that the existing total resource base of natural gas in Canada and the United States has shrunk from that shown in the December 1999 Report, or that the present resource base is now inadequate to supply the substantially reduced loads that have occurred because of high natural gas prices. Furthermore, all of the Defendants have reported significant increases in profits since 2000, attributed to their sales of natural gas in the United States, despite the substantial reduction in sales resulting from high prices—indicating that their costs of producing the gas have not increased. The U.S. Energy Information Agency has reported that "high prices and a strong drilling effort in 2003 have tended to keep total domestic dry gas output above levels seen in 2002."

17.     Natural gas futures prices reported on the New York Mercantile Exchange on May 26, 2004 were $6.680 per MMBtu for June 2004, increasing to $7.191 for January 2005, resulting from the anticompetitive conduct of Defendants. By combining or conspiring to restrain trade or commerce in the sale of natural gas in interstate commerce in the United States, the Defendants have unlawfully denied Plaintiffs access to a competitive market, to the injury of the Plaintiffs.

18.     Defendants' joint actions to ensure unnecessarily high prices for natural gas have continued unabated and have had the intended result.  By the end of 2004, the average wellhead price for that entire year increased to $5.49 per Mcf, and in 2005 (for the period January through August, prior to the

arrival of Hurricanes Katrina and Rita), to $6.26 per Mcf.

19.    All of the defendants in their third-quarter financial reports have cited the purported shortage of gas resulting from these Hurricanes as a major reason for the dramatic increase in the price of natural gas. The U.S. Energy Information Administration ("EIA") reported on December 1, 2005  that the latest average wellhead price for October 2005 was $10.97 per Mcf. This was $5.14 above the average wellhead price for the previous winter season (December 2004-March 2005) of $5.85 per Mcf, reported at a point in time (October 2005) shortly after Hurricane Rita struck but well before the winter months, when demand is normally greatest. Based on current high prices for winter 2005-2006, it is reasonable to project that the average wellhead price for this winter season will be over $7.00 per Mcf more than the average wellhead price for winter season 2004-2005 of $5.85 per Mcf.

20.    The average wellhead price charged by the defendants is the major component of plaintiffs' wholesale costs for natural gas for their municipal distribution systems. The EIA estimates that the additional cost for delivery of the gas from the wellhead to the city gate is small, averaging only $1.09 per Mcf for the first eight months of 2005.

21.    On December 14, 2005, the natural gas futures prices for the winter months of December 2005 through March 2006 on the New York Mercantile Exchange (NYMEX) were reported as follows:

| | |
|---|---|
| December 2005 | $12.329 per MMBtu |
| January 2006 | $15.378 per MMBtu |
| February 2006 | $15.427 per MMBtu |
| March 2006 | $15.287 per MMBtu |

These prices averaged $7.616 per MMBtu higher than the average wellhead

prices one year earlier for the winter of 2004-2005:

| | |
|---|---|
| December 2004 | $6.25 per Mcf |
| January 2005 | $5.52 per Mcf |
| February 2005 | $5.59 per Mcf |
| March 2005 | $5.96 per Mcf |

22.     Similar increases of approximately $7.00 per MMBtu occurred in the natural gas futures prices at Henry Hub between the winter of 2004-2005 and the current winter of 2005-2006. (The Henry Hub is a pipeline hub on the Louisiana Gulf coast. It is the delivery point for the natural gas futures contracts on the New York Mercantile Exchange (NYMEX). All of the defendants have referred to Henry Hub prices in their reports of third-quarter 2005 financial results, with the exception of Exxon Mobil, which does not break out natural gas prices.) The EIA reported on December 15, 2005, that the futures prices for natural gas at Henry Hub for December 2005 through March 2006, at the end of the week ending December 14, 2005, had settled as follows:

| | |
|---|---|
| December 2005 | $11.730 per MMBtu |
| January 2006 | $14.679 per MMBtu |
| February 2006 | $14.728 per MMBtu |
| March 2006 | $14.602 per MMBtu |

These prices also are over $7.00 per MMBtu higher on average than the natural gas futures prices in 2004 at Henry Hub for the winter of 2004-2005:

| | |
|---|---|
| December 2004 | $6.395 per MMBtu |
| January 2005 | $6.509 per MMBtu |
| February 2005 | $6.454 per MMBtu |
| March 2005 | $6.244 per MMBtu |

23.     The over-$7.00-per-MMBtu increase in natural gas prices within

one year from the winter of 2004-2005 to the winter of 2005-2006—whether measured at the wellhead, NYMEX, or Henry Hub—is over two-and-one-half times as much as the $2.74 per MMBtu total that the defendants projected in the 1999 Report would be reasonably adequate to provide for a large increase in natural gas usage in the United States. Defendants there projected that usage would grow from 22 Tcf, the usage level prior to 2000, to 29 Tcf by 2010.

24.    The average wellhead price of natural gas in the United States in 2006, as reported by the EIA, has increased substantially over the below-$2.00 per Mcf average for the last eight years of the past decade:

| Year | Average U.S. Wellhead Price |
|---|---|
| 1992-99 | $2.00 |
| 2000 | 3.68 |
| 2001 | 4.00 |
| 2002 | 2.95 |
| 2003 | 4.88 |
| 2004 | 5.46 |
| 2005 | 7.51 |
| 2004—5-month avg. | 5.16 |
| 2005—5-month avg. | 5.91 |
| 2006—5-month avg. | 7.05 |

25.    There is no shortage of natural gas in the United States that justifies these high prices. The EIA has reported that proved reserves of dry natural gas in the United States have increased every year since 1999, the date of the 1999 Natural Petroleum Council report:

| Proved Reserves | Change from previous year |
|---|---|

| 1999 | 167.406 Tcf | + 3.365 Tcf |
| 2000 | 177.427 Tcf | + 10.021 Tcf |
| 2001 | 183.460 Tcf | + 6.033 Tcf |
| 2002 | 186.946 Tcf | + 3.486 Tcf |
| 2003 | 189.044 Tcf | + 2.098 Tcf |
| 2004 | 192.513 Tcf | + 3.469 Tcf |

("Proved reserves" are estimated quantities of natural gas that analysis of geologic and engineering data demonstrates with reasonable certainty are recoverable under existing economic and operating conditions. The location, quantity, and grade of the natural gas are usually considered to be well established in such reserves, and the technology exists to extract it. "Dry natural gas" is natural gas that remains after: 1) the liquefiable hydrocarbon portion has been removed from the gas stream (*i.e.*, gas after lease, field, and/or plant separation); and 2) any volumes of non-hydrocarbon gases have been removed, where they occur in sufficient quantity to render the gas unmarketable. Dry natural gas is also known as consumer-grade natural gas.)

26.    The total usage of natural gas in the United States, which at the time of the 1999 Report was 22.4 Tcf, has not substantially increased to the present time. The EIA attributed this fact to the high cost of natural gas.

| Consumption of Dry Natural Gas in the United States | |
|---|---|
| 1999 | 22.405 Tcf |
| 2000 | 23.333 Tcf |
| 2001 | 22.239 Tcf |
| 2002 | 23.007 Tcf |

| 2003 | 22.375 Tcf |
| 2004 | 22.410 Tcf |
| 2005 | 21.870 Tcf |
| 2006 (Jan.-May) | 9.621 Tcf |
| 2005 (Jan.-May) | 10.262 Tcf |

Based on the reported lower consumption in the U.S. from January to May of 2006, it appears that the total consumption in 2006 will be less than the 21.870 Tcf consumed in 2005.

27.    As of 1999, proved reserves of natural gas totaling 167.406 Tcf were adequate to supply the United States' annual requirements of 22.4 Tcf for 7.47 years. Increases in proved reserves each year from 1999 through 2004 resulting in a total of 192.513 Tcf make the U.S. supply adequate to fulfill natural gas requirements, at the currently projected 2006 level of less than 21.8 Tcf, for 9.05 years.

28.    According to the EIA, as of January 1, 2003, the volume of "technically recoverable" U.S. natural gas resources, including 186.9 Tcf in proved reserves, was 1,337.5 Tcf. This is a 59.71-year supply. Subsequently, the EIA reports that the "technically recoverable" U.S. natural gas resources are 1,769.6 Tcf, representing an 80.9-year supply.

29.    Working natural gas levels in storage remain at historic highs. (Working gas is the volume of gas in the reservoir above the level of base gas. Working gas is available to the marketplace. (Base gas, or cushion gas, is the volume of gas intended as permanent inventory in a storage reservoir to maintain adequate pressure and deliverability rates throughout the withdrawal season.)) On September 21, 2006, EIA reported that the working gas in storage was 3.177 Tcf, which is 12.6 percent above last year's five-year average inventory level at this time.

30.    Losses claimed from Hurricanes Katrina and Rita in the Gulf of Mexico are temporary, do not exceed the increased proved reserves for one year, and are a small part of the gas now in storage. On December 9, 2005, the Minerals Management Service ("MMS"), an office of the U.S. Department of the Interior, quantified the "shut-in" volumes of natural gas resulting from Katrina and Rita, from August 26, 2005 until December 9, 2005, as 0.519 Tcf (519.237 Bcf). ("Shut in" means closed temporarily; wells capable of production may be shut in for repair, cleaning, inaccessibility to a market, etc.) The EIA estimated on December 1, 2005 that future shut-in volumes would be only 0.00504 Tcf per week and are expected to end soon; as such, they are clearly negligible. The increase in 2004 of 3.469 Tcf in total proved reserves in the United States exceeds the shut-in volumes resulting from Katrina and Rita by almost seven times. The increase in total proved reserves in 2005 is projected to be as much or more than the 2004 figure.

31.    The increase in total proved natural gas reserves in 2005 and 2006 (not yet reported by EIA) over the 192.523 Tcf of 2004 and the total stored natural gas available in the United States, as reported by EIA on September 21, 2006, of 3.177 Tcf, are more than adequate to provide all projected requirements for natural gas for winter 2006-2007.

32.    The total "shut-in" supplies of natural gas from these hurricanes do not justify a price increase of over $7.00 per Mcf for all natural gas throughout the United States for winter 2005-2006.  The volume of natural gas found by the MMS to have been shut in as of December 9, 2005, as a result of the hurricanes in the Gulf of Mexico—0.519 Tcf—is only 2.3 percent of the current total annual U.S. gas usage of 22.4 Tcf. Based on last winter's average cost at the wellhead from December 2004 through March 2005 of

$6.26 per Mcf, the value of the shut-in gas would be only $3.24 billion to the producer-defendants. However, based on the shortage purportedly created by the shut-in in the Gulf of Mexico as a result of Katrina and Rita, the price of all U.S. natural gas for the 2005-2006 winter season was increased to over $14 per Mcf—more than $7.00 above last winter's wellhead price. (Shut-in gas is not forever lost, but will become available to defendants for sale at a later date. At the present time, all of the flow historically obtainable from the Gulf of Mexico, except 20 Bcf per week, is available.) This results in a total profit of $65.84 billion to U.S. gas producers, including defendants, for the winter heating season alone (December-March). Thus, the producers, even after subtracting $3.24 billion for the shut-in gas, will reap an extra profit of $62.6 billion at the expense of U.S. consumers.

33.    Based on their required financial filings with the Securities and Exchange Commission, reports to shareholders, or market disclosures, each of the defendants has collected substantially increased profits for the first half of 2006, greatly exceeding the considerable profits they reported for the first half of 2005.

|  | 6 Months Ending June 30 | |
|  | 2006 | 2005 |
| Exxon Mobil | $18.70 billion | $15.5 billion |
| Royal Dutch Shell | $14.215 billion | $11.911 billion |
| BP, p.l.c. | $12.889 billion | $12.193 billion |
| ConocoPhillips | $9.422 billion | $5.461 billion |

| ChevronTexaco | $8.349 billion | $6.361 billion |

Royal Dutch Shell and BP, p.l.c. are the corporate parents of defendants Coral Energy Resources, L.P. and BP America, respectively.

34.    Most of the plaintiffs receive all of their supplies of natural gas from regional basins that are far from the Gulf of Mexico. Since Katrina and Rita only impacted facilities in the Gulf area, they have had no effect on the availability of those other domestic sources—yet the plaintiffs' futures prices for winter 2005-2006 have escalated dramatically.

35.    By withholding supplies of natural gas from the market on the pretext of a shortage purportedly caused by the shut-in of gas in the Gulf of Mexico, and otherwise combining or conspiring to restrain trade or commerce in the sale of natural gas in interstate commerce in the United States, the Defendants have unlawfully denied Plaintiffs access to a competitive market, to the injury of the Plaintiffs.

# V
## COUNT II
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT

36.    Plaintiffs incorporate the allegations in paragraphs 1–35 above.

37.    Defendants have monopolized or attempted to monopolize or combine or conspire among themselves or with another person or persons to monopolize the trade and commerce in the United States relating to the sale of natural gas, resulting in the unlawful increase in the price of natural gas therein to the Plaintiffs.

38.    The Defendants own or control over 70% of the total proved reserves of natural gas available to serve purchasers of such gas in the United States, including Plaintiffs, who are dependent on wholesale purchases of gas

for their municipal systems. By withholding available supplies of natural gas from the market to obtain high prices for that gas, the Defendants have monopolized or attempted to monopolize the market, to the injury of the Plaintiffs.

39.    Defendants have willfully engaged, and are illegally engaging, in a cumulative course of conduct intended to monopolize the relevant market for natural gas, including but not limited to agreeing among themselves not to commit but to withhold gas resources, failing to draw upon proved reserves and working gas in storage and other sources of gas available to them, and using Hurricanes Katrina and Rita as a pretext for raising prices.  These practices have no legitimate business justification.  They restrict competition in an unnecessary and unreasonable way.  Defendants have undertaken this course of conduct with the specific intent of monopolizing the market described above.  There is a dangerous probability that, unless restrained, Defendants' course of conduct will succeed, in violation of Sherman Act § 2.

## VI

### COUNT III
### VIOLATION OF SECTION 2 OF THE CLAYTON ACT

40.    Plaintiffs incorporate the allegations in paragraphs 1–39 above.

41.    Defendants have maintained discriminatory price differentials between sales of natural gas available to Plaintiffs at wholesale and direct sales to large retail customers, which has in the past and continues now to substantially lessen competition, in violation of Section 2 of the Clayton Act (15 U.S.C. § 13).

## VII

19

## **EFFECTS**

42.    The foregoing acts have had and will have the following effects, among others:

   (a)    competition in the sale of natural gas at wholesale to the Plaintiffs has been eliminated;

   (b)    trade and commerce in the sale of natural gas has been restrained;

   (c)    the Plaintiffs have been denied the benefit of lower-cost natural gas and an expanded revenue base, which, but for the Defendants' activities, would have been available to them;

   (d)    Plaintiffs have been denied revenues and potential profits from customers not served by reason of acts of Defendants;

   (e)    Plaintiffs' competitive position and viability is threatened; and

   (f)    as a result of Defendants' continuing violations of Sections 1 and 2 of the Sherman Act and Section 2 of the Clayton Act, Plaintiffs have been and will be damaged and are entitled to monetary and injunctive relief.

## **VIII**
## **PRAYER**

WHEREFORE, Plaintiffs pray:

(a)     for a judgment that Defendants have restrained trade and commerce of natural gas in interstate commerce by a combination in the form of a trust or conspiracy by engaging in unlawful price-fixing, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

(b)     for a judgment that the Defendants have restrained trade and commerce by monopolizing or attempting to monopolize, or combining or conspiring with other persons to monopolize any part of the trade or interstate commerce, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

(c)     for a judgment that the Defendants have maintained discriminatory price differentials between sales of natural gas to the Plaintiffs as wholesale customers and in their direct sales to large retail customers to substantially lessen competition, in violation of Section 2 of the Clayton Act (15 U.S.C. § 13);

(d)     for an order as described by Section 4 of the Clayton Act (15 U.S.C. § 15) awarding to Plaintiffs three-fold the monetary relief in damages sustained by them as a result of Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 2 of the Clayton Act (15 U.S.C. § 13);

(e)     for an order permanently enjoining the Defendants, their officers, agents, employees, successors, and all persons in active concern or participation with them, from engaging

in, carrying out, or renewing any contracts, agreements, policies, practices, or understandings or claiming any rights thereunder having the purpose or effect of continuing, reviving, or renewing the aforesaid violations of the Sherman Act and Clayton Act, or any contract, agreement, policy, practice, or understanding having like or similar purpose or effect, in accordance with the provisions of Section 16 of the Clayton Act (15 U.S.C. § 26);

(f)    that the Plaintiffs recover from the Defendants the cost of their suit, and a reasonable attorney's fee; and

(g)    that Plaintiffs have such other and further relief as the Court may deem just and proper.

# IX

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury in this action.

Respectfully submitted,

/s/ Charles F. Wheatley, Jr.
Charles F. Wheatley, Jr., #121533
John F. Woods, #234310
James F. Fairman #14464
WHEATLEY & RANQUIST, P.A.
34 Defense Street
Annapolis, MD 21401
(410) 266-7524
(301) 261-8608 (Washington, DC line)
(301) 261-8699 (fax)
wheatlaw@aol.com

Robert C. Huntley
Idaho State Bar ID #894
HUNTLEY PARK, L.L.P.
250 S. 5th Street, Suite 660
P.O. Box 2188
Boise, ID 83702
(208) 388-1230
(208) 388-0234 (fax)

May 24, 2007                    *Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

City of Moundridge
225 S. Christian, P.O. Box 636
Moundridge, KS 67107-0636,

City of Winfield
2701 E. Ninth Ave., P.O. Box 646
Winfield, KS 67156,

City of Chanute
101 S. Lincoln, P.O. Box 667
Chanute, KS 66720,

City of Coffeyville
616 Spring Street, P.O. Box 1629
Coffeyville, KS 67337,

City of Denison
111 Central
Denison, KS 66419,

City of Garnett
131 West 5th Avenue, P.O. Box H
Garnett, KS 66032,

City of Greensburg
239 South Main
Greensburg, KS 67054,

City of Halstead
303 Main, P.O. Box 312
Halstead, KS 67056-0312,

City of Humboldt
701 Bridge St.,  P.O. Box 228
Humboldt, KS 66748,

JURY TRIAL REQUESTED

Case No. 1:04-cv-00940
Judge Richard W. Roberts

filed: June 8, 2004
amended: September 8, 2004
supplemented: January 4, 2006
supplemented: September 27, 2006
amended: May 24, 2007

City of Iola
2 West Jackson, P.O. Box 308
Iola, KS 66749-0308,

City of Kechi
220 W. Kechi Road, P.O. Box 88
Kechi, KS 67067,

City of La Cygne
210 Commercial, P.O. Box 600
La Cygne, KS 66040,

City of Larned
417 Broadway, P.O. Box 70
Larned, KS 67550,

City of Lyons
217 East Ave. South, P.O. Box 808
Lyons, KS 67544,

City of Macon
106 W. Bourke Street, P.O. Box 569
Macon, MO 63552,

City of Minneapolis
218 N. Rock Street
Minneapolis, KS 67467,

City of Osage City
201 S. 5th Street, P.O. Box 250
Osage City, KS 66523,

City of Rensselaer
122 South Van Rensselaer
Rensselaer, IN 47976,

City of Sabinal
501 N. Center, P.O. Box 838
Sabinal, TX 78881,

City of Shelbina
116 E. Walnut Street
Shelbina, MO 63468,

City of Spearville
101 West Avenue A, P.O. Box 441
Spearville, KS 67876,

Village of Stonington
416 N. Main, P.O. Box 290
Stonington, IL 62567, and

City of Wellington
317 South Washington
Wellington, KS 67152,

    Plaintiffs,

  v.

Exxon Mobil Corporation
(CSC, Agent)
1090 Vermont Avenue, N.W.
Washington, DC 20005,

BP America, Inc.
1776 I Street, N.W.
Washington, DC 20036,

Coral Energy Resources, L.P.
c/o Robert A. Burgoyne, Esq.
Fulbright & Jaworski
801 Pennsylvania Avenue N.W.
Washington, DC 20004-2604,

ChevronTexaco Corporation
1401 I Street, N.W., Suite 1200
Washington, DC 20005, ~~and~~

ConocoPhillips Corporation
(United States Corporation
     Company, Agent)
1090 Vermont Avenue, N.W.
Washington, DC 20005, and

Shell Oil Company
(CT Corporation System, Agent)
1015 15th Street, N.W.
Suite 1000
Washington, DC 20005

Defendants.

## AMENDED SECOND SUPPLEMENTAL COMPLAINT

The Cities of Moundridge, Kansas; Winfield, Kansas; Chanute, Kansas; Coffeyville, Kansas; Denison, Kansas; Garnett, Kansas; Greensburg, Kansas; Halstead, Kansas; Humboldt, Kansas; Iola, Kansas; Kechi, Kansas; La Cygne, Kansas; Larned, Kansas; Lyons, Kansas; Macon, Missouri; Minneapolis, Kansas; Osage City, Kansas; Rensselaer, Indiana; Sabinal, Texas; Shelbina, Missouri; Spearville, Kansas; Stonington, Illinois; and Wellington, Kansas; Plaintiffs, by their attorneys, bring this action against the Defendants, named herein, and allege as follows:

# I

# JURISDICTION AND VENUE

1.    This Complaint is filed and this action is instituted against the Defendants under Sections 4 and 16 of the Act of Congress of October 15, 1914, as amended, 15 U.S.C. §§ 15, 26,  commonly known as the Clayton Act, in order to restrain, and to provide compensation to the Plaintiffs for, the past and continuing violation by the Defendants as hereinafter set forth, of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and Section 2 of the Clayton Act (15 U.S.C. § 13); and pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and the Court's general venue statutes, 28 U.S.C. §§ 1391(c), 1391(e), 1392(a), 1393(a)(b).

2.    This Court has personal jurisdiction over the Defendants pursuant to either the District of Columbia's general jurisdiction statute (D.C. Code § 13-334(a)), its long-arm statute (D.C. Code § 130423(a)(1)), and/or Section 12 of the Clayton Act (15 U.S.C. § 22). The Defendants are found or transact business in the District of Columbia. Without in any way limiting the generality of the first two sentences of this paragraph, Defendant Shell Oil Company is registered to do business as a foreign corporation in the District of Columbia, where it has a registered agent authorized to accept service of process, and maintains a permanent office in the District at 1401 I Street, N.W., which is headed by a vice president or other officer and whose personnel transact business in the District of Columbia not only with Congress and federal agencies and instrumentalities, but also with the embassies and consulates of foreign governments, non-governmental organizations ("NGOs"), and global institutions.

## II
## <u>THE PARTIES</u>

3.    The Plaintiffs, public corporations organized and existing under the laws of their respective states, own and operate natural gas distribution systems in their respective municipalities, and receive their natural gas supplies at wholesale in interstate commerce through interstate natural gas transmission systems, which convey the natural gas from wellhead sources to the delivery points (city gates) of the Plaintiffs.

4.    Defendants are companies that own and control major supplies of natural gas presently available to serve users of natural gas in the United States. Each of the Defendants "resides or is found or has an agent" in the District of Columbia, under 15 U.S.C. § 15(a), and 15 U.S.C. § 26.

5.    The Plaintiffs have been seeking for a number of years to supply the natural gas requirements of users located within their respective municipalities at reasonable prices, but have been thwarted in their efforts by the Defendants, who have entered combinations or conspiracies in restraint of trade or commerce, and who have also acted to monopolize and increase the wholesale prices for natural gas available to the Plaintiffs in the market.

## III
## <u>TRADE AND COMMERCE</u>

6.    The natural gas industry is composed generally of three functional levels: production, transmission, and distribution. Production encompasses the actual gathering and production of natural gas. Transmission refers to the moving of natural gas via pipeline transmission facilities from points where the natural gas is produced to points of interconnection, where

the gas is delivered to purchasers, which would include municipally owned distribution systems like those of the Plaintiffs, or other utilities, or direct users.

7.      Defendants constitute the major producers of natural gas operating throughout the United States, as well as in Canada. Almost all of the natural gas used in the United States is produced in the United States (including its offshore territories) or in Canada, and the Defendants either directly or indirectly through their interests in other entities that produce natural gas, produce over 70% of the total natural gas used in the United States.

8.      Defendants are engaged in activities to control and unlawfully increase the price of natural gas in the United States in restraint of trade or commerce in the United States. Defendants sell natural gas to natural gas utilities and marketers located in numerous states, and sell such natural gas to such persons across state lines. These sales of natural gas at wholesale by Defendants are in interstate commerce. The alleged violations hereinafter described have prevented and are preventing the flow of natural gas in interstate commerce.

9.      Defendants' ownership or control of natural gas supplies available for sale in the United States give them monopoly power over the sale of natural gas in the wholesale market in the United States, which adversely affects the Plaintiffs' cost of wholesale natural gas. Defendants' ownership of the available supplies of natural gas gives them market power to run up the price for firm natural gas supplies and to reduce or exclude supplies for a sustained period of time, and thereby increase wholesale prices.

10.     Defendants own or control a number of transmission lines, as

7

well as natural gas marketing entities for the sale and transportation of natural gas produced by them in interstate commerce, and Plaintiffs believe this will be supported by additional evidence after a reasonable opportunity for further investigation or discovery.

~~11.Defendants compete with Plaintiffs for retail sales and have for a number of years undertaken to sell natural gas directly at retail to numerous customers in competition with the Plaintiffs.~~

~~12.Plaintiffs and Defendants compete (a) for the sale of natural gas at retail within Plaintiffs' service territories; (b) to serve customers located in areas on or within the border of Plaintiffs' service area; and (c) to attract potential customers and retain existing customers.~~

# IV
## VIOLATIONS ALLEGED

### COUNT I
### VIOLATION OF SECTION I OF THE SHERMAN ACT

11.    Plaintiffs incorporate the allegations in paragraphs 1 ~~12~~ 10 above.

12.    Defendants have imposed unreasonable restraints on the aforesaid trade in commerce of natural gas in the United States in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

13.    In 1999, the Defendants participated in a report issued December 15, 1999 by the National Petroleum Council relating to the availability and price of natural gas in the United States, projected through 2010 (the "December 1999 Report"). The Defendants concluded at that time that the existing and projected supplies of natural gas available for users in the United

States could be increased above the 1999 total usage of 22 trillion cubic feet ("Tcf") to a total usage in the United States of approximately 29 Tcf by the year 2010, and that this could be accomplished at an average wellhead sales price of $2.74 per one million British Thermal Units ("MMBtu") over the entire 10-year period. The $2.74 projected average price, at that point, was higher than the existing average wellhead prices, which for the previous eight years had not exceeded $2.00 per MMBtu. However, the Plaintiffs' actual cost of natural gas supplies at the wellhead exceeded $2.74 in 2000, and has continued to grow substantially higher to the present.

14.    At the same time, because of the high prices, the total U.S. demand was not increasing up to the projected 29 Tcf by 2010, as had been projected in the 1999 National Petroleum Council report, but in fact was decreasing. For 2002, usage was only 19.5 Tcf, and in 2003, natural gas demand had declined to 19.3 Tcf, which the U.S. Energy Information Agency concluded was "due mainly to high prices."

15.    In 2002–2003, the Defendants participated in a revision of the National Petroleum Council report of 1999, which resulted in a new report entitled "Balancing Natural Gas Policy: Fueling the Demands of Our Growing Economy," issued in September 2003 (the "September 2003 Report"). The Defendants, who participated in the study, jointly concluded that "[s]upply and demand are projected to balance at higher price ranges than historical levels" —unless certain new federal legislation was enacted granting substantial subsidies and benefits to natural gas producers. The report showed steadily increasing prices that never fall below $5.00, the level reached in 2003; it projected them to rise to approximately $6.00 in 2004, and to escalate above $6.00 through 2010. The actual sales of natural gas by the Defendants

in interstate commerce since mid-2000 have exceeded the $2.74 per MMBtu price projected through 2010 in the original December 1999 Report—and now, exceed the new prices Defendants jointly agreed to in the September 2003 Report. The unanimous participation and concurrence by the Defendants in these high new price levels for sales of natural gas in the United States constituted a "combination formed for the purpose and with the effect of raising, …fixing, pegging, or stabilizing the price of [natural gas] in interstate commerce or foreign commerce," in violation of Section 1 of the Sherman Act.

16.    The Defendants jointly participated and agreed in the September 2003 Report that "current and higher gas prices are the result of a fundamental shift in the supply and demand balance." However, the September 2003 Report contains no evidence that the existing total resource base of natural gas in Canada and the United States has shrunk from that shown in the December 1999 Report, or that the present resource base is now inadequate to supply the substantially reduced loads that have occurred because of high natural gas prices. Furthermore, all of the Defendants have reported significant increases in profits since 2000, attributed to their sales of natural gas in the United States, despite the substantial reduction in sales resulting from high prices—indicating that their costs of producing the gas have not increased. The U.S. Energy Information Agency has reported that "high prices and a strong drilling effort in 2003 have tended to keep total domestic dry gas output above levels seen in 2002."

17.    Natural gas futures prices reported on the New York Mercantile Exchange on May 26, 2004 were $6.680 per MMBtu for June 2004, increasing to $7.191 for January 2005, resulting from the anticompetitive

conduct of Defendants. By combining or conspiring to restrain trade or commerce in the sale of natural gas in interstate commerce in the United States, the Defendants have unlawfully denied Plaintiffs access to a competitive market, to the injury of the Plaintiffs.

18.     Defendants' joint actions to ensure unnecessarily high prices for natural gas have continued unabated and have had the intended result.  By the end of 2004, the average wellhead price for that entire year increased to $5.49 per Mcf, and in 2005 (for the period January through August, prior to the arrival of Hurricanes Katrina and Rita), to $6.26 per Mcf.

19.     All of the defendants in their third-quarter financial reports have cited the purported shortage of gas resulting from these Hurricanes as a major reason for the dramatic increase in the price of natural gas. The U.S. Energy Information Administration ("EIA") reported on December 1, 2005  that the latest average wellhead price for October 2005 was $10.97 per Mcf. This was $5.14 above the average wellhead price for the previous winter season (December 2004-March 2005) of $5.85 per Mcf, reported at a point in time (October 2005) shortly after Hurricane Rita struck but well before the winter months, when demand is normally greatest. Based on current high prices for winter 2005-2006, it is reasonable to project that the average wellhead price for this winter season will be over $7.00 per Mcf more than the average wellhead price for winter season 2004-2005 of $5.85 per Mcf.

20.     The average wellhead price charged by the defendants is the major component of plaintiffs' wholesale costs for natural gas for their municipal distribution systems. The EIA estimates that the additional cost for delivery of the gas from the wellhead to the city gate is small, averaging only $1.09 per Mcf for the first eight months of 2005.

21.    On December 14, 2005, the natural gas futures prices for the winter months of December 2005 through March 2006 on the New York Mercantile Exchange (NYMEX) were reported as follows:

| | |
|---|---|
| December 2005 | $12.329 per MMBtu |
| January 2006 | $15.378 per MMBtu |
| February 2006 | $15.427 per MMBtu |
| March 2006 | $15.287 per MMBtu |

These prices averaged $7.616 per MMBtu higher than the average wellhead prices one year earlier for the winter of 2004-2005:

| | |
|---|---|
| December 2004 | $6.25 per Mcf |
| January 2005 | $5.52 per Mcf |
| February 2005 | $5.59 per Mcf |
| March 2005 | $5.96 per Mcf |

22.    Similar increases of approximately $7.00 per MMBtu occurred in the natural gas futures prices at Henry Hub between the winter of 2004-2005 and the current winter of 2005-2006. (The Henry Hub is a pipeline hub on the Louisiana Gulf coast. It is the delivery point for the natural gas futures contracts on the New York Mercantile Exchange (NYMEX). All of the defendants have referred to Henry Hub prices in their reports of third-quarter 2005 financial results, with the exception of Exxon Mobil, which does not break out natural gas prices.) The EIA reported on December 15, 2005, that the futures prices for natural gas at Henry Hub for December 2005 through March 2006, at the end of the week ending December 14, 2005, had settled as follows:

| | |
|---|---|
| December 2005 | $11.730 per MMBtu |
| January 2006 | $14.679 per MMBtu |
| February 2006 | $14.728 per MMBtu |

      March 2006      $14.602 per MMBtu

These prices also are over $7.00 per MMBtu higher on average than the

natural gas futures prices in 2004 at Henry Hub for the winter of 2004-2005:

      December 2004    $6.395 per MMBtu
      January 2005     $6.509 per MMBtu
      February 2005    $6.454 per MMBtu
      March 2005      $6.244 per MMBtu

      23.    The over-$7.00-per-MMBtu increase in natural gas prices within

one year from the winter of 2004-2005 to the winter of 2005-2006—whether

measured at the wellhead, NYMEX, or Henry Hub—is over two-and-one-half

times as much as the $2.74 per MMBtu total that the defendants projected in

the 1999 Report would be reasonably adequate to provide for a large increase

in natural gas usage in the United States. Defendants there projected that

usage would grow from 22 Tcf, the usage level prior to 2000, to 29 Tcf by

2010.

      24.    The average wellhead price of natural gas in the United States in

2006, as reported by the EIA, has increased substantially over the below-

$2.00 per Mcf average for the last eight years of the past decade:

| Year | Average U.S. Wellhead Price |
|---|---|
| 1992-99 | $2.00 |
| 2000 | 3.68 |
| 2001 | 4.00 |
| 2002 | 2.95 |
| 2003 | 4.88 |
| 2004 | 5.46 |
| 2005 | 7.51 |
| 2004—5-month avg. | 5.16 |

| 2005—5-month avg. | 5.91 |
|---|---|
| 2006—5-month avg. | 7.05 |

25.    There is no shortage of natural gas in the United States that justifies these high prices. The EIA has reported that proved reserves of dry natural gas in the United States have increased every year since 1999, the date of the 1999 Natural Petroleum Council report:

|  | Proved Reserves | Change from previous year |
|---|---|---|
| 1999 | 167.406 Tcf | +  3.365 Tcf |
| 2000 | 177.427 Tcf | + 10.021 Tcf |
| 2001 | 183.460 Tcf | +  6.033 Tcf |
| 2002 | 186.946 Tcf | +  3.486 Tcf |
| 2003 | 189.044 Tcf | +  2.098 Tcf |
| 2004 | 192.513 Tcf | +  3.469 Tcf |

("Proved reserves" are estimated quantities of natural gas that analysis of geologic and engineering data demonstrates with reasonable certainty are recoverable under existing economic and operating conditions. The location, quantity, and grade of the natural gas are usually considered to be well established in such reserves, and the technology exists to extract it. "Dry natural gas" is natural gas that remains after: 1) the liquefiable hydrocarbon portion has been removed from the gas stream (*i.e.*, gas after lease, field, and/or plant separation); and 2) any volumes of non-hydrocarbon gases have been removed, where they occur in sufficient quantity to render the gas unmarketable. Dry natural gas is also known as consumer-grade natural gas.)

26.    The total usage of natural gas in the United States, which at the time of the 1999 Report was 22.4 Tcf, has not substantially increased to the present time. The EIA attributed this fact to the high cost of natural gas.

| Consumption of Dry Natural Gas in the United States | |
|---|---|
| 1999 | 22.405 Tcf |
| 2000 | 23.333 Tcf |
| 2001 | 22.239 Tcf |
| 2002 | 23.007 Tcf |
| 2003 | 22.375 Tcf |
| 2004 | 22.410 Tcf |
| 2005 | 21.870 Tcf |
| 2006 (Jan.-May) | 9.621 Tcf |
| 2005 (Jan.-May) | 10.262 Tcf |

Based on the reported lower consumption in the U.S. from January to May of 2006, it appears that the total consumption in 2006 will be less than the 21.870 Tcf consumed in 2005.

27.    As of 1999, proved reserves of natural gas totaling 167.406 Tcf were adequate to supply the United States' annual requirements of 22.4 Tcf for 7.47 years. Increases in proved reserves each year from 1999 through 2004 resulting in a total of 192.513 Tcf make the U.S. supply adequate to fulfill natural gas requirements, at the currently projected 2006 level of less than 21.8 Tcf, for 9.05 years.

28.    According to the EIA, as of January 1, 2003, the volume of "technically recoverable" U.S. natural gas resources, including 186.9 Tcf in proved reserves, was 1,337.5 Tcf. This is a 59.71-year supply. Subsequently, the EIA reports that the "technically recoverable" U.S. natural gas resources are 1,769.6 Tcf, representing an 80.9-year supply.

29.    Working natural gas levels in storage remain at historic highs. (Working gas is the volume of gas in the reservoir above the level of base gas. Working gas is available to the marketplace. (Base gas, or cushion gas, is the volume of gas intended as permanent inventory in a storage reservoir to maintain adequate pressure and deliverability rates throughout the withdrawal season.)) On September 21, 2006, EIA reported that the working gas in storage was 3.177 Tcf, which is 12.6 percent above last year's five-year average inventory level at this time.

30.    Losses claimed from Hurricanes Katrina and Rita in the Gulf of Mexico are temporary, do not exceed the increased proved reserves for one year, and are a small part of the gas now in storage. On December 9, 2005, the Minerals Management Service ("MMS"), an office of the U.S. Department of the Interior, quantified the "shut-in" volumes of natural gas resulting from Katrina and Rita, from August 26, 2005 until December 9, 2005, as 0.519 Tcf (519.237 Bcf). ("Shut in" means closed temporarily; wells capable of production may be shut in for repair, cleaning, inaccessibility to a market, etc.) The EIA estimated on December 1, 2005 that future shut-in volumes would be only 0.00504 Tcf per week and are expected to end soon; as such, they are clearly negligible. The increase in 2004 of 3.469 Tcf in total proved reserves in the United States exceeds the shut-in volumes resulting from Katrina and Rita by almost seven times. The increase in total proved reserves in 2005 is projected to be as much or more than the 2004 figure.

31.    The increase in total proved natural gas reserves in 2005 and 2006 (not yet reported by EIA) over the 192.523 Tcf of 2004 and the total stored natural gas available in the United States, as reported by EIA on September 21, 2006, of 3.177 Tcf, are more than adequate to provide all

projected requirements for natural gas for winter 2006-2007.

32.    The total "shut-in" supplies of natural gas from these hurricanes do not justify a price increase of over $7.00 per Mcf for all natural gas throughout the United States for winter 2005-2006.  The volume of natural gas found by the MMS to have been shut in as of December 9, 2005, as a result of the hurricanes in the Gulf of Mexico—0.519 Tcf—is only 2.3 percent of the current total annual U.S. gas usage of 22.4 Tcf. Based on last winter's average cost at the wellhead from December 2004 through March 2005 of $6.26 per Mcf, the value of the shut-in gas would be only $3.24 billion to the producer-defendants. However, based on the shortage purportedly created by the shut-in in the Gulf of Mexico as a result of Katrina and Rita, the price of all U.S. natural gas for the 2005-2006 winter season was increased to over $14 per Mcf—more than $7.00 above last winter's wellhead price. (Shut-in gas is not forever lost, but will become available to defendants for sale at a later date. At the present time, all of the flow historically obtainable from the Gulf of Mexico, except 20 Bcf per week, is available.) This results in a total profit of  $65.84 billion to U.S. gas producers, including defendants, for the winter heating season alone (December-March). Thus, the producers, even after subtracting $3.24 billion for the shut-in gas, will reap an extra profit of $62.6 billion at the expense of U.S. consumers.

33.    Based on their required financial filings with the Securities and Exchange Commission, reports to shareholders, or market disclosures, each of the defendants has collected substantially increased profits for the first half of 2006, greatly exceeding the considerable profits they reported for the first half of 2005.

|  | 6 Months Ending June 30 | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Exxon Mobil | $18.70 billion | $15.5 billion |
| Royal Dutch Shell | $14.215 billion | $11.911 billion |
| BP, p.l.c. | $12.889 billion | $12.193 billion |
| ConocoPhillips | $9.422 billion | $5.461 billion |
| ChevronTexaco | $8.349 billion | $6.361 billion |

Royal Dutch Shell and BP, p.l.c. are the corporate parents of defendants Coral Energy Resources, L.P. and BP America, respectively.

34.    Most of the plaintiffs receive all of their supplies of natural gas from regional basins that are far from the Gulf of Mexico. Since Katrina and Rita only impacted facilities in the Gulf area, they have had no effect on the availability of those other domestic sources—yet the plaintiffs' futures prices for winter 2005-2006 have escalated dramatically.

35.    By withholding supplies of natural gas from the market on the pretext of a shortage purportedly caused by the shut-in of gas in the Gulf of Mexico, and otherwise combining or conspiring to restrain trade or commerce in the sale of natural gas in interstate commerce in the United States, the Defendants have unlawfully denied Plaintiffs access to a competitive market, to the injury of the Plaintiffs.

## V
### COUNT II
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT

36.    Plaintiffs incorporate the allegations in paragraphs 1–37 35

above.

37.    Defendants have monopolized or attempted to monopolize or combine or conspire among themselves or with another person or persons to monopolize the trade and commerce in the United States relating to the sale of natural gas, resulting in the unlawful increase in the price of natural gas therein to the Plaintiffs.

38.    The Defendants own or control over 70% of the total proved reserves of natural gas available to serve purchasers of such gas in the United States, including Plaintiffs, who are dependent on wholesale purchases of gas for their municipal systems. By withholding available supplies of natural gas from the market to obtain high prices for that gas, the Defendants have monopolized or attempted to monopolize the market, to the injury of the Plaintiffs.

39.    Defendants have willfully engaged, and are illegally engaging, in a cumulative course of conduct intended to monopolize the relevant market for natural gas, including but not limited to agreeing among themselves not to commit but to withhold gas resources, failing to draw upon proved reserves and working gas in storage and other sources of gas available to them, and using Hurricanes Katrina and Rita as a pretext for raising prices. These practices have no legitimate business justification. They restrict competition in an unnecessary and unreasonable way. Defendants have undertaken this course of conduct with the specific intent of monopolizing the market described above. There is a dangerous probability that, unless restrained, Defendants' course of conduct will succeed, in violation of Sherman Act § 2.

**VI**

COUNT III
VIOLATION OF SECTION 2 OF THE CLAYTON ACT

40.     Plaintiffs incorporate the allegations in paragraphs 1—41 39 above.

41.     Defendants have maintained discriminatory price differentials between sales of natural gas available to Plaintiffs at wholesale and direct sales to large retail customers, which has in the past and continues now to substantially lessen competition, in violation of Section 2 of the Clayton Act (15 U.S.C. § 13).

**VII**

**EFFECTS**

42.     The foregoing acts have had and will have the following effects, among others:

   (a)     competition in the sale of natural gas at wholesale to the Plaintiffs has been eliminated;

   (b)     trade and commerce in the sale of natural gas has been restrained;

   (c)     the Plaintiffs have been denied the benefit of lower-cost natural gas and an expanded revenue base, which, but for the Defendants' activities, would have been available to them;

   (d)     Plaintiffs have been denied revenues and potential profits from customers not served by reason of acts of Defendants;

   (e)     Plaintiffs' competitive position and viability is threatened;

and

(f)    as a result of Defendants' continuing violations of Sections 1 and 2 of the Sherman Act and Section 2 of the Clayton Act, Plaintiffs have been and will be damaged and are entitled to monetary and injunctive relief.

# VIII
# PRAYER

WHEREFORE, Plaintiffs pray:

(a)    for a judgment that Defendants have restrained trade and commerce of natural gas in interstate commerce by a combination in the form of a trust or conspiracy by engaging in unlawful price-fixing, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

(b)    for a judgment that the Defendants have restrained trade and commerce by monopolizing or attempting to monopolize, or combining or conspiring with other persons to monopolize any part of the trade or interstate commerce, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

(c)    for a judgment that the Defendants have maintained discriminatory price differentials between sales of natural gas to the Plaintiffs as wholesale customers and in their direct sales to large retail customers to substantially lessen

21

competition, in violation of Section 2 of the Clayton Act (15 U.S.C. § 13);

(d)    for an order as described by Section 4 of the Clayton Act (15 U.S.C. § 15) awarding to Plaintiffs three-fold the monetary relief in damages sustained by them as a result of Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 2 of the Clayton Act (15 U.S.C. § 13);

(e)    for an order permanently enjoining the Defendants, their officers, agents, employees, successors, and all persons in active concern or participation with them, from engaging in, carrying out, or renewing any contracts, agreements, policies, practices, or understandings or claiming any rights thereunder having the purpose or effect of continuing, reviving, or renewing the aforesaid violations of the Sherman Act and Clayton Act, or any contract, agreement, policy, practice, or understanding having like or similar purpose or effect, in accordance with the provisions of Section 16 of the Clayton Act (15 U.S.C. § 26);

(f)    that the Plaintiffs recover from the Defendants the cost of their suit, and a reasonable attorney's fee; and

(g)    that Plaintiffs have such other and further relief as the Court may deem just and proper.

## IX

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury in this action.

Respectfully submitted,

<u>/s/ Charles F. Wheatley, Jr.          </u>
Charles F. Wheatley, Jr., #121533
John F. Woods, #234310
James F. Fairman #14464
WHEATLEY & RANQUIST, P.A.
34 Defense Street
Annapolis, MD 21401
(410) 266-7524
(301) 261-8608 (Washington, DC line)
(301) 261-8699 (fax)
wheatlaw@aol.com

Robert C. Huntley
Idaho State Bar ID #894
HUNTLEY PARK, L.L.P.
250 S. 5th Street, Suite 660
P.O. Box 2188
Boise, ID 83702
(208) 388-1230
(208) 388-0234 (fax)

May 24, 2007                         *Counsel for Plaintiffs*

23